**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **PATRICIA JOHNSON, on behalf of herself and all others similarly situated,**<br><br>    Plaintiff,<br>vs.<br><br>**BAC HOME LOANS SERVICING, LP, a subsidiary of BANK OF AMERICA, N.A.**<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>) C.A. NO. 10-10316<br>)<br>)<br>)<br>)<br>) **CLASS ACTION COMPLAINT**<br>)<br>) **JURY TRIAL DEMANDED**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**INTRODUCTION**

1.   Patricia Johnson ("Plaintiff") brings this suit on behalf of herself and a class of similarly situated Massachusetts residents to challenge the failure of Defendant, BAC Home Loans Servicing, LP, a subsidiary of Bank of America, N.A. ("Defendant" or "BAC") to honor its agreements with borrowers to modify mortgages and prevent foreclosures under the United States Treasury's Home Affordable Modification Program ("HAMP").

2.   Plaintiff's claims are simple – when a large financial institution promises to modify an eligible loan to prevent foreclosure, homeowners who live up to their end of the bargain expect that

promise to be kept. This is especially true when the financial institution is acting under the aegis of a federal program that is specifically targeted at preventing foreclosure.

3. In October 2008, Bank of America accepted $15 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211. In January 2009, in connection with its acquisition of Merrill Lynch, Bank of America accepted another $10 billion in TARP funds as well as a partial guarantee against losses on $118 billion in mortgage-related assets. In April 2009, Bank of America signed a contract with the U.S. Treasury (attached as Exhibit 1 and included by reference) agreeing to participate in HAMP -- a program in which BAC, as the servicing arm of Bank of America, received incentive payments for providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers.

4. As a participating servicer in HAMP, BAC has, in turn, entered into a written agreement with Plaintiff for a temporary trial modification. Plaintiff, for her part, has complied with these agreements by submitting the required documentation and making payments. Despite Plaintiff's efforts, Defendant BAC has ignored its contractual obligation to permanently modify her loan.

5. As a result, Plaintiff and hundreds, if not thousands, of other Massachusetts homeowners are wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes. Defendant's actions thwart the purpose of HAMP and are illegal under Massachusetts law.

## JURISDICTION

6. Plaintiff invokes the jurisdiction of this Court pursuant to 28 U.S.C. § 1332 because this action is between parties that are citizens of different states and the amount in controversy is greater than $75,000. For diversity jurisdiction purposes, a national bank is a citizen of the state designated as its main office on its organization certificate. *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 306

(2006).  BAC is, on information and belief, a citizen of North Carolina.  Plaintiff is a citizen of Massachusetts.

7.      This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d) in that this matter is brought as a putative class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a State different from any defendant.

8.      Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) inasmuch as the unlawful practices are alleged to have been committed in this District, Defendant regularly conducts business in this District, and the named Plaintiff resides in this District.

## PARTIES

9.      Patricia Johnson is a 72 year old woman residing alone at 23 Barr Street, Salem, MA 01970 (hereinafter "Barr Street").

10.     Bank of America, N.A. is a mortgage lender with headquarters at 101 Tryon Street, Charlotte, NC 28255.

11.     BAC Home Loans Servicing, LP is a subsidiary of Bank of America, N.A., located at 4500 Park Granada, Calabasas, CA 91302.

## FACTUAL BACKGROUND

### *The Foreclosure Crisis*

12.     Over the last three years, the United States has been in a foreclosure crisis.  A congressional oversight panel has recently noted that one in eight U.S. mortgages is currently in foreclosure or default.[1]

---

[1] Congressional Oversight Panel, Oct. 9, 2009 report at 3.  Available at http://cop.senate.gov/reports/library/report-100909-cop.cfm.

