**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **PATRICIA JOHNSON, FAUSTO CABRERA, VELLYN ANTONELLI, CARMEN FOX, MARK ANGELOPOULOS, DIANE ANDERSON JAMES COOLEY and MARGARET COOLEY, on behalf of themselves and all others similarly situated,**<br><br>    **Plaintiffs,**<br>**vs.**<br><br>**BAC HOME LOANS SERVICING, LP, a subsidiary of BANK OF AMERICA, N.A.**<br><br>    **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **C.A. NO. 10-10316**<br><br><br>**FIRST AMENDED**<br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**INTRODUCTION**

1.      Patricia Johnson, Fausto Cabrera, Vellyn Antonelli, Carmen Fox, Mark Angelopoulos, Diane Anderson, James Cooley and Margaret Cooley ("Plaintiffs") bring this suit on behalf of themselves and a class of similarly situated Massachusetts residents to challenge the failure of Defendant, BAC Home Loans Servicing, LP, a subsidiary of Bank of America, N.A. ("Defendant" or "BAC") to honor its agreements with borrowers to modify mortgages and prevent foreclosures under the United States Treasury's Home Affordable Modification Program ("HAMP").

2.      Plaintiffs' claims are simple – when a large financial institution promises to modify an eligible loan to prevent foreclosure, homeowners who live up to their end of the

bargain expect that promise to be kept.  This is especially true when the financial institution is acting under the aegis of a federal program specifically targeted at preventing foreclosure.

3.     In October 2008, Bank of America accepted $15 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211. In January 2009, in connection with its acquisition of Merrill Lynch, Bank of America accepted another $10 billion in TARP funds as well as a partial guarantee against losses on $118 billion in mortgage-related assets. In April 2009, Bank of America signed a contract with the U.S. Treasury (attached as Exhibit 1 and included by reference) agreeing to participate in HAMP -- a program in which BAC, as the servicing arm of Bank of America, received incentive payments for providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers.

4.     As a participating servicer in HAMP, BAC has, in turn, entered into a standard agreement with each Plaintiff for a temporary trial modification of that plaintiff's existing note and mortgage.  Each such modification agreement promises that if the borrower complies with the terms of the temporary modification agreement and the borrower's representations on which the offer of a modification was based continue to be true in all material respects, then the borrower will receive a permanent modification on the same terms.  Plaintiffs, for their part, have complied with these agreements by submitting the required documentation and making payments.  Despite Plaintiffs' efforts, Defendant BAC has ignored its contractual obligation to permanently modify their loans.

5.     As a result, Plaintiffs are wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes.  Defendant's actions thwart the purpose of HAMP and are illegal under Massachusetts law.

## JURISDICTION

6.      Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. § 1332 because this action is between parties that are citizens of different states and the amount in controversy is greater than $75,000.  For diversity jurisdiction purposes, a national bank is a citizen of the state designated as its main office on its organization certificate.  *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 306 (2006).  BAC is, on information and belief, a citizen of North Carolina.  Plaintiffs are citizens of Massachusetts.

7.      This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d) in that this matter is brought as a putative class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a State different from any defendant.

8.      Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) inasmuch as the unlawful practices are alleged to have been committed in this District, Defendant regularly conducts business in this District, and the named Plaintiffs reside in this District.

## PARTIES

9.      Patricia Johnson is a 72-year-old woman residing at 23 Barr Street, Salem, Massachusetts, 01970.

10.      Fausto Cabrera is a 33 year-old man residing with his wife and four (4) children at 118 Marianna Street, Lynn, Massachusetts, 01902.

11.      Vellyn Antonelli is a 51 year-old woman residing with her son and her fiancé at 51 Hudson Road, Stow, Massachusetts 01775.

12.     Carmen Fox is an individual residing at 62 Frederick Street, Unit 35, Dracut Massachusetts 08126.

13.     Mark Angelopoulos and Diane Anderson are a married couple residing at 46 Buena Vista Street, Swampscott, Massachusetts 01907.

14.     James Cooley and Margaret Cooley, both age 68, are a married coupled residing at 23 Ranley Road, Hyde Park, Massachusetts 02126.

15.     Bank of America, N.A. is a mortgage lender with headquarters at 101 Tryon Street, Charlotte, North Carolina 28255.

16.     BAC Home Loans Servicing, LP is a subsidiary of Bank of America, N.A., located at 4500 Park Granada, Calabasas, California 91302.

## FACTUAL BACKGROUND

### *The Foreclosure Crisis*

17.     Over the last three years, the United States has been in a foreclosure crisis.  A congressional oversight panel has recently noted that one in eight U.S. mortgages is currently in foreclosure or default.[1]

18.     The number of Massachusetts properties with foreclosure filings in 2008 was 150% higher than in 2007 and 577% higher than in 2006 – a near seven-fold increase in only two years.[2]

19.     According to 2009 data, the numbers continue to rise; in the third quarter of 2009, foreclosures were filed on 12,667 Massachusetts properties, a 35% increase over the same period

---

[1] Congressional Oversight Panel, Oct. 9, 2009 report at 3.  Available at http://cop.senate.gov/reports/library/report-100909-cop.cfm.
[2] RealtyTrac Staff. Foreclosure Activity Increases 81 Percent in 2008. Jan. 15, 2009. Available at http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&accnt=0&itemid=5681.

of 2008.[3]  Overall in 2009, over 36,000 individual properties in Massachusetts had foreclosure

filings against them which, while slightly less than 2008, still represents an increase of over

100% from 2007 levels and an increase of more than 400% over 2004.[4]

20.     Increased foreclosures have a detrimental effect not just on the borrowers who

lose unique property and face homelessness, but also on the surrounding neighborhoods that

suffer decreased property values and municipalities that lose tax revenue.

21.     State legislative efforts were able to temporarily slow the pace of completed

foreclosures in 2009, but toward the end of the year, the number of new filings once again rose,

demonstrating that foreclosures were merely delayed, not prevented.[5]

22.     The foreclosure crisis is not over.  Economists predict that interest rate resets on

the riskiest of lending products will not reach their zenith until sometime in 2011.  *See* Eric

Tymoigne, Securitization, Deregulation, Economic Stability, and Financial Crisis, Working

Paper No. 573.2 at 9, Figure 30 *available at*

http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1458413 (citing a Credit Suisse study

showing monthly mortgage rate resets).

