UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PATRICIA JOHNSON, FAUSTO CABRERA,
VELLYN ANTONELLI, CARMEN FOX,
MARK ANGELOPOULOUS, DIANE
ANDERSON, JAMES COOLEY, AND
MARGARET COOLEY, on behalf of herself
and all others similarly situated,

      Plaintiffs,

      v.

BAC HOME LOANS SERVICING, LP, a
subsidiary of BANK OF AMERICA, N.A.,

      Defendant.

Civil Action No. 10-10316 - RWZ

## BAC HOME LOANS SERVICING, L.P.'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs in this case seek to enforce the federal government's Home Affordable

Modification Program ("HAMP") against Defendant BAC Home Loans Servicing, L.P.

("BAC"). This is just one of a series of at least five identical class actions brought by the same

lawyers against the major mortgage loan servicers in Massachusetts. The essential claim is that

BAC was required to give each Plaintiff a permanent loan modification under HAMP, but that it

has thus far failed to do so. There are no allegations that Plaintiffs' loan terms were unfair, or

that the Plaintiffs did not understand the terms of their loans, or that there was anything wrong

with the loans themselves. In fact, most of the loans were made by other lenders, and BAC is

merely the loan servicer. But because of changes in Plaintiffs' personal circumstances, each of

them found themselves unable to make their monthly mortgage loan payments.

As a result, Plaintiffs each allege that, at their request, BAC placed them in a trial payment plan ("TPP") under HAMP, which substantially reduced each of their monthly payments from what they were otherwise obligated to pay under their original loan agreements. Plaintiffs paid nothing and gave up nothing to receive this benefit. According to Plaintiffs, however, BAC has not acted quickly enough. Plaintiffs ask this Court to enforce their interpretation of HAMP by requiring BAC to immediately make each Plaintiff's – and each putative class member's – trial HAMP modification permanent.

The complaint must be dismissed for multiple reasons. As an initial matter, it is clear that there is no private right of action under HAMP. Recognizing that they cannot sue under HAMP, Plaintiffs couch their HAMP claims in the language of breach of contract, the covenant of good faith and fair dealing and promissory estoppel. These claims, however, must necessarily fail on multiple levels. First, the "contracts" that Plaintiffs rely on (an alleged promise to give them a permanent modification) were, at best, "agreements to agree," which lack the specificity required of an enforceable contract. Indeed, the contract claim (which seeks a back-door enforcement of HAMP) ignores the very requirements of HAMP, i.e., that in order to obtain a permanent loan modification, a borrower must actually *qualify*, including income verification, an analysis of the modified loan's affordability and other factors. According to Plaintiffs, however, as long as a borrower made his trial plan payments, he *must* be given a HAMP modification, regardless of whether he otherwise qualifies. This premise is wrong under the HAMP guidelines in effect at the time of Plaintiffs' TPPs, and as such under the alleged contract.

To be sure, the permanent modification process for some of the named Plaintiffs has worked more slowly than originally envisioned under HAMP. Some of them have nevertheless

already received permanent modifications, others have been offered permanent modifications but have not accepted them, others' requests are still being processed and still others simply do not qualify under HAMP.  But a delay in processing a HAMP loan modification (which can occur for any number of reasons depending on the individual borrower) cannot give rise to a breach of contract claim.  And even if an enforceable contract existed, Plaintiffs have suffered no economic loss as a result of the alleged breach, i.e., there are no contract damages as a  matter of law.

For the same reason, Plaintiffs' promissory estoppel claim must fail, and they have failed to allege any facts that could conceivably entitle them to relief as to their claim for breach of the implied covenant of good faith and fair dealing.  And, because Plaintiffs did not send a demand letter in compliance with M.G.L. c. 93A, §9(3) prior to filing suit, they cannot recover under that statute as a matter of law.  The Complaint should be dismissed in its entirety, with prejudice.

## FACTUAL BACKGROUND AND ALLEGATIONS

**I.      The Home Affordable Modification Program.**

In early 2009, the U.S. Treasury announced a national modification program intended to help 3 to 4 million at-risk homeowners avoid defaulting on their mortgage loans by reducing monthly payments.  First Amended Class Action Complaint ("Compl."), Ex. 2 at 1 (HAMP Supplemental Directive 09-01).  On March 4, 2009, the government published detailed program guidelines for HAMP, which it then supplemented on April 6, 2009.  *Id.*  Under the guidelines, borrowers who meet certain criteria may be eligible to have their loans modified.  *Id.* at 2.