13.     The number of Massachusetts properties with foreclosure filings in 2008 was 150% higher than in 2007 and 577% higher than in 2006 – a near seven-fold increase in only two years.[2]

14.     According to 2009 data, the numbers continue to rise; in the third quarter of 2009, foreclosures were filed on 12,667 Massachusetts properties, a 35% increase over the same period of 2008.[3] Overall in 2009, over 36,000 individual properties in Massachusetts had foreclosure filings against them which, while slightly less than 2008, still represents an increase of over 100% from 2007 levels and an increase of more than 400% over 2004.[4]

15.     Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the surrounding neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

16.     State legislative efforts were able to temporarily slow the pace of completed foreclosures in 2009, but toward the end of the year, the number of new filings once again rose, demonstrating that foreclosures were merely delayed, not prevented.[5]

17.     The foreclosure crisis is not over.  Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith until sometime in 2011.  *See* Eric Tymoigne, Securitization, Deregulation, Economic Stability, and Financial Crisis, Working Paper No. 573.2 at 9, Figure 30 *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1458413 (citing a Credit Suisse study showing monthly mortgage rate resets).

---

[2] RealtyTrac Staff. Foreclosure Activity Increases 81 Percent in 2008. Jan. 15, 2009. Available at http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&accnt=0&itemid=5681.
[3] RealtyTrac Staff. U.S. Foreclosure Activity Increases 5 Percent in Q3. Oct. 15, 2009. Available at http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&accnt=0&itemid=7706.
[4] RealtyRrac Staff.  RealtyTrac Year End Report Shows Record 2.8 Million U.S. Properties with Foreclosure Filings in 2009.  Available at http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&itemid=8333
[5] For 2007 comparison, see Gavin, Robert. Fewer Lose Their Homes in August. Boston Globe. Sept. 23, 2009. Available at
http://www.boston.com/realestate/news/articles/2009/09/23/foreclosures_in_mass_drop_but_petitions_soar/.

*Creation of the Home Affordable Modification Program*

18. Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act"). 12 U.S.C.A. §5201 *et. seq.* (2009).

19. The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership." 12 U.S.C.A. §5201.

20. The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP. 12 U.S.C. § 5211. Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions. *Id.*

21. Congress allocated up to $700 billion to the United States Department of the Treasury for TARP. 12 U.S.C. § 5225.

22. In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).

23. The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures." 12 U.S.C.A. §5219.

24. The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." *Id.*

25. The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures on the Federal Housing Finance Agency, Federal National Mortgage Association ("Fannie Mae"), Federal Home Loan Mortgage Corporation

("Freddie Mac") and the Federal Reserve Board in their roles as "Federal property managers." 12 U.S.C.A. §5220.

26. On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

27. The Making Home Affordable program consists of two subprograms. The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.

28. The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now know as the Home Affordable Modification Program, or HAMP. It is this subprogram that is at issue in this case.

29. HAMP is funded by the federal government, primarily with TARP funds. The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

30. Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to the existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1000.00 for each HAMP modification.

*Broken Promises Under HAMP*

31. The industry entities that perform the actual interface with borrowers – including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure – are known as "servicers." Servicers typically act as the agents of the entities that hold mortgage loans. BAC

Home Loans Servicing, LP is a servicing business operated by Bank of America, N.A. and its actions described herein were made as agents for the entities that hold mortgage loans.

32. Should a servicer elect to participate in HAMP,[6] they execute a Servicer Participation Agreement ("SPA") with the federal government.

33. On April 19, 2009, Steve R. Bailey, Senior Vice President of Bank of America, N.A. executed an SPA, thereby making BAC a participating servicer in HAMP. A copy of this SPA is attached hereto as Exhibit 1.

34. The SPA executed by Mr. Bailey incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers. These documents together are known as the "Program Documentation" (SPA 1.B.), and are incorporated by reference herein.

35. The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services." (SPA 1.A., 2.A.)[7]

36. The Program Documentation requires Participating Servicers to evaluate *all loans*, which are 60 or more days delinquent for HAMP modifications. (SD 09-01 p. 4.) In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if HAMP is appropriate for the borrower.

---

[6] Certain classes of loans, namely those held by Fannie Mae, Freddie Mac or companies that accepted money under the TARP program are subject to mandatory inclusion in HAMP. Otherwise, participation by servicers in the HAMP program is voluntary.

[7] The Program Documentation also includes Supplemental Directive 09-01 ("SD 09-01," attached hereto as Exhibit 2), Home Affordable Modification Program; Base Net Present Value (NPV) Model Specifications ("NPV Overview," attached hereto as Exhibit 3) and Supplemental Documentation—Frequently Asked Questions ("HAMPFAQS," attached hereto as Exhibit 4) and Supplemental Directive 09-08 ("SD 09-08," attached hereto as Exhibit 5). These documents together describe the basic activities required under HAMP and are incorporated by reference in the TPP Agreement signed by Plaintiff and herein.