### *Creation of the Home Affordable Modification Program*

23.     Congress passed the Emergency Economic Stabilization Act of 2008 on October

3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February

17, 2009 (together, the "Act").  12 U.S.C.A. §5201 *et. seq.* (2009).

---

[3] RealtyTrac Staff. U.S. Foreclosure Activity Increases 5 Percent in Q3. Oct. 15, 2009. Available at
http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&accnt=0&itemid=7706.
[4] RealtyRrac Staff.  RealtyTrac Year End Report Shows Record 2.8 Million U.S. Properties with Foreclosure Filings
in 2009.  Available at http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&itemid=8333.
[5] For 2007 comparison, see Gavin, Robert. Fewer Lose Their Homes in August. Boston Globe. Sept. 23, 2009.
Available at
http://www.boston.com/realestate/news/articles/2009/09/23/foreclosures_in_mass_drop_but_petitions_soar/.

24.     The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership."12 U.S.C.A. §5201.

25.     The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP. 12 U.S.C. § 5211.  Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions. *Id.*

26.     Congress allocated up to $700 billion to the United States Department of the Treasury for TARP. 12 U.S.C. § 5225.

27.     In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).

28.     The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures."  12 U.S.C. §5219.

29.     The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." *Id.*

30.     The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures on the Federal Housing Finance Agency, Federal National Mortgage Association ("Fannie Mae"), Federal Home Loan Mortgage Corporation ("Freddie Mac") and the Federal Reserve Board in their roles as "Federal property managers." 12 U.S.C. §5220.

31.     On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

32.     The Making Home Affordable program consists of two subprograms.  The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.

33.     The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now know as the Home Affordable Modification Program, or HAMP.  It is this subprogram that is at issue in this case.

34.     HAMP is funded by the federal government, primarily with TARP funds.  The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

35.     Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to the existing mortgage obligations in order to make the monthly payments more affordable.   Servicers receive $1000.00 for each HAMP modification.

*Broken Promises Under HAMP*

36.     The industry entities that perform the actual interface with borrowers – including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure – are known as "servicers."  Servicers typically act as the agents of the entities that hold mortgage loans.  BAC Home Loans Servicing, LP is a servicing business operated by Bank of America,

N.A. and its actions described herein were made as agents for the entities that hold mortgage loans.

37.     Should a servicer elect to participate in HAMP,[6] they execute a Servicer Participation Agreement ("SPA") with the federal government.

38.     On April 19, 2009, Steve R. Bailey, Senior Vice President of Bank of America, N.A. executed an SPA, thereby making BAC a participating servicer in HAMP.  A copy of this SPA is incorporated herein and attached as Exhibit 1.

39.     The SPA executed by Mr. Bailey incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers.  These documents together are known as the "Program Documentation" (SPA 1.B.), and are incorporated by reference herein.

40.     The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services."  (SPA 1.A., 2.A.)[7]

41.     The Program Documentation requires Participating Servicers to evaluate *all loans*, which are 60 or more days delinquent for HAMP modifications.  (SD 09-01 p. 4.)  In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if HAMP is appropriate for the borrower.

---

[6] Certain classes of loans, namely those held by Fannie Mae, Freddie Mac or companies that accepted money under the TARP program are subject to mandatory inclusion in HAMP.  Otherwise, participation by servicers in the HAMP program is voluntary.

[7] The Program Documentation also includes Supplemental Directive 09-01 ("SD 09-01," attached hereto as Exhibit 2), Home Affordable Modification Program; Base Net Present Value (NPV) Model Specifications ("NPV Overview," attached hereto as Exhibit 3) and Supplemental Documentation—Frequently Asked Questions ("HAMPFAQS," attached hereto as Exhibit 4) and Supplemental Directive 09-08 ("SD 09-08," attached hereto as Exhibit 5).  These documents together describe the basic activities required under HAMP and are incorporated by reference in the TPP Agreement signed by Plaintiff and herein.

42.     A HAMP Modification consists of two stages.  First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP").[8]  The TPP consists of a three-month period in which the homeowner makes mortgage payments based on a formula that uses the initial financial information provided.

43.     BAC offers TPPs to eligible homeowners by way of a TPP Agreement, which describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

44.     If the homeowner executes the TPP Agreement, complies with all documentation requirements and makes all three TPP monthly payments, the second stage of the HAMP process is triggered, in which the homeowner is offered a permanent modification.

45.     BAC has routinely failed to live up to its end of the TPP Agreement and offer permanent modifications to homeowners.  In February 2010, the U.S. Treasury reported that BAC's parent company had 1,066,025 HAMP-eligible loans in its portfolio.  Trial periods have been started on only 237,766 of these loans. Of those, just 12,761 resulted in permanent modifications (only 5% of the started Trial modifications and 1% of the eligible pool) even though many more homeowners had made the payments and submitted the documentation required by the TPP Agreement.  The Treasury Report is attached hereto as Exhibit 6.

46.     By failing to live up to the TPP Agreement and convert TPPs into permanent modifications, BAC is not only leaving homeowners in limbo, wondering if their homes can be saved, BAC is also preventing homeowners from pursuing other avenues of resolution, including

---

[8] The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the modification, are explained in detail in SD 09-01, attached hereto as Exhibit 2.  Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income for the next five years.

using the money they are putting toward TPP payments to fund bankruptcy plans, relocation

costs, short sales or other means of curing their default.

### Patricia Johnson

47.     Plaintiff Patricia Johnson has been an owner of her Barr Street home since at least

January 10, 1989.  She has lived there for approximately twenty (20) years.

48.     On May 24, 2006, Ms. Johnson took out a $238,000 mortgage loan (hereinafter

the "mortgage loan") for her residence at Barr Street from Countrywide Home Loans, Inc.  At

that time, Ms. Johnson worked as a bookkeeper and a flea market retailer.

49.     Ms. Johnson's mortgage loan is serviced by BAC.

50.     Soon after taking out the mortgage loan, Ms. Johnson began experiencing

financial hardship and fell behind on her payments.

51.     In 2009 Ms. Johnson sought help from her loan servicer in preserving her home of

many years and making her mortgage more affordable.  She applied for a HAMP loan

modification.