All servicers of loans that are owned or guaranteed by Fannie Mae or Freddie Mac ("GSE loans") must participate in the GSE versions of HAMP as to those loans.  Participation in HAMP is voluntary for servicers as to non-GSE loans.  Compl., Ex. 2 at 2.  A servicer that chooses to participate in HAMP must execute a Servicer Participation Agreement "with Fannie Mae in its capacity as financial agent for the United State," *id.*, and Bank of America, N.A. did so.  Compl., ¶¶ 33-34; *see* Compl., Ex. 1.  Since its inception, there have been numerous and substantial changes to HAMP, which has been a constantly evolving new federal program.  In the past fourteen months, Treasury has issued thirteen different supplemental directives and various other documents providing guidance on HAMP, and Fannie and Freddie have each separately issued multiple different bulletins or directives.[1]

---

[1]      *See* Home Affordable Modification Program Servicer Documents, *at* https://www.hmpadmin.com/portal/programs/hamp/servicer.html (providing links to HAMP supplemental directives and other documentation for non-GSE loans) (last visited June 10, 2010); https://www.efanniemae.com/sf/mha/mhamod/ (providing links to Fannie Mae Servicing Guide Announcements and other directives for implementing HAMP for Fannie Mae loans) (last visited June 10, 2010); http://www.freddiemac.com/singlefamily/service/mha_modification.html (providing links to Freddie Mac Seller/Servicer Guide Bulletins and other directives for implementing HAMP for Freddie Mac loans) (last visited June 10, 2010).

Not all mortgage loans are eligible for HAMP, and a participating servicer is not required to modify every HAMP-eligible loan.  If borrower eligibility is satisfied, the servicer is obligated *to consider* the borrower for a HAMP modification, assuming it is not precluded from doing so by its other contractual arrangements or investor requirements.  Compl., Ex. 2 at 1.  Using the borrower's income information, a participating servicer will follow a series of steps (known as the "waterfall") in an effort to adjust the borrower's monthly mortgage payment to 31% of a borrower's total pre-tax monthly income.  *Id.* at 8-10.  Prior to June 1, 2010, servicers could initially consider a borrower's income, and place the borrower into a Trial Period Plan ("TPP") under HAMP based only on the borrower's "verbal" representation of that income.  Compl., Ex. 2 at 5.  Unsurprisingly, this process sometimes resulted in borrowers being ineligible for HAMP when their income was later verified.  Compl., Ex. 2 at 17-18 (borrower must meet all HAMP conditions to be placed in permanent modification).  If application of the waterfall produces an affordable payment, the servicer also subjects the loan to a Net Present Value ("NPV") test.  *Id.* at 4-5.  If the NPV test produces a "negative" result (meaning that losses from foreclosure are less than losses from modification), the servicer is not obligated to modify.  *Id.*

If the borrower returns the TPP, together with documents necessary to verify his or her income and eligibility for a HAMP modification (the income information must be 90 days or less dated as of the time of determining eligibility), the servicer may begin the TPP, although it retains ample discretion in this regard.  *Id.* at 5-6.  If the borrower fails to submit the necessary documentation, or does not return a signed TPP, the servicer may consider the offer to have expired after 60 days.  *Id.* at 15.  A borrower may receive a permanent HAMP modification only if he or she submits all the necessary documentation, is determined to be HAMP-eligible (including that all HAMP requirements continue to be met – *e.g.*, income is verified, NPV is

positive, the original mortgage payment exceeds 31% of pre-tax income and the modified

payment can be reduced to 31%), and makes timely payments. *Id.* at 15, 18.

## II.     *The Plaintiffs' Trial Period Plans.*[2]

Plaintiffs Patricia Johnson, Fausto Cabrera, Vallyn Antonelli, Carmen Fox, Mark

Angelopoulos, Diane Anderson, James Cooley, and Margaret Cooley are Massachusetts

homeowners whose loans are serviced by BAC.  Each of them defaulted on their loans, each

alleges to have sought and complied with their TPP obligations under HAMP, but each alleges

that they have yet to receive a permanent HAMP loan modification.  Compl. ¶ 165.

### A.     Patricia Johnson

In July 2009, when Plaintiff Patricia Johnson ("Johnson") was ten months behind on her

loan payments, BAC sent her a TPP.  Compl. ¶¶ 52-53.  The Complaint alleges that Johnson sent

BAC the signed TPP and requested documentation on July 29, 2009, and that she made timely

TPP payments to BAC.  *Id.* ¶¶ 56, 58.  Johnson claims that BAC sent her a letter on November

13, 2009, requesting a signed copy of her most recent tax return, and that she provided the

requested documentation.  *Id.* ¶¶ 62, 64.  Johnson then sent additional documentation to BAC in

February 2010.  *Id.* ¶¶ 66-67.  The Complaint alleges that as of the filing of the Complaint,

Johnson had not been offered a permanent HAMP modification.  *Id.* ¶ 68.[3]

---

[2]      The recitation of the factual allegations herein is taken in part from Plaintiffs' Complaint and is intended only to aid in the Court's resolution of this Motion to Dismiss.  By including these allegations in this memorandum, BAC does not intend to admit them and reserves its right to challenge them at a later date.