37. A HAMP Modification consists of two stages. First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP").[8] The TPP consists of a three-month period in which the homeowner makes mortgage payments based on a formula that uses the initial financial information provided.

38. BAC offers TPPs to eligible homeowners by way of a TPP Agreement, which describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

39. If the homeowner executes the TPP Agreement, complies with all documentation requirements and makes all three TPP monthly payments, the second stage of the HAMP process is triggered, in which the homeowner is offered a permanent modification.

40. BAC has routinely failed to live up to its end of the TPP Agreement and offer permanent modifications to homeowners. In February 2010, the U.S. Treasury reported that BAC's parent company had 1,066,025 HAMP-eligible loans in its portfolio. Trial periods have been started on only 237,766 of these loans. Of those, just 12,761 resulted in permanent modifications (only 5% of the started Trial modifications and 1% of the eligible pool) even though many more homeowners had made the payments and submitted the documentation required by the TPP Agreement. The Treasury Report is attached hereto as Exhibit 6.

41. By failing to live up to the TPP Agreement and convert TPPs into permanent modifications, BAC is not only leaving homeowners in limbo, wondering if their homes can be saved, BAC is also preventing homeowners from pursuing other avenues of resolution, including

---

[8] The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the modification, are explained in detail in SD 09-01, attached hereto as Exhibit 2. Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income for the next five years.

using the money they are putting toward TPP payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their default.

*Patricia Johnson*

42. Plaintiff Patricia Johnson has been an owner of her Barr Street home since at least January 10, 1989. She has lived there for approximately twenty (20) years.

43. On May 24, 2006, Plaintiff took out a $238,000 mortgage loan (hereinafter the "mortgage loan") for her residence at Barr Street from Countrywide Home Loans, Inc. At that time, Patricia Johnson worked as a bookkeeper and a flea market retailer.

44. The servicing of the Plaintiff's mortgage loan was transferred to the Defendant BAC sometime after 5/24/06 and continues to this date.

45. Soon after taking out the mortgage loan, Patricia Johnson began experiencing hardships such as challenges related to her advancing age, lost income, increasing costs of living and mounting credit card debt which all combined to cause her to have difficulty making payments on her mortgage loan and resulted in her falling behind on her payments.

46. In 2009 Patricia Johnson sought help from her loan servicer in preserving her home of many years and making her mortgage more affordable. She applied for a HAMP loan modification.

47. By July, 2009 Patricia Johnson was about 10 months behind in her mortgage payments.

48. By letter date July 3, 2009 BAC offered Patricia Johnson a loan modification entitled *Home Affordable Modification Trial Period Plan* (hereinafter Trial Period Plan or TPP). A copy of the cover materials for the offer is attached hereto as Exhibit 7. Among the documents required by BAC to accompany Patricia Johnson's acceptance of the offer was a signed IRS Form 4506-T, which allows BAC to obtain a copy of her most recent tax return, and a "copy of the most recent filed federal tax return with all schedules." BAC did not require a signed copy of her tax return.

9

49. The TPP provided that the plan was effective August 2, 2009 and would run from August, 2009 to October, 2009. Her monthly mortgage payments (Principle, Interest, Taxes and Insurance) were reduced to $1,188.33 effective August, 2009.

50. The TPP agreement is entitled "Home Affordable Modification Program Loan Trial Period," and the first sentence of the agreement provides: "If I am in compliance with this Loan Trial Period and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement, as set forth in Section 3 [below], that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."

51. On July 29, 2009, Patricia Johnson executed the TPP Agreement, along with a hardship affidavit and included documents requested by Defendant BAC Home Loan Servicing, LP and sent them to the Defendant via facsimile and Federal Express. A copy of the executed TPP Agreement and partially redacted supporting documentation is attached hereto as Exhibit 8. She supplemented her filing by fax the next day to correct a clerical error as regards copies of her bank statements. A partially redacted copy of this supplement is attached hereto as Exhibit 9.