52.     By July 2009 Ms. Johnson was about 10 months behind in her mortgage

payments.

53.     By letter date July 3, 2009 BAC offered Ms. Johnson a loan modification entitled

*Home Affordable Modification Trial Period Plan* ("TPP").  Among the documents required by

BAC to accompany Ms. Johnson's acceptance of the offer was a signed IRS Form 4506-T,

which allows BAC to obtain a copy of her most recent tax return, and a "copy of the most recent

filed federal tax return with all schedules."  BAC did not require a signed copy of her tax return.

54.    The TPP provided that the plan was effective August 2, 2009 and would run from August, 2009 to October, 2009.  Her monthly mortgage payments (Principle, Interest, Taxes and Insurance) were $1,188.33, effective August, 2009.

55.    The TPP agreement is entitled "Home Affordable Modification Program Loan Trial Period," and the first sentence of the agreement provides: "If I am in compliance with this Loan Trial Period and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement, as set forth in Section 3 [below], that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."

56.     On July 29, 2009, Ms. Johnson executed the TPP Agreement, along with a hardship affidavit and included documents requested by Defendant BAC Home Loan Servicing, LP and sent two copies of the TPP Agreement, along with the other documents to the Defendant via facsimile and Federal Express.  A copy of the executed TPP Agreement is attached hereto as Exhibit 7.

57.    The Trial Period Plan states "I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of the Plan if I qualify for the Offer or will send me written notice that I do not qualify for the offer."  Nevertheless, BAC Home Loan Servicing, LP has sent neither a signed copy of the Plan, nor a written rejection.

58.    Ms. Johnson timely made each of the probationary payments contemplated in the TPP Agreement due in August, September and October 2009.  She has also made timely payments due in November and December 2009, January, 2010, February 2010, March 2010 and April 2010.

59.     In an effort to identify who the holder of the mortgage loan is, Ms. Johnson, through her attorney, sent an August 10, 2009 letter to Bank of America pursuant to 15 U.S.C. § 1641(f) asking that it identify, among other things, the name, address and telephone number of the owner of the mortgage loan.  Bank of America Home Loans replied by letter dated September 1, 2009 to Ms. Johnson and by letter dated August 31, 2009 to her counsel stating "Please be advised that the above referenced mortgage is backed by/owned by a private investor." and "Regrettably, we cannot provide you with the private investor's name or information.  However, please know that as details of the bill (Homeowner Affordability and Stability Plan) become known we will contact qualified borrowers."

60.     Despite being in the midst of her Trial Period and having made timely payments pursuant to the TPP Agreement, the Defendant made collection calls to the home of Ms. Johnson in August, 2009.  When counsel for Ms. Johnson called the Defendant to protest the collection calls because she was in the midst of a Trial Period, he was informed that the collection calls would continue, Trial Period notwithstanding.  The Defendant continued to make collection calls to Ms. Johnson during her Trial Period.

61.     After making the three payments contemplated by the TPP Agreement, BAC did not offer Ms. Johnson a permanent loan modification by the end of October 2009.

62.     Following the end of the originally identified Trial Period, Ms. Johnson continued to be in compliance with the terms of the TPP Agreement and her representations to the Defendant continued to be true in all material respects.  Despite this and without any warning that BAC considered there to be a problem with documentation, by letter dated November 13, 2009 Bank of America Home Loans sent Ms. Johnson a letter containing the following:

> Thank you for making your trial period mortgage payments as part of the federal government's Home Affordable Modification Program.  Your trial period has

expired, and we have determined that, while you have made all required payments, as of the trial period expiration date some of your required documents for us to complete your loan modification are incomplete or have not been provided to us.

We want to help you stay in your home, so we are offering you a one-time trial period extension through December 31, 2009. The extension is being offered to give you additional time to provide us with all of the required documentation and information to qualify you for a permanent loan modification. During this extension, you must continue to make additional monthly trial period mortgage payments. Your trial payments will continue to be due on the first of the month in the amount of $1,188.33.

The following is a list of documents that we have not received and must have by November 27, 2009 in order to determine your eligibility for a permanent modification. Please complete and return the following documents:

Documents required for processing:

    -A signed copy of the most recent tax return, with all schedules.

**It is important that you make the additional trial period mortgage payments(s) and return all remaining documents by November 27, 2009.** (emphasis in original) If you do not provide all of the requested missing documentation or do not make your additional trial payments during the trial period extension, you will not receive a Home Affordable Modification. You will not be eligible for consideration under this program in the future and we will resume collection activities to bring the account current. If you provide us with the required documentation sooner than the due date stated in this letter and you continue to make your monthly trial period payments, we will be able to provide you with a permanent loan modification sooner than December 31, 2009.

63.    Prior to November 13, 2009 BAC had not requested a "signed" copy of Ms. Johnson's tax return.

64.    In response to BAC's November 13, 2009 letter, Ms. Johnson timely provided BAC with a signed copy of her most recent tax return with all schedules.

65.    Despite Ms. Johnson having provided BAC with all documentation it requested, BAC once again failed to provide Ms. Johnson a permanent loan modification by December 31, 2009.

66.     By letter dated January 29, 2010 BAC sent yet another letter to Ms. Johnson.  As with its November 13, 2009 letter, BAC claimed that Ms. Johnson had failed to provide required documentation and threatened to deny her a permanent loan modification unless she complied by providing documentation.  This time BAC demanded she produce:

    a.      Hardship Affidavit completed and signed by all borrowers

    b.      Copy of the most recently filed federal tax return with all schedules.

    c.      If self-employed, copy of the most recent filed federal tax return with all schedules, and copy of the most recent quarterly or year-to-date profit/loss statement

67.     On February 5, 2010, through her counsel, Ms. Johnson re-provided all documents requested by BAC plus copies of her two most recent pay stubs.

68.     Despite her compliance in all material respects with the terms of the TPP Agreement, Ms. Johnson had not been offered a permanent loan modification under the HAMP Program guidelines at the time of the filing of the Complaint in this matter.

69.     The three-month Trial Period Plan, which should have led to a permanent loan modification offer by the end of October, 2009, did not result in any determination by BAC during that time frame.  Nor did Ms. Johnson's continued compliance yield a permanent modification by the time of the filing of the Complaint in this matter.