[3]      Ms. Johnson was offered and accepted a loan modification in response to her Chapter 93A demand.  *See* Complaint ¶ 205.  She has not, however, returned the modification agreement to BAC and her loan cannot be modified until she does so.

B.    Fausto Cabrera

Plaintiff Fausto Cabrera ("Cabrera") obtained a loan from Massachusetts Limited

Liability Company in 2005.  Compl. ¶ 72.  He subsequently defaulted on his loan payments to

BAC (the loan servicer), and BAC sent him a TPP on May 20, 2009.  Compl. ¶¶ 74, 76.

Cabrera's TPP reduced his monthly payment from $1,600.83 to $1,012.84, and he allegedly

made three consecutive TPP payments.  *Id.* ¶¶ 77, 80.  According to the Complaint, BAC

commenced foreclosure proceedings against Cabrera due to his default in June 2009, but

postponed each foreclosure proceeding and has not, in fact, foreclosed.  *Id.* ¶¶ 83-88.  Cabrera

remains in his home to this date, but the Complaint alleges that he has not yet been offered a

permanent loan modification under HAMP.  *Id.* ¶ 91.

C.    Vellyn Antonelli

Plaintiff Vellyn Antonelli ("Antonelli") obtained a loan from Mortgage Partners, Inc. in

2006.  Compl. ¶ 93.  She had difficulty paying her monthly mortgage payments, and BAC sent a

TPP on July 28, 2009.  Compl. ¶¶ 95, 97.  Antonelli's TPP reduced her monthly payment from

$2,429.52 to $1,148.79 and she allegedly made her August, September, and October 2009

payments to BAC under the TPP.  *Id.* ¶¶ 98, 101.  Antonelli completed debt counseling as part of

the TPP.  *Id.* ¶ 103.  Antonelli alleges that she received two Notices of Intention to Foreclose

from BAC, but was not foreclosed on, and she remains in her home.  *Id.* ¶¶ 104-06.

D.    Carmen Fox

Plaintiff Carmen Fox ("Fox") was behind on her mortgage payments to BAC in March

2009, and late in July 2009 BAC allegedly informed Fox that it would initiate foreclosure

proceedings on her home.  Compl. ¶¶ 115-116.  BAC subsequently sent Fox a TPP on October

19, 2009.  *Id.* ¶ 118.  Fox's TPP reduced her monthly payment from $1,678.87 to $1,097.40,

Compl. ¶ 118, and she allegedly made her three required TPP payments.  *Id.* ¶¶ 119, 121.  Fox

alleges that BAC continued with the foreclosure activity in December and January, but BAC

postponed each foreclosure sale and did not foreclose.  *Id.* ¶¶ 122-23.  Fox remains in her home

to this date.  Fox further alleges that as of the filing date of the Complaint, she had not been

offered a permanent loan modification under HAMP.  *Id.* ¶ 124.[4]

     E.    <u>Mark Angelopoulos and Diane Anderson</u>

     Plaintiffs Mark Angelopoulos ("Angelopoulos") and Diane Anderson ("Anderson")

defaulted on their mortgage payments to BAC and were sent a TPP on June 22, 2009.  Compl. ¶¶

130, 132, 134.  Angelopoulos and Anderson allegedly made timely TPP payments to BAC.  *Id.* ¶

137.  On November 30, 2010, BAC requested additional documentation that Angelopoulos and

Anderson believed they had previously provided.  *Id.* ¶¶ 139-40.  The Complaint alleges that

Angelopoulos and Anderson spoke with a customer service agent at BAC who told them not to

send in the materials.  *Id.* ¶ 140.  Angelopoulos and Anderson claim that as of the filing date of

the Complaint, they had not been offered a permanent loan modification under HAMP.  *Id.* ¶

142.[5]  They have not been foreclosed upon, and both individuals remain in their home.

     F.    <u>James and Margaret Cooley</u>

     Plaintiffs James and Margaret Cooley ("Cooleys") took a loan from Mortgage Lenders

Network USA in 2006.  Compl. ¶ 146.  They allege that as of the filing date of the Complaint,

they had not been offered a permanent loan modification from BAC under HAMP.  Compl. ¶

161.  The Cooleys, however, received their TPP modification from Wilshire Credit Corporation

---

[4]    Fox's permanent modification failed the NPV test and is thus HAMP ineligible.  As it does for virtually all TPP applicants who do not qualify for HAMP, BAC is exploring other modification options for Fox.

[5]    Angelopoulos and Anderson were, in fact, sent permanent modification documents prior to the filing of the Complaint, which they accepted on May 7, 2010.