52. The Trial Period Plan states "I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of the Plan if I qualify for the Offer or will send me written notice that I do not qualify for the offer." Nevertheless, BAC Home Loan Servicing, LP has sent neither a signed copy of the Plan, nor a written rejection.

53. Patricia Johnson timely made each of the probationary payments contemplated in the TPP Agreement due in August, September and October, 2009. She has also made timely payments due in November and December, 2009 and January, 2010.

54. In an effort to identify who the holder of the mortgage loan is, Patricia Johnson, through her attorney, sent an August 10, 2009 letter to Bank of America pursuant to 15 U.S.C. § 1641(f) asking that it identify, among other things, the name, address and telephone number of the owner of the mortgage loan. A copy of this letter is attached hereto as Exhibit 10. Bank of America Home Loans replied by letter dated September 1, 2009 to Patricia Johnson and by letter dated August 31, 2009 to her counsel that "Please be advised that the above referenced mortgage is backed by/owned by a private investor." and "Regrettably, we cannot provide you with the private investor's name or information. However, please know that as details of the bill (Homeowner Affordability and Stability Plan) become known we will contact qualified borrowers." A copy of these letters is attached hereto as Exhibit 11.

55. Despite being in the midst of her Trial Period and having made timely payments pursuant to the TPP Agreement, the Defendant made collection calls to the home of Patricia Johnson in August, 2009. When counsel for Patricia Johnson called the Defendant to protest the collection calls because she was in the midst of a Trial Period he was informed that the collection calls would continue, Trial Period notwithstanding. The Defendant continued to make collection calls to Patricia Johnson during her Trial Period.

56. BAC did not offer Patricia Johnson a permanent loan modification by the end of October 2009, which was the end of the originally identified Trial Period.

57. Following the end of the originally identified Trial Period, Patricia Johnson continued to be in compliance with the terms of the TPP Agreement and her representations to the Defendant continued to be true in all material respects. Despite this and without any warning that BAC considered there to be a problem with documentation, by letter dated November 13, 2009 Bank of America Home Loans sent Patricia Johnson a letter containing the following:

> Thank you for making your trial period mortgage payments as part of the federal government's Home Affordable Modification Program. Your trial period has expired, and we have determined that, while you have made all required payments, as of the trial period expiration date some of your required documents for us to complete your loan modification are incomplete or have not been provided to us.
>
> We want to help you stay in your home, so we are offering you a one-time trial period extension through December 31, 2009. The extension is being offered to give you additional time to provide us with all of the required documentation and information to qualify you for a permanent loan modification. During this extension, you must continue to make additional monthly trial period mortgage payments. Your trial payments will continue to be due on the first of the month in the amount of $1,188.33.
>
> The following is a list of documents that we have not received and must have by November 27, 2009 in order to determine your eligibility for a permanent modification. Please complete and return the following documents:
>
> Documents required for processing:
>
>     -A signed copy of the most recent tax return, with all schedules.
>
> **It is important that you make the additional trial period mortgage payments(s) and return all remaining documents by November 27, 2009.** (emphasis in original) If you do not provide all of the requested missing documentation or do not make your additional trial payments during the trial period extension, you will not receive a Home Affordable Modification. You will not be eligible for consideration under this program in the future and we will resume collection activities to bring the account current. If you provide us with the required documentation sooner than the due date stated in this letter and you continue to make your monthly trial period payments, we will be able to provide you with a permanent loan modification sooner than December 31, 2009.

A copy of this letter is attached hereto as Exhibit 12.

    58.    Prior to November 13, 2009 BAC had not requested a "signed" copy of Patricia Johnson's tax return.

    59.    In response to BAC's November 13, 2009 letter, Patricia Johnson timely provided BAC with a signed copy of her most recent tax return with all schedules.

    60.    Despite having provided BAC with all documentation it requested, BAC once again failed to provide Patricia Johnson a permanent loan modification by December 31, 2009.