70.     Like the other class members in this matter, Ms. Johnson has been living in limbo, without any assurances that her home will not be foreclosed, despite her compliance with HAMP requirements and her continued monthly payments under the TPP.

### *Fausto Cabrera*

71.     Fausto Cabrera has been an owner of the property located at 118 Marianna Street since April 4, 2004.

72.     On August 23, 2005, Mr. Cabrera refinanced the mortgage loan on his home with Massachusetts Limited Liability Company.  At that time, Mr. Cabrera worked as a mechanic.

73.     BAC is the servicer of Mr. Cabrera's mortgage loan.

74.     Sometime after taking out the loan, Mr. Cabrera began experiencing hardships that caused him to have difficulty making payments on his mortgage loan and resulted in him falling behind on his payments.

75.     In 2009 Mr. Cabrera sought help with his mortgage from BAC.

76.     Mr. Cabrera was offered a TPP by BAC on May 20, 2009.  A copy of the letter accompanying the TPP offer is attached hereto as Exhibit 8.

77.     Mr. Cabrera timely accepted the offer by returning the executed TPP Agreement to BAC.  The TPP set his mortgage payments (Principal, Interest, Taxes and Insurance) at $1,012.84/month.  The TPP effective date was June 19, 2009 (the date the signed TPP agreement was due along with his first payment under the plan).  The TPP covered three (3) months: July, August and September, 2009.

78.     Based on information and belief, the TPP agreement is entitled "Home Affordable Modification Program Loan Trial Period," and the first sentence of the agreement provides: "If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Servicer will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3, that

would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."

79.     Based on information and belief, the Trial Period Plan further states "I understand that after I sign and return two copies of this Plan to the Servicer, the Servicer will send me a signed copy of this Plan if I qualify for the Offer or will send me written notice that I do not qualify for the Offer."  Nevertheless, BAC Home Loan Servicing, LP has sent neither a signed copy of the Plan, nor a written rejection.

80.     Mr. Cabrera timely made each of the payments described in the TPP agreement due in June, August and September, 2009 (no payment was due in July, 2009).  He has also made timely payments at the TPP amount due in October, November and December, 2009 and January, February, March, and April 2010.

81.     Since the TPP period began, and at all times relevant, Mr. Cabrera has responded to all document requests made by BAC by timely supplying the requested documents.

82.     As of this date, Mr. Cabrera has not received any written decision on his application for a Making Home Affordable permanent loan modification.

83.     At or about the same time BAC offered a TPP Agreement to Mr. Cabrera, it embarked on a second contradictory track to collect on the mortgage loan.  It referred the matter to its attorney Harmon Law Office, P.C. ("Harmon") to begin foreclosure proceedings.  Harmon sent a June 3, 2009 letter to Mr. Cabrera stating that it had been retained to foreclose on the property to collect the alleged debt.

84.     In the midst of the TPP, on October 12, 2009 Harmon served Mr. Cabrera with an Order of Notice expressing its intention to foreclose by entry and possession and exercise of power of sale.  On November 2, 2009 Harmon sent a "Notice of Mortgage Foreclosure Sale"

enclosing a copy of the Notice of Mortgagee's Sale of Real Estate and Deficiency Notice.  The

notice informed Mr. Cabrera that BAC's attorney intended to sell his house at a foreclosure sale

on December 2, 2009.   BAC, through its attorney, announced this intention despite the fact that

Mr. Cabrera was still in his TPP under the Making Home Affordable program.

85.     BAC refused to postpone the scheduled foreclosure sale until the day before the

scheduled sale.  On December 1, 2009 Harmon rescheduled the foreclosure sale for Monday,

January 11, 2010.

86.     BAC refused to postpone the Monday, January 11, 2010 foreclosure sale until the

business day before the scheduled sale.  On Friday, January 8, 2010 Harmon rescheduled the

foreclosure sale for Monday, February 15, 2010.

87.     BAC refused to postpone the Monday, February 15, 2010 foreclosure sale until

three (3) business days before the scheduled sale.  On February 9, 2010 Harmon rescheduled the

foreclosure sale for Monday, March 22, 2010.

88.     BAC cancelled the Monday, March 22, 2010 on that same day with no notice to

Mr. Cabrera.

89.     Despite his compliance in all material respects with the terms of the TPP

Agreement, BAC did not provide Mr. Cabrera with a permanent loan modification by September

31, 2009, nor has it done so since then.

90.     Instead, BAC has inflicted on Mr. Cabrera collection actions, foreclosure

proceedings and redundant, ambiguous and threatening demands for documents.  At this point,

his TPP is now in its tenth month with no end in sight.

91.     Like the other class members in this matter, Mr. Cabrera has been living in limbo,

without any assurances that his home will not be foreclosed, despite his compliance with HAMP

requirements, his continued monthly payments under the TPP, and his right to a permanent HAMP modification.

### *Vellyn Antonelli*

92.    Vellyn Antonelli has been an owner of the property located at 51 Hudson Road since November 2005.

93.    On December 13, 2006, Ms. Antonelli took out a mortgage loan for her residence at Hudson Road from Mortgage Partners, Inc.

94.    BAC is the servicer of Ms. Antonelli's loan.

95.    Sometime after taking out the mortgage loan, Ms. Antonelli began experiencing hardships which caused her to have difficulty making payments on her mortgage loan and resulted in her falling behind on her payments.

96.    In early 2009 Ms. Antonelli began seeking help to reduce her mortgage payment. She appealed for help from Countrywide Home Loans/BAC and in March 2009, applied for a *Making Home Affordable* loan modification.

97.    After months of problems in getting her application for a Making Home Affordable loan modification approved, Ms. Antonelli was finally offered a TPP by BAC on July 28, 2009.

98.    Ms. Antonelli accepted the offer on August 3, 2009.  The TPP Agreement lowered her mortgage payments (Principal, Interest, Taxes and Insurance) to $1,148.79 per month.  The TPP Agreement's effective date was August 11, 2009.  The TPP Agreement period was for three (3) months: August, September and October 2009.  A copy of the TPP Agreement executed by Ms. Antonelli is attached hereto as Exhibit 9.