("Wilshire"), the previous loan servicer, not from BAC. *Id.* ¶ 150. BAC did not become the servicer of the Cooleys' loan until March 1, 2010. *Id.* ¶ 155. The Complaint alleges that BAC is "waiting for paperwork from Wilshire" in order to process the TPP and possible permanent HAMP modification. *Id.* ¶ 158. The Cooleys claim to have paid BAC their full non-TPP payment in March 2010, the amount owed per month under their mortgage, "in fear that BAC would foreclose as it threatened," but BAC has yet to initiate foreclosure proceedings and the Cooleys currently remain in their home. *Id.* ¶¶ 156-57.[6]

## ARGUMENT

### I.    *Plaintiffs May Not Pursue A Lawsuit For A Permanent Modification Under HAMP.*

Despite the causes of action alleged, what the Complaint attempts, on its face, is to enforce BAC's obligations under HAMP, as Plaintiffs perceive them, through a private lawsuit. Plaintiffs claim that BAC's actions "thwart the purpose of HAMP," and they ask the Court to declare that BAC be "required" to "offer permanent modifications" to Plaintiffs and the Class. Compl. ¶ 5; Prayer for Relief. That Plaintiffs seek to enforce HAMP is made plain by the fact that they have brought identical lawsuits against every major loan servicer in the Commonwealth.[7]

Plaintiffs are simply not permitted to enforce HAMP through a private lawsuit. This is so for at least two reasons. First, HAMP itself, although designed to help homeowners, does not create a right to a loan modification. Neither the Emergency Economic Stabilization Act, 12

---

[6]    The Cooleys have recently submitted additional documentation to BAC to allow it to complete the evaluation of their HAMP eligibility.

[7]    See *Bosque v. Wells Fargo Bank, N.A.*, Civil Action No. 10-10311-FDS, filed 2/23/2010; *Durmic v. J.P. Morgan Chase Bank, N.A.,* Civil Action No. 1-10380-RGS, filed 3/3/2010; *Reyes v. IndyMac Mortgage Services, F.S.B.*, Civil Action No. 10-10389-NG, filed 3/4/2010; *Belyea v. Litton Loan Servicing, LLP,* Civil Action No. 10-10931-GAO, filed 6/4/2010.

U.S.C. § 5201 (2008) ("EESA"), which created HAMP, nor HAMP's guidelines intended "to create a property interest in loan modifications for mortgages in default." *Williams v. Geithner*, No. 09-1959, 2009 WL 3757380, *6 (D. Minn. Nov. 9, 2009).

Second, HAMP does not provide plaintiffs with the right to privately enforce its terms – whether directly or under state law. *See Aleem v. Bank of America, N.A.*, No. EDCV 09-01812, 2010 WL 532330, *3-4 (C.D. Cal. Feb. 9, 2010) (no private right of action under HAMP); *Gonzales v. First Franklin Loan Servs.*, No. 1:09-CV-00941, 2010 WL 144862, *18 (E.D. Cal. Jan. 11, 2010) (no private right of action under EESA).  As such, state laws cannot be used to create private rights of action where none exist under federal law. *Aleem,* 2010 WL 532330 at *3-4 ("UCL cannot create a private right of action where none exists under the federal statute"); *Pantoja v. Countrywide Home Loans, Inc.,* 640 F. Supp. 2d 1177, 1187 (N.D. Cal. 2009); *Ung v. GMAC Mortgage,* No. EDCV 09-893, 2009 WL 2902434, *9-11 (C.D. Cal. Sept. 4, 2009) (dismissing TARP-based claims pled as the basis for state law claims).

That HAMP does not provide for a private right of action is consistent with the fact that enforcement of HAMP is vested exclusively with Freddie Mac, which the U.S. Treasury designated as its compliance agent under HAMP.  Compl., Ex. 2, at 25.  To ensure that loan servicers comply with HAMP requirements, Freddie Mac has extensive oversight and remedial powers to enforce HAMP's mandates.  *See id.*  As such, Plaintiffs are not permitted to pursue private claims under HAMP.[8]

---

[8]     Nor can Plaintiffs sue under the Servicer Participation Agreement as a third-party beneficiary. *Villa v. Wells Fargo Bank, N.A.*, No. 10-cv-81, 2010 Wl 935680, *2-3 (S.D. Cal. March 15, 2010) (borrowers have no standing to enforce Servicer Participation Agreements); *Escobedo v. Countrywide Home Loans, Inc.*, No. 09-cv-1557, 2009 WL 4981618 (S.D. Cal. Dec. 15, 2009) (same).