61. By letter dated January 29, 2010 BAC sent yet another letter to Patricia Johnson. As with its November 13, 2009 letter, BAC claimed that Patricia Johnson had failed to provide required documentation and threatened to deny her a permanent loan modification unless she complied by providing documentation. This time BAC demanded she produce:

    a. Hardship Affidavit completed and signed by all borrowers

    b. Copy of the most recently filed federal tax return with all schedules.

    c. If self-employed, copy of the most recent filed federal tax return with all schedules, and copy of the most recent quarterly or year-to-date profit/loss statement

A copy of this letter is attached hereto as Exhibit 13.

62. On February 5, 2010, through her counsel, Patricia Johnson re-provided all documents requested by BAC plus copies of her two most recent pay stubs. A partially redacted copy of this submission is attached hereto as Exhibit 14.

63. Despite her compliance in all material respects with the terms of the TPP Agreement, Patricia Johnson has not been offered a permanent loan modification under the HAMP Program guidelines.

64. The three-month Trial Period plan, which Patricia Johnson believed would result in a permanent loan modification offer by the end of October, 2009, did not result in any determination by BAC. Nor has Patricia Johnson's continued compliance yielded a permanent modification.

65. Like the other class members in this matter, Patricia Johnson has been living in limbo, without any assurances that her home will not be foreclosed, despite her compliance with HAMP requirements and her continued monthly payments under the TPP.

### *Class Allegations*

66. Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

67. This class action is brought by the Plaintiff on behalf of herself and all Massachusetts homeowners whose loans have been serviced by Defendant and who, since April 19, 2009, have complied with their obligations under a written TPP and have not received a permanent HAMP modification.

68. Plaintiff sues on her own behalf and on behalf of a class of persons under Rules 23(a) and (b) of the Federal Rules of Civil Procedure.

69. Plaintiff does not know the exact size or identities of the proposed class, since such information is in the exclusive control of Defendant. Plaintiff believes that the class encompasses many hundreds of individuals and whose identities can be readily ascertained from Defendant's books and records. Therefore, the proposed class is so numerous that joinder of all members is impracticable.

70. Based on the size of the modifications at issue, Plaintiff believes the amount in controversy exceeds $5 million.

71. All members of the class have been subject to and affected by the same conduct. The claims are based on form contracts and uniform loan modification processing requirements. There are questions of law and fact that are common to the class, and predominate over any questions affecting only individual members of the class. These questions include, but are not limited to the following:

    a. the nature, scope and operation of Defendant's obligations to homeowners under HAMP ;

    b. whether Defendant's receipt of an executed TPP Agreement, along with supporting documentation and three monthly payments, creates a binding contract or

        otherwise legally obligates Defendant to offer class members a permanent HAMP modification;

        c.  whether Defendant's failure to provide permanent HAMP modifications in these circumstances amounts to a breach of contract and/or a breach of the covenant of good faith and fair dealing; and

        d.  whether the Court can order damages and enter injunctive relief.

72.    The claims of the individual named Plaintiff are typical of the claims of the class and do not conflict with the interests of any other members of the class in that both the Plaintiff and the other members of the class were subject to the same conduct, signed the same agreement and were met with the same absence of a permanent modification.

73.    The individual named Plaintiff will fairly and adequately represent the interests of the class.  She is committed to the vigorous prosecution of the class' claims and has retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions.

74.    A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

75.    This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

76.    The Defendant has acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## COUNT I
### *Breach of Contract*

77. Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

78. Plaintiff brings this claim on her own behalf and on behalf of each member of the Class described above.

79. As described above, the TPP Agreement sent by Defendant to Plaintiff constitutes a valid offer.

80. By executing the TPP Agreement and returning it to Defendant along with the supporting documentation, Plaintiff accepted Defendant's offer.

81. Alternatively, Plaintiff's return of the TPP Agreement constitutes an offer. Acceptance of this offer occurred when Defendant accepted Plaintiff's TPP payments.

82. Plaintiff's TPP payments to Defendant constitute consideration. By making those payments, Plaintiff gave up the ability to pursue other means of saving her home.

83. Plaintiff and Defendant thereby formed a valid contract.

84. To the extent that the contract was subject to a condition subsequent providing BAC an opportunity to review the documentation submitted by Plaintiff when she returned the signed TPP, this condition was waived by BAC and/or it is estopped to assert it as a defense to Plaintiff's claims.