99.    The TPP Agreement is entitled "Home Affordable Modification Program Loan

Trial Period," and the first sentence of the agreement provides: "If I am in compliance with this

Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all

material respects, then the Servicer will provide me with a Home Affordable Modification

Agreement ("Modification Agreement"), as set forth in Section 3, that would amend and

supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."

100.    The TPP states "I understand that after I sign and return two copies of this Plan to

the Servicer, the Servicer will send me a signed copy of this Plan if I qualify for the Offer or will

send me written notice that I do not qualify for the Offer."  Nevertheless, BAC Home Loan

Servicing, LP has sent neither a signed copy of the Plan, nor a written rejection.

101.    Ms. Antonelli timely made each of the payments described in the TPP agreement

due in August, September and October 2009.  She has also made timely payments at the TPP

amount due in November and December 2009 and January, February, March, and April 2010.

102.    Since the TPP period began, and at all times relevant hereto, Ms. Antonelli has

responded to all document requests made by BAC by timely supplying the requested documents.

103.    On January 26, 2010, four months after the trial period was to have concluded,

BAC required Ms. Antonelli to undergo debt counseling as a condition of her receiving a

permanent loan modification under the Making Home Affordable program.  Nevertheless, Ms.

Antonelli completed the debt counseling on February 1, 2010 and provided proof of her

completion of the debt-counseling requirement to BAC on February 11, 2010.

104.    Despite the fact that Ms. Antonelli had timely made her required payments for the

Trial Period and many months beyond, BAC sent Ms. Antonelli a Notice of Intention to

Foreclose dated February 8, 2010. BAC also sent her a similar notice dated February 24, 2010.

The notices of intention to foreclose make no mention of the pending Making Home Affordable loan modification application or TPP.

105.     In response to the Notice of Intention to Foreclose, Ms. Antonelli called BAC in February 2010 to protest because she was in a Trial Period and had timely made all of her payments and complied with all of BAC's document demands.  In that telephone conversation, BAC customer service personnel informed her, for the first time, that her permanent loan modification application had been denied on February 2, 2010.  The reason for the denial was vaguely explained as "your income."   BAC admitted not sending any notice telling her of its alleged decision.  Ms. Antonelli asked that BAC send her a written decision after which she would contact BAC to discuss the matter further.

106.     Contrary to these representations, by letter dated March 31, 2010, BAC indicated to Ms. Antonelli that she had been approved for a permanent modification.  The letter did not include the permanent loan modification itself, which still has not been tendered to Ms. Antonelli.

107.     Given the foreclosure activity against her, as well as BAC's February 2010 indication that she has been denied, Ms. Antonelli takes little comfort in the March 31, 2010 letter.  BAC has not lived up to the promises it made in the TPP Agreement unless and until it tenders her a permanent loan modification.

108.     Despite her compliance in all material respects with the terms of the TPP Agreement, BAC did not provide Ms. Antonelli with a permanent loan modification by October 31, 2009, nor has it done so since then.

109.    Instead, BAC has inflicted on Ms. Antonelli collection actions and redundant, ambiguous and threatening demands for documents.  At this point, her TPP is now in its eighth month.

110.    Like the other class members in this matter, Ms. Antonelli has been living in limbo, without any assurances that her home will not be foreclosed, despite her compliance with HAMP requirements, her continued monthly payments under the TPP, and her right to a permanent HAMP modification.

### Carmen Fox

111.    Carmen Fox has owned her Frederick Street home since 2006.

112.    On May 15, 2006, Ms. Fox took out a mortgage loan for the purchase of her home with Bank of America, N.A.

113.    At all times relevant to this complaint, Ms. Fox's mortgage loan was serviced by defendant BAC.

114.    In 2008, Ms. Fox began facing various financial hardships, which combined to cause her to have difficulty making payments on her mortgage loan.

115.    By March 2009, Ms. Fox was about two months behind in her mortgage payments.

116.    By letter dated July 29, 2009, BAC informed Ms. Fox that her mortgage loan was being referred to their legal counsel, Harmon, to initiate foreclosure proceedings.

117.    After several months of seeking help from BAC in preserving her home, Ms. Fox applied for a HAMP loan modification and sent in documentation in August 2009.

118.    By letters dated October 14 and October 19, 2009, BAC offered Ms. Fox a TPP Agreement.  Under the TPP Agreement, Ms. Fox's mortgage payments were set at $1,097.40 for a three-month period to run from December 2009 through February 2010.

119.    Ms. Fox timely accepted the offer by returning an executed copy of the TPP agreement, along with requested documents to BAC.  A copy of the TPP Agreement retained by Ms. Fox is attached hereto as Exhibit 10.

120.    The first sentence of the TPP Agreement provides: "If I am in compliance with this [TPP] and my representations in Section 1 continue to be true in all material respects, then the Servicer will provide me with a Home Affordable Modification Agreement ('Modification Agreement'), as set forth in Section 3, that would amend and supplement 1) the Mortgage on the Property and (2) the Note secured by the Mortgage."

121.    Ms. Fox timely made all three payments contemplated under the TPP.

122.    Despite Ms. Fox's compliance with the TPP, BAC, through Harmon, proceeded with foreclosure activity.   BAC caused to have served on Ms. Fox the following:

   a.     On December 10, 2009, a letter containing an *Order of Notice*, and

   b.     On December 22, a *Notice of Mortgage Foreclosure Sale, Notice of Mortgagee's Sale of Real Estate* to be held on January 21, 2010, and *Notice of Intention to Foreclosure Mortgage and of Deficiency After Foreclosure of Mortgage*, and

   c.     On January 15, 2010, a letter informing Ms. Fox that the foreclosure sale scheduled for January 21, 2010 would be postponed until February 22, 2010, and

   d.     On January 27, 2010 a letter informing Ms. Fox that the foreclosure sale rescheduled for February 22, 2010 would be postponed until March 29, 2010.

123.    With the assistance of counsel, Ms. Fox successfully convinced BAC and its attorneys to postpone again sales scheduled for March 29 and April 29, 2010.  Nevertheless, Ms. Fox has had to deal with the unwanted presence of real estate agents appearing at her door informing her that they are there to show her unit to prospective buyers.  As of the date of this First Amended Complaint, the sale is scheduled for June 2, 2010.

124.    Despite her compliance in all material respects with the terms of the TPP Agreement, BAC did not provide Ms. Fox with a permanent loan modification by February 28, 2010, nor has it done so since then.