**II.     *Plaintiffs Have Not Stated a Claim for Breach of Contract Based Upon the Trial Period Plans.***

Without a cause of action under HAMP, Plaintiffs attempt an end-run around HAMP's dictates by asserting a breach of contract claim based upon the TPPs they received.  This effort fails as a matter of law.  A plaintiff asserting a breach of contract claim must show all of the following elements:  (1) a contract supported by valid consideration, (2) the plaintiff's performance under the contract, (3) the defendant's breach of the contract, and (4) harm or damages to the plaintiff as a result of the defendant's breach.  *MeadWestvaco Corp. v. Worcester New Bond LLC*, No. 07-0921 BLS 2, 2009 WL 971273, *6 (Mass Super. Ct. Jan 6, 2009).  Plaintiffs cannot, as a matter of law, establish at least two of these critical elements.

A.     <u>The Trial Period Plans Are Unenforceable "Agreements to Agree."</u>

Plaintiffs premise their claim for breach of contract on the TPPs BAC provided to them, examples of which are attached to the Complaint as Exhibits 7 and 9-12.  The TPPs, however, are not enforceable against BAC.

1.     The TPPs Themselves Do Not Contain Sufficient Terms to Be a Binding Contract.

Plaintiffs' trial period plans are, at most, mere "agreements to agree" that cannot be enforced against BAC as a matter of law.  "Under Massachusetts law, an 'agreement to reach an agreement is a contradiction in terms and imposes no obligation on the parties thereto.'" *Giuliano v. Nations Title, Inc.*, No. 96-2331, 1998 WL 45459, *4 (1st Cir. Jan. 23, 1998) (quoting *Rosenfield v. U.S. Trust Co.*, 290 Mass. 210 (1935)); *see also Air Tech. Corp. v. General Elec. Co.*, 347 Mass. 613, 626 (1964) ("A purported contract which is no more than agreement to agree in the future on essential terms, or one which does not adequately specify essential terms, ordinarily will be unenforceable.").  In order to constitute an enforceable

contract, a contract that contemplates a further agreement at a later date must set forth the "essential terms . . . with sufficient definiteness and clarity." *Giuliano*, 1998 WL 45459 at *4 (quoting *George W. Wilcox, Inc. v. Shell Eastern Petroleum Prods.*, 283 Mass. 383, 388 (1933)).

The TPPs on which Plaintiffs premise their breach of contract claims fail to set forth the essential terms of the permanent modifications that Plaintiffs hoped to receive with any clarity. Indeed, the TPPs recognize that Plaintiffs may not receive *any* permanent modification after the documents and information related to their loans have been considered.  Section 2.F of the TPPs provide that the TPP can be terminated for a number of reasons, including that the Servicer determines that the borrower's representations are not true and correct.  *See, e.g.*, Compl., Ex. 7 at 2.  And, even if the TPPs would eventually result in permanent modifications, the TPPs contain no description of what the terms of those permanent modifications will look like:  they do not set forth the amounts remaining to be repaid by Plaintiffs, the final interest rates or monthly payment amounts of the modified loans, the amount of any principal forbearance, or the dates on which the modified loans would mature.  *Cf. Jordan-Milton Machinery, Inc. v. F/V Teresa Marie, II*, 978 F.2d 32, 35 (1st Cir. 1992) (purported agreement to provide financing was "too vague and uncertain to constitute an enforceable contract" where agreement omitted any description of "the term of the loan (i.e., when repayment was to begin and end); there was no agreement as to the amount to be repaid each month; nor was there an agreement as to the rate of interest to be charged").

        2.        The Requirements of HAMP Make Clear That The TPP Can Be No More Than an Agreement to Agree.

That the TPPs cannot be an enforceable contract is evidenced by the very allegations Plaintiffs make, and the terms of HAMP.  Because Plaintiffs seek permanent modifications under

HAMP, there can be no dispute that they must *qualify* for a permanent modification under the program. But Plaintiffs' theory is that any borrower who receives a TPP and makes his three payments *must* be given a permanent modification. *See* Compl. ¶¶ 44, 165.

Plaintiffs' essential theory thus stands HAMP on its head. Nowhere do HAMP guidelines mandate that any borrower who obtains a TPP and makes payments is guaranteed a permanent modification. Indeed, the guidelines implicitly *reject* that conclusion. At the time plaintiffs received their TPPs, HAMP guidelines expressly permitted a servicer to place a borrower on a trial plan *before* the servicer obtained all of the borrower's documentation and was able to determine eligibility for a permanent modification. Compl., Ex. 2, at 5, 17 ("[s]ervicers are not required to verify financial information prior to the effective date of the trial period"). HAMP guidelines also contemplated that the servicer would evaluate (or reevaluate) the borrower's NPV during the trial plan to determine if the NPV is positive (and thus eligible for modification) or negative (and thus not appropriate for modification).[9] The guidelines do not presume that every trial modification would necessarily result in a permanent loan modification, nor do they expect that every permanent modification will be provided immediately upon completion of the trial plan.