85. By failing to offer Plaintiff a permanent HAMP modification, Defendant breached that contract.

86. Plaintiff remains ready, willing and able to perform under the contract by continuing to make TPP payments and provide documentation.

87. Plaintiff has suffered harm and is threatened with additional harm from Defendant's breach. By making TPP payments both during and after the TPP, Plaintiff forewent other remedies that might be pursued to save her home, such as restructuring her debt under the bankruptcy code, or

pursuing other strategies to deal with her default, such as selling her home. On information and belief, some putative class members have suffered additional harm in the form of foreclosure activity against their homes.

## COUNT II
### *Breach of the Implied Covenant of Good Faith and Fair Dealing*

88. Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

89. Plaintiff brings this claim on her own behalf and on behalf of each member of the Class described above.

90. Defendant is obligated by contract and common law to act in good faith and to deal fairly with each borrower.

91. "[T]he purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).

92. Defendant routinely and regularly breaches this duty by:

   a. failing to perform loan servicing functions consistent with its responsibilities to Plaintiff;

   b. failing to properly supervise its agents and employees including, without limitation, its loss mitigation and collection personnel and its foreclosure attorneys;

   c. routinely demanding information already in its files;

   d. making inaccurate calculations and determinations of Plaintiff's eligibility for HAMP;

   e. failing to follow through on written and implied promises;

   f. failing to follow through on contractual obligations; and

    g.   failing to give permanent HAMP modifications and other foreclosure alternatives to qualified borrowers.

93.   As a result of these failures to act in good faith and the absence of fair dealing, Defendant caused Plaintiff harm.

COUNT III
*Promissory Estoppel, in the alternative*

94.   Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

95.   Plaintiff brings this claim on her own behalf and on behalf of each member of the Class described above.

96.   Defendant, by way of its TPP Agreements, made a representation to Plaintiff that if she returned the TPP Agreement executed and with supporting documentation, and made her TPP payments, she would receive a permanent HAMP modification.

97.   Defendant's TPP Agreement was intended to induce Plaintiff to rely on it and make monthly TPP payments.

98.   Plaintiff did indeed rely on Defendant's representation, by submitting TPP payments.

99.   Given the language in the TPP Agreement, Plaintiff's reliance was reasonable.

100.   Plaintiff's reliance was to her detriment. Plaintiff has yet to receive a permanent HAMP modification and has lost the opportunity to fund other strategies to deal with her default and to avoid foreclosure.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully requests the following relief:

    a.   Certify this case as a class action and appoint the named Plaintiff to be class representative and her counsel to be class counsel;

b. Enter a judgment declaring the acts and practices of Defendant complained of herein to constitute a breach of contract and a breach of the covenant of good faith and fair dealing, as well as a declaration that they are required by the doctrine of promissory estoppel to offer permanent modifications to class members;

c. Grant a permanent or final injunction enjoining Defendant's agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiffs and the members of the Class;

d. Order Defendant to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under HAMP;

e. Order specific performance of Defendant's contractual obligations together with other relief required by contract and law;

g. Award actual and punitive damages to the Plaintiff and the class;

h. Award Plaintiff the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and

i. Grant Plaintiff and the Class such other and further relief as this Court finds necessary and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues so triable.

Respectfully Submitted,
On behalf of the Plaintiff

*/s/ Gary Klein*
Gary Klein (BBO 560769)
Shennan Kavanagh (BBO 655174)
Kevin Costello (BBO 669100)
RODDY KLEIN & RYAN
727 Atlantic Avenue

        Boston, MA  02111-2810
        Tel:  (617) 357-5500
        Fax:  (617) 357-5030

        Stuart Rossman (BBO 430640)
        Charles Delbaum (BBO 543225)
        NATIONAL CONSUMER LAW CENTER
        7 Winthrop Square, 4th floor
        Boston, MA 02110
        (617) 542-9595 (*telephone*)
        (617) 542-8010 *(fax)*

        Michael Raabe (BBO 546107)
        NEIGHBORHOOD LEGAL SERVICES
        170 Common Street, Suite 300
        Lawrence, MA 01840
        Tel:  (978) 686-6900
        Fax:  (978) 685-2933

DATE:  February 23, 2010