125.    Instead, BAC has inflicted on Ms. Fox a repeatedly postponed foreclosure sale that it refuses to cancel.  At this point, her TPP is now in its fifth month.

126.    Like the other class members in this matter, Ms. Fox has been living in limbo and a foreclosure sale on her home is imminent, despite her compliance with HAMP requirements, her continued monthly payments under the TPP, and her right to a permanent HAMP modification.

### *Mark Angelopoulos and Diane Anderson*

127.    Mark Angelopoulos and Diane Anderson have been owners of the property located at 46 Buena Vista Street since June 18, 2001

128.    On May 23, 2005, Mr. Angelopoulos and Ms. Anderson took out a $225,000 mortgage loan for their residence from Countrywide Home Loans, Inc.

129.    The servicing of the mortgage loan was transferred to Defendant BAC sometime after May 23, 2005.  BAC continues servicing the mortgage loan to this date.

130.     Sometime after taking out the mortgage loan, Mr. Angelopoulos and Ms. Anderson began experiencing hardships that caused them to have difficulty making payments on their mortgage loan and resulted in them falling behind on their payments.

131.     In 2009, Mr. Angelopoulos and Ms. Anderson sought help to make their mortgage more affordable.  They appealed for help from BAC and applied for a *Making Home Affordable* loan modification.

132.     BAC offered Mr. Angelopoulos and Ms. Anderson a TPP on June 22, 2009.  A copy of the TPP is attached hereto as Exhibit 11.

133.     Mr. Angelopoulos and Ms. Anderson accepted the offer on July 9, 2009.

134.     The TPP provided that the plan was effective July 22, 2009 and would run from August to October 2009.   Their monthly mortgage payments (Principal, Interest, Taxes and Insurance) were set at $1,587.81.

135.     The TPP agreement is entitled "Home Affordable Modification Program Loan Workout Plan," and the first sentence of the agreement provides: "If I am in compliance with this Trial Period Plan (the 'Plan') and my representations in Section 1 continue to be true in all material respects, then the Servicer will provide me with a Home Affordable Modification Agreement ('Modification Agreement'), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."

136.     The TPP states "I understand that after I sign and return two copies of this Plan to the Servicer, the Servicer will send me a signed copy of this Plan if I qualify for the Offer or will send me written notice that I do not qualify for the Offer."  Nevertheless, BAC has sent neither a signed copy of the TPP, nor a written rejection.

137.    Mr. Angelopoulos and Ms. Anderson timely made each of the payments described in the TPP agreement due in August, September and October 2009.  They have also made timely payments at the TPP amount due in November and December 2009 and January, February, March, and April 2010.

138.    Since the TPP period began, and at all times relevant hereto, Mr. Angelopoulos and Ms. Anderson have responded to all document requests made by BAC by timely supplying the requested documents or obtaining confirmation from BAC that they did not have to provide requested documentation.

139.    On November 30, 2010 BAC sent Mr. Angelopoulos and Ms. Anderson a letter requesting additional documents that they believed they had already provided.  They called BAC and spoke with a Customer Service Representative who informed them that they did not need to send any of the documents described in the letter.

140.    On January 30, 2010 BAC sent Mr. Angelopoulos and Ms. Anderson a letter requesting additional documents that they believed they had already provided.  On February 1, 2010, Mr. Angelopoulos and Ms. Anderson called BAC and spoke with a Customer Service Representative named "Josie" who informed them that they did not need to send any of the documents described in the letter and that "Josie" would note it in the BAC system.

141.    Over the course of the Trial Period, Mr. Angelopoulos and Ms. Anderson called BAC to complain about the delay in approving them for a permanent loan modification, notwithstanding their full compliance with the terms of the agreement.

142.    Despite their compliance in all material respects with the terms of the TPP Agreement, BAC did not provide Mr. Angelopoulos and Ms. Anderson with a permanent loan modification by October 31, 2009, nor has it done so since then.

143.     The TPP, which Mark Angelopoulos and Diane Anderson had been informed would result in a permanent loan modification offer by the end of October, 2009 unless they were otherwise notified, has not resulted in any clear determination.  Rather, BAC has inflicted on Mr. Angelopoulos and Ms. Anderson collection actions, negative reports to Credit Reporting Agencies and redundant and ambiguous and threatening demands for documents.  At this point, their TPP is now in its ninth month with no end in sight.

144.     Like the other class members in this matter, Mr. Angelopoulos and Ms. Anderson have been living in limbo, without any assurances that their home will not be foreclosed, despite their compliance with HAMP requirements, their continued monthly payments under the TPP, and their right to a permanent HAMP modification.

*James and Margaret Cooley*

145.     James and Margaret Cooley ("the Cooleys") have been the owners of their Ranley Road home since 1974.

146.     On December 20, 2006 the Cooleys took out a $334,000 mortgage loan (the "mortgage loan") for their residence from Mortgage Lenders Network USA, Inc.

147.     The servicing of the Cooleys' mortgage loan was transferred to Wilshire Credit Corporation ("Wilshire").  Wilshire serviced the mortgage loan until February 28, 2010.

148.     Sometime after taking out the mortgage loan, the Cooleys began experiencing hardships that caused them to have difficulty making payments on their mortgage loan.

149.     In 2009 the Cooleys sought help to make their mortgage more affordable.  They appealed for help from Wilshire.

150.     Wilshire offered the Cooleys a TPP on November 3, 2009.   A copy of the TPP is attached hereto as Exhibit 12.

151.    The Cooleys accepted the offer on November 7, 2009.

152.    The TPP provided that the plan was effective December 3, 2009, and would run for four months, from December 2009 to March 2010.  The Cooleys' monthly mortgage payments (Principal, Interest, Taxes and Insurance) were set at $1,327.77.

153.    The TPP agreement is entitled "Home Affordable Modification Program Loan Trial Period," and the first sentence of the agreement provides: "If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Servicer will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."

154.    The TPP states "I understand that after I sign and return two copies of this Plan to the Servicer, the Servicer will send me a signed copy of this Plan if I qualify for the Offer or will send me written notice that I do not qualify for the Offer."  Nevertheless, neither Wilshire nor BAC Home Loan Servicing, LP has sent either a signed copy of the Plan or a written rejection. The Cooleys timely made each of the payments described in the TPP agreement due in December 2009 and January, February and March 2010.  They have also made timely payment at the TPP amount in April 2010.