Moreover, the form and substance of the TPP documents are required by Treasury under the HAMP program. *See, e.g.,* Compl., Ex. 2. The HAMP TPPs upon which Plaintiffs premise their claims were extended to Plaintiffs using a "Form 3156" – the form that Fannie Mae and the

---

[9]    *See* Supplemental Directive 10-01, at 10 (Jan. 28, 2010), *available at* https://www.hmpadmin.com/portal/docs/hamp_servicer/sd1001.pdf; *see also* HAMP FAQs at 27-28 (April 2, 2010) (Q2314), *available at* https://www.hmpadmin.com/portal/docs/hamp_servicer/hampfaqs.pdf**.**

U.S. Treasury specifically promulgated for servicers to use when extending TPPs to borrowers.[10]

As set forth in HAMP Supplemental Directive 09-01, servicers "must obtain prior written

approval from Treasury or Fannie Mae" if they want to use their own TPP documents.  Compl.,

Ex. 2, at 15.  As such, the TPPs are part of HAMP and require HAMP eligibility – by merely

complying with HAMP's requirements to use a particular form, BAC was not contractually

promising Plaintiffs a permanent modification.

Finally, the language of the TPPs confirm that borrower must satisfy HAMP's

requirements to be eligible for a permanent modification.  Among other things, all borrower

representations must remain accurate and truthful, and permanent modification of Plaintiffs'

loans was conditioned on the receipt and review by BAC of additional documentation and the

satisfaction of all necessary conditions to render Plaintiffs eligible for a permanent modification.

Compl., Ex. 2 at 1, 3.

For all of these reasons, and as a matter of law, Plaintiffs' TPPs cannot be considered

enforceable contracts against BAC for a permanent loan modification.

B.      Plaintiffs Have Alleged No Cognizable Harm or Damages Due to the Alleged
        Breaches.

Even if the TPPs constitute enforceable contracts, the Complaint identifies no monetary

harm or damages to Plaintiffs as a result of the alleged breach– nor can it.  As a result of the

TPPs, Plaintiffs' monthly payments were substantially reduced from what they would otherwise

have been obligated to pay under the terms of their original loans.  Some of them have already

---

[10]     *See* News and Updates 2009 – Home Affordable Modification Trial Period Plan, *at*
https://www.efanniemae.com/sf/formsdocs/documents/newsupdates/newsandupdates2009.jsp (describing Fannie
Mae's creation of the Form 3156 in March & April 2009).  Form 3156 has since been discontinued and replaced by
a form entitled "Making Home Affordable Program Request For Modification and Affidavit."  *See* Supplemental
Directive 09-07, at 6-7 (Oct. 8, 2009), *available at*
https://www.hmpadmin.com/portal/docs/hamp_servicer/sd0907.pdf.

received permanent modifications, others have been offered but have not accepted them, and still others are in process.  (See notes 3-6 *supra*).  But all Plaintiffs are still living in their homes and have not been foreclosed upon.  In light of this, Plaintiffs' contention that they "are wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes," Compl. ¶ 5, rings particularly hollow.  Plaintiffs have been given the opportunity to do, and are doing, exactly those things.

Plaintiffs' other allegations of harm are without merit.  The averment that as a result of the alleged breaches, "Plaintiffs forewent other remedies that might be pursued to save their home *[sic]*, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their default, such as selling their home," Compl. ¶ 185, is simply inaccurate.  Nothing currently prevents Plaintiffs from declaring bankruptcy or putting their homes on the market.  They could have done so yesterday, they could still do so today, and they will be able to do so tomorrow.

Any other "remedies" or "strategies" that Plaintiffs may have foregone as a result of the alleged breach here are not pleaded with enough particularity to satisfy the requirement of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-55 (2007), that the factual allegations in the Complaint "must be enough to raise a right to relief above the speculative level."  *Cf. Kiely v. Raytheon Co.*, 105 F.3d 734, 739 (1st Cir. 1997) (holding allegation that, if not for breach of contract, plaintiff may have taken some other action that could have been more advantageous to him was "too speculative to be enforceable").  Similarly, the bald assertion that "[s]ome putative class members have suffered additional harm in the form of foreclosure activity against their homes," Compl. ¶ 185, does not sufficiently plead that the Plaintiffs themselves have suffered

any harm.  The Complaint identifies no harm or damages to Plaintiffs as a result of BAC's

alleged breaches of the TPPs, and Plaintiffs' breach of contract claim must be dismissed.

### III.   *Plaintiffs' Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Must Fail for the Same Reasons Their Breach of Contract Claim Fails.*

Plaintiffs cannot recover for breach of the implied covenant of good faith and fair

dealing.  A critical hurdle any plaintiff must clear in order to state a claim for breach of this

covenant is to establish the existence of a contract.  *See Christensen v. Kingston School Comm.*,

360 F. Supp. 2d 212, 226 (D. Mass. 2005).  As already set forth in detail above, the TPPs under

which Plaintiffs seek recovery are not enforceable contracts.  This alone bars any entitlement to

relief.  In addition, Plaintiffs are unable to establish the requisite damages necessary to recover

for breach of the covenant of good faith and fair dealing, for all of the same reasons noted above.