155.    Effective March 1, 2010, the servicing of the Cooleys' mortgage loan was transferred to the Defendant BAC.  BAC continues servicing the loan to this date.

156.    Upon BAC's takeover of the servicing of the Cooleys' mortgage loan, BAC denied any knowledge of the Cooleys being in a TPP and it insisted that their monthly payment obligation was $2,292.61 (not the TPP amount of $1,327.77) and that they were over $6,000 in arrears and in danger of being foreclosed upon.

157.     Not knowing what to do and in fear that BAC would foreclose as it threatened, friends and family helped the Cooleys make March, 2010 payments to BAC in excess of the Cooleys' obligation under the TPP.

158.     BAC has responded to every call from the Cooleys regarding their participation in the TPP by saying that it is waiting for paperwork from Wilshire to confirm whether the Cooleys are in a TPP.

159.     Since the TPP period began, and at all times relevant hereto, the Cooleys have responded to all document and information requests made by Wilshire and BAC by timely supplying the requested documents and information.

160.     As of this date, the Cooleys have not received any written decision on their application for a permanent HAMP loan modification.

161.     Despite their compliance in all material respects with the terms of the TPP Agreement, BAC did not provide the Cooleys with a permanent HAMP modification by March 31, 2010, nor has it done so since then.

162.     The TPP, which the Cooleys had been informed would result in a permanent loan modification offer by the end of March, 2010 unless they were otherwise notified, has not resulted in a determination; instead, BAC has inflicted on the Cooleys deceptive collection actions that induced them to pay money to BAC they did not have to pay.  At this point, their TPP is now in its fifth month with no end in sight.

163.     Like the other class members in this matter, the Cooleys have been living in limbo, without any assurances that their home of over 30 years will not be foreclosed, despite their compliance with HAMP requirements, their continued monthly payments under the TPP, and their right to a permanent HAMP modification.

### *Class Allegations*

164.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

165.    This class action is brought by the Plaintiffs on behalf of themselves and all Massachusetts homeowners whose loans have been serviced by Defendant and who, since April 19, 2009, have complied with their obligations under a written TPP and have not received a permanent HAMP modification.

166.    Plaintiffs sue on their own behalf and on behalf of a class of persons under Rules 23(a) and (b) of the Federal Rules of Civil Procedure.

167.    Plaintiffs do not know the exact size or identities of the proposed class, since such information is in the exclusive control of Defendant.  Plaintiffs believe that the class encompasses many hundreds of individuals and whose identities can be readily ascertained from Defendant's books and records.  Therefore, the proposed class is so numerous that joinder of all members is impracticable.

168.    Based on the size of the modifications at issue, Plaintiffs believe the amount in controversy exceeds $5 million.

169.    All members of the class have been subject to and affected by the same conduct. The claims are based on standard form contracts and uniform loan modification processing requirements.  There are questions of law and fact that are common to the class, and predominate over any questions affecting only individual members of the class.  These questions include, but are not limited to the following:

        a.      the nature, scope and operation of  Defendant's obligations to homeowners under HAMP ;

b.       whether Defendant's receipt of an executed TPP Agreement, along with supporting documentation and three monthly payments, creates a binding contract or otherwise legally obligates Defendant to offer class members a permanent HAMP modification;

c.       whether Defendant's failure to provide permanent HAMP modifications in these circumstances amounts to a breach of contract and/or a breach of the covenant of good faith and fair dealing;

d.       whether Defendant's conduct violates Massachusetts Consumer Protection Act, G.L. c. 93A, §2 and applicable regulations; and

e.       whether the Court can order damages and enter injunctive relief.

170.     The claims of the named Plaintiffs are typical of the claims of the class and do not conflict with the interests of any other members of the class in that both the Plaintiffs and the other members of the class were subject to the same conduct, signed the same agreement and were met with the same absence of a permanent modification.

171.     The named Plaintiffs will fairly and adequately represent the interests of the class. They are committed to the vigorous prosecution of the class claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions.

172.     A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

173.     This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

174.     The Defendant has acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## COUNT I
### *Breach of Contract*

175.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

176.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

177.     As described above, the standard TPP Agreements sent by Defendant to each Plaintiff constitutes a valid offer.

178.     By executing the TPP Agreements and returning them to Defendant along with the supporting documentation, Plaintiffs accepted Defendant's offers.

179.     Alternatively, Plaintiffs' return of the TPP Agreements constitutes an offer. Acceptance of these offers occurred when Defendant accepted Plaintiffs' TPP payments.

180.     Plaintiffs' TPP payments to Defendant constitute consideration.  By making those payments, Plaintiffs gave up the ability to pursue other means of saving their home.

181.     Plaintiffs and Defendant thereby formed valid contracts.

182.     To the extent that the contract was subject to a condition subsequent by providing BAC an opportunity to review the documentation submitted by Plaintiffs when they returned the signed TPPs, to determine its sufficiency, this condition was waived by BAC in that it failed to timely raise it and/or it is estopped to assert it as a defense to Plaintiffs' claims.

183.     By failing to offer Plaintiffs permanent HAMP modifications, Defendant breached those contracts.

184.    Plaintiffs remain ready, willing and able to perform under the contracts by continuing to make TPP payments and provide documentation.

185.    Plaintiffs have suffered harm and are threatened with additional harm from Defendant's breach.  By making TPP payments both during and after the TPP, Plaintiffs forewent other remedies that might be pursued to save their home, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their default, such as selling their home. Some putative class members have suffered additional harm in the form of foreclosure activity against their homes.

## COUNT II
### Breach of the Implied Covenant of Good Faith and Fair Dealing

186.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

187.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

188.    Defendant is obligated by contract and common law to act in good faith and to deal fairly with each borrower.

189.    "[T]he purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).

190.    Defendant routinely and regularly breaches this duty by:

a.    failing to perform loan servicing functions consistent with its responsibilities to Plaintiffs;

b.    failing to properly supervise its agents and employees including, without limitation, its loss mitigation and collection personnel and its foreclosure attorneys;

32

c.      routinely demanding information already in its files;

d.      making inaccurate calculations and determinations of Plaintiffs' eligibility for HAMP;

e.      failing to follow through on written and implied promises;

f.      failing to follow through on contractual obligations; and

g.      failing to give permanent HAMP modifications and other foreclosure alternatives to qualified borrowers.