As with their breach of contract claim, Plaintiffs can establish no contract and no damages, and

thus cannot recover for breach of the implied covenant of good faith and fair dealing.

Moreover, Plaintiffs have simply not alleged any conduct by BAC that would entitle

them to recover under this theory.  "[N]ot every breach of contract is a breach of the implied

covenant of good faith and fair dealing."  *Christensen*, 360 F. Supp. 2d at 226.  Rather, recovery

for breach of the covenant "requires conduct taken in bad faith either to deprive a party of the

fruits of labor already substantially earned or unfair leveraging of the contract terms to secure

undue economic advantage."  *Id.* (citing *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass.

451, 471 (1991)).  None of the allegations in the Complaint, viewed charitably, would establish a

path to relief under either of these grounds.  With respect to the former, the Complaint is entirely

devoid of any allegation or insinuation that BAC acted in bad faith by not granting Plaintiffs

permanent modifications immediately upon their payment of three trial period payments.  With

respect to the latter, there is no allegation that could conceivably establish that BAC "unfairly leveraged" the terms of the TPPs to secure an economic advantage.  Indeed, the economic advantage under the TPPs has inured entirely to the benefit of Plaintiffs, who have (at least temporarily) been relieved of their obligation to make full mortgage payments, and instead have been permitted to make significantly smaller payments while keeping their homes.  Because Plaintiffs have not pleaded facts consistent with BAC's liability under this theory, their claim for breach of the implied covenant of good faith and fair dealing must be dismissed.

**IV.   *Plaintiffs' Claim for Promissory Estoppel Must Fail for the Same Reason as Their Contract-Based Claims.***

Plaintiffs' alternative theory of relief for recovering under the TPPs – promissory estoppel – fares no better than their claims for breach of contract and breach of the covenant of good faith and fair dealing.  "A claim for promissory estoppel requires proof that: (1) a promise was made that the promisor should reasonably expect to induce reliance by the promisee; (2) the promise induces detrimental reliance by the promisee; and (3) injustice can be avoided only by enforcing the promise."  *McGeoghean v. McGeoghean*, Nos. 2004-05164, 04P-4734EP1, 05-52SU24, 2009 WL 2230884, *4 (Mass. Super. Ct. June 1, 2009).  An "essential element of a claim for promissory estoppel under Massachusetts law" is that the plaintiff suffered damages in reliance on the defendant's promise.  *Veranda Beach Club Ltd. Partnership v. Western Surety Co.*, 936 F.2d 1364, 1381 n.10 (1st Cir. 1991) (citing *Hall v. Horizon House Microwave, Inc.*, 506 N.E.2d 178, 184 (Mass. App. Ct. 1987)).

Plaintiffs simply have not pled facts establishing that they suffered damages as a result of their reliance on BAC's alleged promises and that "injustice can be avoided only by enforcing the promise."  The sole harm Plaintiffs allege as a result of their reliance on the supposed

promises is that they "have lost the opportunity to fund other strategies to deal with their default and avoid foreclosure." Compl. ¶ 198.  To the contrary, Plaintiffs have, as a result of their TPPs, been making payments in an amount far less than they were otherwise obligated to pay under the terms of their original mortgage contract.  As a result of their reduced mortgage debt, Plaintiffs have freed up hundreds (or in some cases thousands) of dollars per month to "fund other strategies" – whatever those strategies may be.  If Plaintiffs are again referring to the possibility that they could have or would have filed for bankruptcy or sold their homes, this is, as discussed above, a red herring, because Plaintiffs are still fully capable of doing either of those things if they wish.  And, to the extent that Plaintiffs are referring to different "strategies," these damages are purely speculative and therefore not pleaded with enough particularity to satisfy the strict pleading requirements of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-55 (2007).  Because Plaintiffs have failed to identify a detrimental change in their position as a result of any allegedly broken promise, their promissory estoppel claim must be dismissed.

## V.     *Plaintiffs' Chapter 93A Claims Must Also Be Dismissed.*

Plaintiffs' claims for unfair and deceptive acts and practices, brought under M.G.L. c. 93A, must be dismissed because Plaintiffs have failed to satisfy a critical prerequisite to suit under that statute -- the 93A demand letter.  M.G.L. c. 93A, § 9(3).  This is a "absolute prerequisite to an action asserted under G.L. c. 93A, § 9," and failure to satisfy it entitles a defendant to judgment as a matter of law.  *Ball v. Wal-Mart, Inc.*, 102 F. Supp. 2d 44, 54 (D. Mass. 2000) (granting summary judgment for defendant where plaintiff failed to send demand letter); *see also Kanamaru v. Holyoke Mut. Ins. Co.*, 892 N.E.2d 759, 768 (Mass. App. Ct. 2008) (affirming entry of summary judgment for defendant where plaintiff "did not plead having sent a letter in compliance with this requirement").  The Plaintiffs here who seek to recover for a

purported violation of c. 93A (*i.e.*, all the named Plaintiffs other than Johnson) failed to send such a letter, and their claims must accordingly be dismissed.