191.    As a result of these failures to act in good faith and the absence of fair dealing, Defendant caused Plaintiffs harm, as alleged above.

## COUNT III
### *Promissory Estoppel, in the alternative*

192.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

193.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

194.    Defendant, by way of its TPP Agreements, made representations to Plaintiffs that if they returned the TPP Agreements executed and with supporting documentation, and made their TPP payments, they would receive permanent HAMP modifications.

195.    Defendant's TPP Agreements were intended to induce Plaintiffs to rely on them and make monthly TPP payments.

196.    Plaintiffs did indeed rely on Defendant's representation, by submitting TPP payments.

197.    Given the language in the TPP Agreement, Plaintiffs' reliance was reasonable.

198.    Plaintiffs' reliance was to their detriment.  Plaintiffs have yet to receive a

permanent HAMP modification and have lost the opportunity to fund other strategies to deal

with their default and to avoid foreclosure.

### COUNT IV
***Violation of the Massachusetts Consumer Protection Act and Applicable Regulations***
On behalf of Fausto Cabrera, Vellyn Antonelli, Carmen Fox, Mark Angelopoulos, Diane
Anderson, James Cooley and Margaret Cooley, and a class of similarly situated individuals
("the enumerated plaintiffs")

199.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

200.    The enumerated plaintiffs bring this claim on their own behalf and on behalf of

each member of the Class described above.

201.    Defendant has violated and continues to violate the Massachusetts Consumer

Protection Act, G.L. c. 93A, §2 and applicable regulations promulgated by the Massachusetts

Attorney General pursuant to G.L. c. 93A, §2(c) including, without limitation:

a.      940 C.M.R. § 3.16, in that its conduct was unfair, deceptive, oppressive,

unconscionable, and contrary to public policy and generally recognized standards

applicable to the consumer lending business;

b.      940 C.M.R. § 3.16, in that its conduct violated the requirement of good

faith and fair dealing applicable to contracts under G.L. c. 106, §1-203;

c.      940 C.M.R. § 3.16, in that its conduct violated existing statutes, rules,

regulations or laws, meant for the protection of the public's health, safety or

welfare, as detailed below;

d.      940 C.M.R. § 3.05, in that it made deceptive representations or failed to

disclose relevant information as to loan modifications offered to borrowers;

e.     940 C.M.R. § 8.06, in that it is a Mortgage Lender and made false or

misleading representations to borrowers; and

f.     940 C.M.R. § 25.03, because it offers Foreclosure-related Services within

the meaning of 940 C.M.R. § 25.01 without adequately describing the services

offered.

202.   The enumerated plaintiffs have been injured by virtue of Defendant's violations.

Said injuries include, but are not limited to:

a.     wrongful foreclosures;

b.     otherwise avoidable losses of homes to foreclosure;

c.     less favorable loan modifications;

d.     increased fees and other costs to avoid or attempt to avoid foreclosure;

e.     loss of savings in fruitless attempts to secure loan modifications;

f.     loss of opportunities to pursue other refinancing or loss mitigation

strategies; and

g.     significant stress and emotional distress.

203.   Defendant's conduct was and is willful or knowing within the meaning of the

Massachusetts Consumer Protection Act, G.L. c. 93A, §9.

204.   Defendant's refusal to grant relief upon demand was and is in bad faith, with

knowledge or reason to know that the act or practice complained of violated G.L. c. 93A, §2.

205.   On February 25, 2010, Ms. Johnson sent Bank of America a demand for relief

pursuant to G.L. c. 93A on her own behalf and on behalf of a group of similarly situated

individuals.  A copy of this letter is attached as Exhibit 13.  Although Bank of America made an

offer of settlement to Ms. Johnson as an individual, it made no offer of settlement to the class of

similarly situated individuals identified in the February 25, 2010 letter in accordance with G.L. c. 93A, § 9(2).

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

a.      Certify this case as a class action and appoint the named Plaintiffs to be class representatives and their counsel to be class counsel;

b.      Enter a judgment declaring the acts and practices of Defendant complained of herein to constitute a breach of contract and a breach of the covenant of good faith and fair dealing, as well as a declaration that they are required by the doctrine of promissory estoppel to offer permanent modifications to class members on the terms promised in class members' temporary modifications;

c.      Grant a permanent or final injunction enjoining Defendant's agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiffs and the members of the Class;

d.      Order Defendant to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under HAMP;

e.      Order specific performance of Defendant's contractual obligations together with other relief required by contract and law;

f.      Award actual and/or statutory minimum damages pursuant to M.G.L. c. 93A § 9(3) to the Plaintiffs and the class;

g.      Award multiple damages pursuant to M.G.L. c. 93A § 9(3) to the Plaintiffs and the class;

h.      Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees pursuant to M.G.L. c. 93A § 9(3);

i.      Grant Plaintiffs and the Class such other and further relief as this Court finds necessary and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully Submitted,
On behalf of the Plaintiffs,

*/s/ Gary Klein*
Gary Klein (BBO 560769)
Shennan Kavanagh (BBO 655174)
Kevin Costello (BBO 669100)
RODDY KLEIN & RYAN
727 Atlantic Avenue
Boston, MA  02111-2810
Tel:  (617) 357-5500
Fax:  (617) 357-5030

Stuart Rossman (BBO 430640)
Charles Delbaum (BBO 543225)
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th floor
Boston, MA 02110
(617) 542-9595 (*telephone*)
(617) 542-8010 *(fax)*

On behalf of Patricia Johnson, Fausto Cabrera, Vellyn Antonelli, Mark Angelopoulos, Diane Anderson, James Cooley and Margaret Cooley,

*/s/ Michael Raabe*
Michael Raabe (BBO 546107)
NEIGHBORHOOD LEGAL SERVICES
170 Common Street, Suite 300
Lawrence, MA 01840
Tel:  (978) 686-6900
Fax:  (978) 685-2933

DATE:  April 30, 2010

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF) and paper copies will be sent to those indicated as non-registered participants on April 30, 2010.

/s/ Gary Klein

Gary Klein