On February 25, 2010, the single original named plaintiff in this matter, Patricia Johnson, sent a 93A demand letter, purportedly "on her own behalf and on behalf of a group of similarly situated individuals."  Compl. ¶ 205.  That letter described the facts relevant to Ms. Johnson's claim against BAC, but mentioned no other "similarly situated individual" by name.  *See* Compl. Ex. 13.  BAC responded on March 26, 2010 by offering relief to Ms. Johnson as an individual, but did not offer settlement to the putative class of similarly situated individuals identified in the letter.  Compl. ¶ 205.  Ms. Johnson accepted that tendered offer of settlement to her individually, and accordingly, she has not brought any claim against BAC under chapter 93A.  However, on April 30, 2010, the complaint was amended to add seven new named plaintiffs, all of whom now assert a 93A claim against BAC.  The seven new plaintiffs, none of whom were mentioned in Ms. Johnson's February 25 letter (neither by name nor by reference to the factual circumstances alleged in the Complaint), now rely upon her letter to satisfy the statutory prerequisite.  *Id.*

This effort must fail.  M.G.L. chapter 93A, § 9(3) requires that "[a]t least thirty days prior to the filing of any such action, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent."  The statute itself therefore requires that the demand letter "identify[] the claimant," *id.*, language that "denote[s] the party from whom a written demand letter is expected and to whom a written tender is made."  *Richards v. Arteva Specialties S.A.R.L.*, 66 Mass. App. Ct. 726, 732, 850 N.E.2d 1068, 1074 (Mass. App. 2006).  Plaintiffs assert that the February 25 letter, because it identified "a group of similarly

situated individuals," of which the newly-added plaintiffs are supposedly a part, satisfied § 9(3)'s requirement that they be identified.

This is incorrect as a matter of Massachusetts law.  The purpose of chapter 93A's pre-suit demand letter requirement is "to promote negotiation and settlement of claims and to allow the potential defendant the chance to make a reasonable offer of settlement in order to limit the damages a potential plaintiff might recover."  *Bassi v. Julian Crane & Equip. Corp.*, No. 02-0306, 2005 WL 3105676, *6 (Mass. Super. Oct. 26, 2005) (citing *Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 704 (1975)).  Plaintiffs' attempt to rely upon the class allegations in a demand letter sent by an entirely different individual to satisfy their pre-filing notice requirement undermines the very purposes of the pre-suit demand requirement.  As noted, the demand letter at issue in this case does not even mention the named Plaintiffs now seeking to recover under 93A, let alone describe the injuries each of them allegedly suffered.  Without any notice that any of the individual Plaintiffs claimed to have suffered injury under chapter 93A, BAC was afforded no opportunity to evaluate the facts on which Plaintiffs seek to recover, the strength of Plaintiffs' cases, and what a reasonable settlement might be in light of the injuries allegedly suffered.  As a result, it had no opportunity to avoid suit, to limit its damages, or to avoid potential responsibility for Plaintiffs' attorneys fees and costs in this action by making a reasonable offer of settlement.  It bears noting, moreover, that if Plaintiffs' position were accepted, it would lead to the result that *any* person who claims to be a member of the putative class referenced in the demand letter – whether represented by the same counsel as Ms. Johnson or not – could file suit against BAC under chapter 93A, without BAC having been given the opportunity to review that person's claims and the facts, or to make a settlement offer to that individual.

20

Plaintiffs' attempt to bring a 93A claim without complying with the demand requirement eviscerates the pre-litigation resolution processes of the statute.  The 93A claim should be dismissed.

## CONCLUSION

For the foregoing reasons, BAC Home Loans Servicing, L.P. respectfully request that the Court dismiss Plaintiffs' First Amended Class Action Complaint with prejudice for failure to state a claim upon which relief can be granted, and grant such other relief as it deems just and equitable.

Dated:  June 14, 2010

Respectfully submitted,
BAC Home Loans Servicing, L.P.,
By its attorneys,


/s/ James W. McGarry
James W. McGarry (BBO No. 633726)
jmcgarry@goodwinprocter.com
Mark Tyler Knights (BBO No. 670991)
mknights@goodwinprocter.com
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts  02109
Tel.:  617.570.1000
Fax:  617.523.1231


## CERTIFICATE OF SERVICE

I, James W. McGarry, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on June 14, 2010.

/s/ James W. McGarry

LIBA/2093531.6