**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **PATRICIA JOHNSON, FAUSTO CABRERA, VELLYN ANTONELLI, CARMEN FOX, MARK ANGELOPOULOS, DIANE ANDERSON JAMES COOLEY and MARGARET COOLEY, on behalf of themselves and all others similarly situated,**<br><br>**Plaintiffs,**<br>**vs.**<br><br>**BAC HOME LOANS SERVICING, L.P., a subsidiary of BANK OF AMERICA, N.A.**<br><br>**Defendant.** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **C.A. NO. 10-10316** |

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**

Plaintiffs Patricia Johnson, Fausto Cabrera, Vellyn Antonelli, Carmen Fox, Mark Angelopoulos, Diane Anderson, James Cooley and Margaret Cooley, on behalf of themselves and all others similarly situated ("Plaintiffs") hereby oppose the motion to dismiss [Docket No. 10] of Defendant BAC Home Loans Servicing, L.P. ("Defendant" or "BAC").

## I.    INTRODUCTION

BAC's memorandum is an effort to misdirect the Court from the indisputable fact that it fails to meet its contractual obligations to modify residential mortgages across Massachusetts. BAC's routine breach of form contracts undermines homeowners in their efforts to prevent foreclosure. Damages, preventable homelessness and other substantial injuries result.

BAC makes not a single reference to the language of its form contract that is the basis for this lawsuit,[1] but rather sets up sleight of hand arguments about private rights of action under the federal government's Home Affordable Modification Program ("HAMP").  Plaintiffs' claims are not founded directly in HAMP program requirements – they spring independently from the binding agreements Plaintiffs have executed with BAC.  The First Amended Complaint ("FAC") requests that BAC tender promised permanent loan modification agreements and demands that BAC make affected borrowers whole for damages.

Repeatedly, BAC's memorandum ignores the standard for dismissal under Fed. R. Civ. P. 12(b)(6), inappropriately disputing multiple allegations of the First Amended Complaint.  For instance, BAC's repeated speculation that some Plaintiffs may ultimately be ineligible for

---

[1] Among other sections of the TPP contract, the First Amended Complaint [Docket No. 5] (hereinafter "FAC") focuses on the following language: "If [the Plaintiff] [is] in compliance with this Trial Period Plan (the "Plan") and [her] representations in Section 1 continue to be true in all material respects, then the Servicer will provide [the Plaintiff] with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage." *See* First Amended Complaint [Docket No. 5] at ¶¶ 55, 78, 99, 120, 135, 153.

permanent loan modifications, *see* BAC Mem. at 12-14, is inconsistent with the requirement that factual allegation in the Complaint must be taken as true for the purposes of this motion. Similarly, BAC's assertion that it is entitled to an ongoing period throughout and beyond the TPP to evaluate Plaintiffs' eligibility based on pending documentation requests, *see id.,* is at odds with the allegations, by each Plaintiff, that all requested documentation was provided. Each Plaintiff has properly pled that they complied with all of the requirements of the TPP Agreements, that they are eligible for permanent modifications under HAMP, and that they were not tendered required modification agreements before the close of the trial period.

BAC's argument on their breach of the implied covenant of good faith and fair dealing likewise is similarly unpersuasive – the First Amended Complaint adequately alleges bad faith. Finally, BAC's position on the Plaintiffs' G.L. c. 93A claim would eviscerate the class action provisions of the statute – a result that comports with neither a plain reading of the statute nor applicable case law. BAC had the requisite notice of the claims of the class and a more than adequate opportunity to resolve this matter for a class.  Chapter 93A requires nothing more.

## II.       BACKGROUND

Plaintiffs in this matter are united by a common factual circumstance – each of them was determined by BAC to qualify for HAMP, and each executed a binding agreement with BAC with an explicit bargained-for exchange.  If an eligible homeowner complied with their TPP Agreement by making three months of payments (in an amount dictated by the servicer) and by providing documentation requested of them to verify their income, BAC promised to tender them a permanent loan modification under the rules of HAMP.  Each of the Plaintiffs delivered on their end of the bargain – making the trial payments promised and providing the documentation requested.  Yet none of the Plaintiffs were tendered permanent modification offers upon

completion of the three-month trial period as promised.  This simple breach forms the basis of Plaintiffs' claims.

BAC's voluntary participation in HAMP, *see* FAC, Ex. 1, has been accompanied by a dismal track record for completing HAMP modifications.  Numbers reported to the Treasury Department in February 2010 show that BAC permanently had modified less than 1% of the eligible loans in its portfolio.  FAC ¶ 45.  Even more significant to the claims here at issue, BAC permanently has modified only 5% of the loans that were subject to TPP Agreements.  *Id.*  This routine failure bespeaks a systemic flaw – BAC is not meeting the obligations created when it enters into TPP Agreements.

A.     **Each Plaintiff Was Uniformly Affected by BAC's Conduct**[2]

As illustrated by BAC's description of the named plaintiffs' factual scenarios in its memorandum, *see* BAC Mem. at 6-9, Plaintiffs uniformly have been affected by BAC's conduct. Each of the named plaintiffs completed the HAMP application process, were determined initially eligible for HAMP and tendered TPP Agreements.  FAC at ¶¶ 75-76 (Cabrera), ¶¶ 96-97 (Antonelli), ¶ 117 (Fox), ¶ 149-50 (Cooley).[3]  Each of the named plaintiffs executed and returned the TPP Agreement that was offered to them.  FAC at ¶ 77 (Cabrera), ¶ 98 (Antonelli), ¶ 119 (Fox), ¶ 151 (Cooley).  Each of the named plaintiffs made the payments called for under the TPP

---

[2] Mark Angelopoulous and Diane Anderson accepted the offer of a permanent modification under HAMP from BAC on May 7, 2010.  Patricia Johnson accepted an offer for a permanent loan modification presented to her after the commencement of litigation.  These Plaintiffs will be voluntarily dismissed from the case either by stipulation or by petition for an Order of the Court, pursuant to Fed. R. Civ. P. 41.

[3] Plaintiffs James and Margaret Cooley began their TPP under the auspices of Wilshire Credit Corporation ("Wilshire").  FAC ¶ 147.  BAC, however, assumed responsibilities for the Cooleys' servicing in the midst of the TPP.  FAC ¶ 155.  The Cooleys assert that BAC, as successor to Wilshire, is bound by the TPP Agreement between Wilshire and themselves.  BAC's motion to dismiss does not argue otherwise.

Agreement, and indeed, continued payments after the TPP ended.  FAC at ¶ 80 (Cabrera), ¶ 101 (Antonelli), ¶ 121 (Fox), ¶ 154, 157 (Cooley).  Last, each named plaintiff fully complied with all documentation requests made to them. FAC at ¶ 81 (Cabrera), ¶ 102 (Antonelli), ¶ 124 (Fox), ¶ 159 (Cooley).

Based on their eligibility and performance under the TPP Agreements, Plaintiffs expected to be tendered a permanent loan modification with payment terms determined according to HAMP at the close of their three month trial periods.  BAC not only failed to tender permanent modifications to the named Plaintiffs by the close of the trial period, it also neglected to send Plaintiffs any written decision within that timeframe. FAC at ¶ 82 (Cabrera), ¶¶ 108 (Antonelli), ¶ 124 (Fox), ¶ 160 (Cooley).  Instead, Plaintiffs were the targets of redundant, ambiguous and threatening demands for documents.  FAC at ¶ 90 (Cabrera), ¶ 109 (Antonelli), ¶ 117 (Fox), ¶ 162 (Cooley).  Even more significant, Plaintiffs were subjected to unnerving and unnecessary foreclosure threats and processes. FAC at ¶¶ 83-88 (Cabrera), ¶¶ 104-106 (Antonelli), ¶ 122 (Fox), ¶ 156 (Cooley).  BAC's failures resulted in harm to Plaintiffs, both because they forewent other opportunities to address their defaults, and because the Servicer's ongoing activities regarding a distressed property, including but not limited to foreclosure threats and processes, effected financial and emotional injury on Plaintiffs by pushing them further into default on their mortgage obligations and causing them to incur additional interest, fees and charges.  FAC ¶¶ 185, 191, 198, 202.

## III.    LEGAL STANDARD

BAC's memorandum contains multiple inappropriate disputes of material facts alleged by Plaintiffs and fails to acknowledge the applicable legal standards for its motion. In order to survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as

true, to state a claim to relief that is plausible on its face.  *See Armstrong Pharmaceuticals, Inc. v. Micron Technologies, Inc.*, Civil Action No. 09-11197-RWZ, 2010 WL 745057 at *1 (D. Mass. Feb. 25, 2010) (Zobel, J.) *quoting Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  If the facts as pled allow the Court to draw a reasonable inference that the Defendant is liable for alleged misconduct, the motion to dismiss must be denied.  *Id.*  Such is the case here.

IV.   **ARGUMENT**

   A.   **Plaintiffs' Claims Arise Under Contract Rather Than Federal HAMP Guidelines**

   BAC's primary argument for dismissal of the case is nothing more than sleight of hand.  BAC attempts to confuse the issues in this case by directing this Court's attention elsewhere -- to the contract between the Defendant and Treasury, to the relationship between borrowers and Treasury, and to the relationship between borrowers and lenders.  BAC Mem. at 9-10.  However, none of those relationships are properly at issue here.[4]

   BAC instructed Plaintiffs to follow certain procedures and were promised in a signed written agreement that following those steps would result in an affordable, permanent loan modification within three months.  Those promises were broken.  The stimulus bill, the SPA, and the HAMP Program Documentation are relevant only as context, in that they provided guidelines for BAC's actions.  But they do not form any part of the legal predicate for Plaintiffs' claims which sound in contract.  Thus, the existence or lack thereof of a private right of action "under

---

[4] BAC's reliance on *Aleem v. Bank of America*, No. EDCV 09-01812, 2010 WL 532330 at *3, (C.D. Cal. Feb. 9, 2010) and *Gonzalez v. First Franklin Loan Services*, No. 1:09-CV-00941. 2010 WL 144862 at *18, (E.D. Cal. Jan. 11, 2010) is entirely misplaced.  In Aleem, the court determined that the plaintiffs did not state a federal cause of action by pleading a violation of HAMP under the California Business and Professions Code.  In Gonzalez, the court ruled only that the Emergency Economic Stabilization Act of 2008 and the Troubled Asset Relief Program do not contain private causes of action.  To suggest, as BAC does, that these cases abrogate BAC's independent responsibility to meet its written contractual obligations is ridiculous. If accepted, no Plaintiff could ever enforce a modification agreement made under HAMP.

HAMP" or the viability of third party beneficiary claims under the SPA are irrelevant.

### B.       Plaintiffs Have Stated a Claim for Breach of Contract

#### 1.       *The TPPs Are Complete, Valid Contracts*

Contrary to BAC's assertion, the TPP Agreements are not merely agreements to agree, with undefined terms to be agreed upon at a later date.  The TPP Agreements leave nothing for the parties to negotiate.  The very first sentence provides:

> If I am in compliance with this Trial Period Plan…, then the Servicer will provide me with a Home Affordable Modification Agreement.

FAC, Ex. 7 at 1.[5]  "Home Affordable Modification Agreement" is not generic language; the term has technical meaning, supplied by reference to the HAMP Program Documentation.  When the plain language of the TPP Agreement is examined in light of the attending circumstances, the terms of the promised permanent loan modification are to be determined based on HAMP rules, particularly the "waterfall."  FAC, Ex. 2 at 8-10.

The language of the TPP Agreements supports the conclusion that the terms of the permanent modification are to be determined in accordance with HAMP.  In addition to promising a "Home Affordable Modification Agreement," the TPP Agreement is titled the "HOME AFFORDABLE MODFICATION TRIAL PERIOD PLAN" in large, capitalized, bold font at the top of the contract. FAC, Ex. 7 at 1.  There is a footnote on each page of the Plan that identifies the contract as a "Fannie Mae/Freddie Mac Uniform Instrument." FAC, Ex. 7 at 1-3.  Furthermore, as BAC notes, the TPP documents are based on samples issued by Treasury to servicers participating in HAMP.[6]  Mot. at 13-14.   The TPP Agreements are complete,

---

[5] For convenience, Plaintiffs in this document will cite to the TPP Agreement attached to the FAC as Exhibit 7.  Exhibits 9-12 are also TPP Agreements and contain the same language.

[6] Defendant attempts to argue that because the TPPs are Treasury forms, they cannot be considered contracts.  Mot. at 13-14. This is a specious argument. The TPP Agreements,

addressing all of the parties' duties and obligations, and therefore are enforceable contracts.

Decades of Massachusetts court decisions confirm this conclusion. Massachusetts courts rely upon "the usual considerations of contract interpretation, including the language of the decree; the circumstances surrounding its formation; its purposes; any technical meaning words used may have had to the parties; and any other documents expressly incorporated in the decree." *U.S. v. Boston Scientific Corp.*, 167 F. Supp. 2d 424, 432 (D. Mass. 2001). "The courts… are slow to turn a plaintiff out of court for the reason that the promise given and relied on was so vague that it can be given no effect." *Weiner v. Pictorial Paper Package Corp.*, 303 Mass. 123 (1939). A contract is not unenforceable because certain terms are left to be fixed at a later date or determined based on later events "and the need for further documents does not preclude the formation of a binding agreement." *Targus Group Intern., Inc. v. Sherman*, 76 Mass.App.Ct. 421, 429 (2010). *See also Situation Mgmt. Systems, Inc. v. Malouf, Inc.*, 430 Mass. 875 (2000) ("It is not required that all terms of the agreement be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract."); *George W. Wilcox, Inc. v. Shell Eastern Petroleum Products*, 283 Mass. 383, 388 (1933) (finding that for a contract to be enforceable, the terms need only be set out "with sufficient definiteness and clarity that a court, by interpretation with the aid of existing and contemplated circumstances, may enforce it.").

None of the cases cited by BAC considers an agreement of the level of specificity reached in the TPP Agreements. Only one case involves anything reduced to writing and agreed

---

whatever their source, are form contracts, voluntarily used by BAC, and under Massachusetts law form contracts are to be construed strictly against the party on whose behalf they have been drafted. *See Lechmere Tire & Sales, Co. v. Burwick*, 360 Mass. 718 (1972). Furthermore, while servicers must obtain approval from Treasury or Fannie Mae if they want to draft their own documents, they are *required* to revise the HAMP documents as necessary to comply with Federal, State and local law. SD 09-01.

to by the parties – *Giuliano v. Nations Title, Inc.*, No. 96-2331, 1998 WL 45459 (1st Cir. Jan. 23, 1998) – and in that case there was only a letter of agreement, committing the parties to "working cooperatively," which the court found to contain "no specific figures, deadlines or actions to be taken by either party". *Id.* at *5. Illustrating the reluctance of courts to allow uncertainty to prevent enforcement, in one case relied upon by BAC, *Air Technology Corp. v. General Electric Co.*, 347 Mass. 613 (1964), the court actually *enforced* an agreement between GE and Air Technology based on a meeting in which GE officials referred to Air Technology as "a team member," even though the terms of Air Technology's subcontract were not yet determined.

### 2.    *Plaintiffs Have Adequately Alleged Compliance with their TPPs*

It is undisputedly the servicer's responsibility to determine the borrower's qualification for a Home Affordable Modification before extending the TPP Agreement.  Servicers collect income information, use HAMP rules to determine payment amount, check investor guidelines, and gather inputs for and perform the Net Present Value test *before* any TPP Agreement is extended to the borrower.  FAC, Ex. 2 at 5-6, 13.  The three month Trial Period has only two purposes: it provides an opportunity for the borrower to demonstrate that the lower payments are actually affordable (by making them), and, in circumstances where initial eligibility was based on oral information, it allows the servicer to verify the accuracy of the income information provided before the TPP Agreement was offered. Unless the borrower fails to make payments, or the income information is wrong, there is no reason why a borrower who was determined by the servicer to be qualified for a Home Affordable Modification before entering the TPP Agreement would *not* qualify three months later.[7]

---

[7] Where the initial information was oral, BAC is required to collect documentation from the borrower that allows it to verify the borrower's income (and the borrower is required to provided that documentation).  However, this is a condition subsequent and does not undercut the validity of the contract. Unlike a condition precedent, which would have to occur before the contract could become binding, "[i]f a condition subsequent is fulfilled, 'the agreement of

Because borrowers who receive a TPP Agreement are already qualified for Home Affordable Modifications in all other respects, the TPP Agreement imposes only two conditions upon borrowers – making payments and providing documentation to verify their reported income.  Plaintiffs allege that they have satisfied those conditions.  FAC at ¶¶ 80-81, 101-102, 121, 124, 154, 157,159.  The proposed class includes *only* borrowers who "have complied with their obligations under a written TPP," a determination that will be apparent from BAC's records.  FAC at ¶ 165.  Borrowers who do not make monthly payments in accordance with the terms of the TPP Agreement, do not provide documentation required by the servicer to verify their income, or whose representations as to income are not true have not so complied.  Such borrowers are not entitled, *by the express terms of the TPP Agreement itself*, to tender of a Home Affordable Modification Agreement.   There is no need to look to the HAMP Program Documentation to establish this, nor does this reading of the express terms of the TPP Agreement "stand HAMP on its head."  BAC Mem. at 13.

### 3.      *Plaintiffs Sufficiently Allege Damages*

BAC's argument that Plaintiffs have failed to allege a claim for breach of contract because they fail to allege cognizable harm is likewise without foundation.  In order to state a claim for breach of contract, "in general, it is sufficient to aver the making of the contract, its terms and the breach thereof."  *Daddario v. City of Pittsfield*, 301 Mass. 552, 555 (1938).  *See also Hacker v. Nitschke*, 310 Mass. 754, 757 (1942) (finding sufficient a count which "alleges the facts upon which an implied contract arose, and the facts constituting a breach of that contract.")

Just last month, the U.S. District Court for the Northern District of West Virginia denied a servicer's motion to dismiss a breach of contract claim brought by borrowers in the context of a

---

the parties, rather than then coming into existence, will simply *continue to be binding.*'"  *O'Marah v. Walkey*, No. 07-4012, 2009 WL 981678 *14 (Mass. Super. 2008) (quoting *Hunneman Real Estate Corp. v. Norwood Realty, Inc.*, 765 NE.2d 800, 805 (Mass. App. Ct. 2002) (emphasis added).

HAMP modification agreement. *Faulkner v. Onewest Bank*, No. 3:10-CV-12, 2010 WL

2472275, *8 -9 (N.D.W.Va. ,June 16, 2010). The court's analysis is instructive:

> According to the plaintiffs' allegations, which control at this point of the case,
> OneWest offered the plaintiffs a loan modification on August 14, 2009. The offer
> was conditional upon: (1) the plaintiffs' signature and return of the Modification
> Agreement along with a check for $2,806.13, representing the first modified
> monthly payment; and (2) verification that the plaintiffs' income qualifies for loan
> modification. The offer stated that it would expire on August 24, 2009. The
> plaintiffs then allege that they accepted the offer on August 21, 2009, and began
> performance by "comply[ing] with *all* of the terms and conditions of the modified
> contract including timely delivery and payment made to [OneWest]." ( [Doc. 1] at
> ¶ 37) (emphasis added). Finally, the plaintiffs allege that OneWest breached its
> obligations by rescinding the Modification Agreement, causing the plaintiffs
> financial and emotional harm. Based upon this alleged breach, the Court finds that
> the plaintiffs have sufficiently stated a claim for breach of contract.

*Id.*

As discussed above, Plaintiffs have alleged that BAC entered into written contracts with

each of them and with each member of the proposed class. FAC at ¶¶ 56, 77, 98, 119, 133, 151,

165.  The terms of those contracts, which are uniform for Plaintiffs, are contained in the TPP

Agreements submitted as exhibits to and quoted in Plaintiffs' First Amended Complaint.  FAC at

¶¶ 55, 78, 79, 99, 100, 120, 135, 136, 153, 154, Exhs. 7, 9-12.  Plaintiffs allege that BAC has not

performed according to the terms of the TPP Agreements[8] and that Plaintiffs have been damaged

---

[8] BAC's breach is its failure to determine the terms of, and then provide, a permanent modification in a timely
manner.  By the very language of the TPP, it is clear that Defendant had an obligation to provide permanent
modifications immediately upon the borrower's successful completion of the Trial Period. Massachusetts law
embraces the maxim *expressio unius est exclusion alterius*, which applies as forcibly to exceptions to obligations as
to the obligations themselves. See *F.D.I.C v. Singh*, 977 F.2d 18 (1st Cir. 1992). Section 4.E. of the Trial Period Plan
states:

> Notwithstanding anything herein to the contrary, if my final two Trial Period Payments are
> received by the Servicer after the close of business on the 15th calendar day of the last month of
> the Trial Period…I agree that the Trial Period shall be extended by one calendar month (the
> 'Additional Trial Period').

FAC, Ex. 7 at 3.

Since the Trial Period Plan provides for a particular allowance, the possible conditional extension of the plan by one
month, any other purported allowance not expressly provided for within the four corners of the contract is excluded.

thereby.  FAC at ¶¶ 61, 68, 89-91, 108-110, 124-126, 142-144, 161-163, 183, 185.  These allegations are sufficient to state a claim for breach of contract.

It is a long established principle of Massachusetts law that "[f]or every breach of a promise made on good consideration, the law awards some damage." *Hagan v. Riley*, 13 Gray 515, 516 (Mass. 1859).  *See also Clark v. Gulesian*, 197 Mass. 492, 494 (1908); *Singarella v. City of Boston*, 342 Mass. 385, 386-387 (1961).  The object in determining the damages for a breach is to put the wronged party in as good a position as if the other party fully had performed.  *See e.g. Bucholz v. Green Bros. Co.*, 272 Mass. 49, 54 (1930).  Put another way, the plaintiff is entitled to damages for harms that "flow according to common understanding as the natural and probable consequences of the breach."  *Evans v. Yegen Associates, Inc.*, 556 F.Supp. 1219, 1230 (D.Mass.1982) (citing *Bucholz*, 272 Mass. at 54).  There is no requirement of specific pleading for damages flowing naturally from the breach.  *See Sherlag* at 235.  Defendant does not and cannot cite authority to the contrary.

Had BAC performed under the TPP Agreements it entered into with Plaintiffs, Plaintiffs' loan documents permanently would have been altered to reflect the terms of a Home Affordable Loan Modification, effective the first day of the month following the three-month TPP period. FAC, Ex. 7 at 2.  Upon modification of their loan documents, Plaintiffs no longer would have been in default of their mortgage obligations (which they necessarily were during the TPP, even if they were current at the start of the TPP), all existing arrearages would have been capitalized, late fees would have been forgiven and Plaintiffs would have had affordable monthly payment amounts going forward. FAC, Ex. 7 at 3, Ex. 2 at 9, 15, 18, 22.  Each month that BAC fails to perform its obligations under the TPP Agreements, Plaintiffs accrue greater fees and charges, are

---

*See e.g.*, *Smart v. Gillette Co. Long-Term Disability Plan*, 70 F.3d 173 (1st Cir. 1995). Therefore, any extension of the Trial Period beyond three months for any other reason is a clear breach of contract.

forced further into delinquency on their mortgages, are in default for longer periods, and are at heightened risk of losing their homes to foreclosure.  These consequences are the natural result of BAC's breaches.

Plaintiffs' allegations – which set out the existence and terms of the contracts and the alleged breach – are sufficient to put BAC on notice of the damages that are the consequence of such breach, and therefore are sufficient.

Plaintiffs also have specifically alleged other elements of damages.  Had BAC performed under the TPPs it entered into with Plaintiffs, Plaintiffs would not have been subjected to additional foreclosure-related activity during the period after their permanent modifications would have become effective.  Plaintiffs allege that because of BAC's breaches, Plaintiffs have incurred foreclosure-related fees and costs that they would not otherwise have incurred.  FAC at ¶¶ 83-88, 104-106, 122, 156, 162, 185, 202.  Plaintiffs also allege that they were damaged by losing opportunities to pursue other means of avoiding foreclosure.  FAC at ¶¶ 5, 46, 180.  These lost opportunities are not too speculative.  *Cf. Don v. Soo Hoo*, 75 Mass.App.Ct. 80 (2009) (affirming jury award of damages for damages for lost opportunity to obtain a bankruptcy discharge).

In applying for a HAMP modification, each Plaintiff and proposed class member averred that his or her current mortgage payments were unaffordable.  Continuation of the status quo, without a modification, thus is not an option for these individuals.  BAC disputes Plaintiffs' allegations that Plaintiffs lost or forewent other opportunities to save their homes.  Mot. at 15.  It is axiomatic that Plaintiffs' allegations may *not* be disputed, but must be accepted as true in the context of a motion to dismiss.

Furthermore, Plaintiffs' allegations are sufficiently specific to satisfy the pleading

standards of *Twombly*.  Plaintiffs could not have "declar[ed] bankruptcy or [sold] their homes on the market… yesterday," as BAC suggests, without giving up their opportunity to keep their homes under permanent, affordable loan modification terms from BAC. Furthermore, with each month of delay in which BAC continues to induce Plaintiffs' reliance on the promise of a Home Affordable Modification, the other options become less available and less favorable.   The amount of Plaintiffs' arrearages increase with each passing month, not only based on unpaid principle, but from interest and fees that would not have accrued in the absence of the lowered TPP payments.   The delay in filing for bankruptcy, in particular, is damaging because it lengthens the period when borrowers must deal with collection efforts by other creditors and because larger unpaid balances undermine the possibility of a workable repayment plan under chapter 13. 11 U.S.C. §§ 1322, 1325.

### C.   Plaintiffs Have Stated a Claim for Breach of the Covenant of Good Faith and Fair Dealing

As discussed above, Plaintiffs adequately have alleged the existence of contracts between themselves and BAC.  "Every contract implies good faith and fair dealing between the parties to it.  The covenant of good faith and fair dealing requires that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract."  *T.W. Nickerson, Inc. v. Fleet Nat. Bank*, 456 Mass. 562, 569-570 (2010) (internal quotations and citations omitted).  The "essential inquiry" when determining whether a party to a contract has breached the covenant of good faith and fair dealing is to consider whether "the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain."  *Speakman v. Allmerica Financial Life Ins.*, 367 F.Supp.2d 122, 132 (D.Mass. 2005).

The fruits of the TPP Agreement that should have flowed to Plaintiffs consisted of the

promise of protection from foreclosure during the plan and a permanent loan modification at the end of three months, with all arrearages capitalized, late fees forgiven and affordable payments. FAC, Ex. 7.   In order to secure those fruits, Plaintiffs had to provide income verification documentation requested by Defendant and make timely payments of the TPP amount for three months.   *Id.*

BAC, by its actions, made it impossible for Plaintiffs to secure the benefits of the contracts in at least two ways.   First, Plaintiffs allege that BAC undermines Plaintiffs' ability to satisfy the requirement to provide income verification, by losing documents, repeatedly requesting documents it had already received, giving conflicting and confusing instructions to borrowers and making mistakes in processing documents.   FAC at ¶¶ 90, 109, 143, 190.   BAC's behavior very clearly breaches the covenant of good faith and fair dealing.   *See, e.g., Tufankjian v. Rockland Trust Co*. 57 Mass.App.Ct. 173, 178-179 (2003) (finding that bank which agreed to provide financing for auto-dealership violated the covenant of good faith and fair dealing by "conducting itself in a manner at odds" with borrower by, *inter alia*, failing to complete appraisal on time and using a more expensive appraiser.); *Restatement (Second) Contracts* §205 (examples of breach of the covenant of good faith and fair dealing include "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.").

Second, Plaintiffs allege that BAC fails to communicate with or adequately supervise foreclosure attorneys (FAC at ¶190), so that Plaintiffs are not protected from foreclosure activity during the TPP, in either the initial three months, or when it extends for longer.   Although the TPP specifies that "the Servicer will suspend any scheduled foreclosure sale" (FAC, Ex. 7 at 2),

at least with regard to some Plaintiffs, BAC repeatedly has allowed sales to be scheduled and has not suspended them until the last minute. FAC at ¶¶ 83-88, 104-106, 122, 125, 156.  Even if such actions do not breach the letter of the TPP Agreement, they are a breach of the covenant of good faith and fair dealing. *Massachusetts v. Mylan Laboratories*, 608 F.Supp.2d 127, 158 -159 (D.Mass. 2008) (citing *Speakman v. Allmerica Financial Life Ins.*, 367 F.Supp.2d 122, 132 (D.Mass.2005) (breach of covenant does not require breach of contract).  Initiating or allowing unnecessary foreclosure activity forces Plaintiffs to take steps to have the sales suspended – with no assurance that such steps will be successful – and results in the imposition of additional foreclosure related fees.

A claim for breach of the covenant of good faith and fair dealing does not require a showing of bad faith.  *Liss v. Studeny*, 450 Mass. 473, 477 fn3 (2008) (citing *Nile v. Nile*, 432 Mass. 390, 398-399 (2000)).  Even if there were a requirement to show bad faith or "unfair leveraging of the contract terms to secure undue economic advantage," Mot. at 16, Plaintiffs' allegations are sufficient.  BAC can cut costs (through inadequate staffing) and earn fees because Plaintiffs do not have the ability to leave the negotiating table and go to another servicer.  The only way for Plaintiffs to get a HAMP modification is to navigate BAC's labyrinthine system. Because BAC has a monopoly on providing relief to Plaintiffs, its actions exert unfair leverage on Plaintiffs.  BAC has control over the income verification process and therefore over when, how and whether Plaintiffs can perform under the TPP Agreement.  BAC *voluntarily* is participating in HAMP (BAC Mem. at 4), so it must be in their best interests to do so, and also to engage in the actions or inactions which have been so harmful to Plaintiffs.

### D.    Plaintiffs Have Made Allegations Sufficient to Entitle Them to Relief Based Upon Promissory Estoppel

There are three essential elements that, if met, give rise to a claim for promissory

estoppel.  There must be 1) a representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made; 2) an act or omission resulting from the representation by the person to whom it was made; and 3) detriment to such person as a result of the act or omission.  *See e.g. Turnpike Motors, Inc. v. Newbury Group, Inc.*, 413 Mass. 119, 123 (1992).

Defendant does not dispute that the first two elements are established by the Plaintiffs' allegations.  BAC Mem. at 17.  Defendant asserts only that Plaintiffs have not alleged damage or detriment as a result of their reliance on and performance under the TPP Agreement.  *Id.*  As discussed above, in the context of damages for breach of contract, Defendant's assertion is contradicted by the allegations in the First Amended Complaint.

In addition to the allegations of damage discussed above, Plaintiffs' payments under the TPP Agreement constitute detrimental reliance on Defendant's promises, despite Defendant's misguided attempt to assert otherwise.  Defendant acknowledges that Plaintiffs' payments in reliance on the TPP Agreement are less than their full mortgage payments.  BAC Mem. at 17.  It is for precisely this reason that making the TPP payments is detrimental to Plaintiffs.  Plaintiffs are *not*, as Defendant asserts, "relieved of their obligation to make full mortgage payments."  *Id*. To the contrary, the TPP Agreements state that Plaintiffs' obligations under their original loan documents "remain in full force and effect."  FAC, Ex. 7 at 3.  Detriment in the context of contract or promissory estoppel means "giving up something which immediately prior thereto the promisee was privileged to retain, or doing something or refraining from doing something which he was then privileged not to do, or to refrain from doing." *Cavanaugh v. U.S. Government*, 640 F. Supp. 437, 440 (D. Mass. 1986) (citing Williston, Contracts [3rd ed.] § 102A).

By making payments at an amount lower than the amount called for in their loan

documents, Plaintiffs necessarily incur late fees and interest charges, fall further into default and incur damage to their credit score and report.  FAC ¶¶ 143, 202.  Only if Defendant follows through on its promises and provides Plaintiffs with permanent loan modifications, will the lower payments made during the TPP period constitute a benefit to Plaintiffs.  "A promise or an act may be a detriment although *on balance* the promisor is making a good bargain. Thus a promise to pay £10,000 for a Rolls Royce worth £12,000, is nonetheless a detriment."  Black's Law Dictionary (8th ed. 2004), detriment (quoting P.S. Atiyah, *An Introduction to the Law of Contract* 101 (3d ed. 1981)).  If Plaintiffs do not receive permanent loan modifications, they will have to pay not only the difference between the TPP payments and their payment obligations under their original loan documents, but all fees, penalties and interest charged in the meantime and allowed under their original loan documents.  FAC, Ex. 7 at 3, Ex. 2 at 22.  This increase in indebtedness is a necessary consequence of Plaintiffs' performance under the TPP Agreements and is clearly detrimental.  Furthermore, because borrowers who begin a TPP and make lower payments are necessarily in default of their mortgage obligations, they are at immediate risk of foreclosure when the TPP is finally terminated and may have to pay the *entire* arrearage at once to avoid losing their homes.  This increased risk, too, is detrimental to Plaintiffs.

### E.   Plaintiffs Adequately Met the Demand Letter Requirement of G.L. c. 93A

BAC's final argument is that the demand letter sent by Patricia Johnson on February 25, 2010 was inadequate under G.L. c. 93A to request relief on behalf of a class.  Yet, the very first sentence of Ms. Johnson's letter, attached as Exhibit 13 to the First Amended Complaint [Docket No. 5] ("the Demand Letter"), states that it is being sent by Ms. Johnson "and a class of similarly situated individuals."  The eight-page Demand Letter goes on to explicitly describe the putative class on whose behalf it was sent:

Claimants believe that there are hundreds, if not thousands, of Massachusetts residents who are similarly situated to Ms. Johnson, i.e. homeowners who have entered into Trial Period Plan ("TPP") Agreements with BAC under the U.S. Treasury Department's Home Affordable Modification Program ("HAMP"), complied with all of the requirements of such Agreements, including but not limited to the making of three monthly Trial Period payments and the provision of documentation, yet have not been given a permanent modification in accord with the TPP Agreement.  The identities of such Massachusetts residents are known only to BAC.

Demand Letter at 1-2.  BAC cannot claim, therefore, that the Demand Letter was insufficiently descriptive of the claimants sending the letter.  Nevertheless, as BAC concedes, its response was addressed to Ms. Johnson individually.  In these circumstances, the putative class is entitled to rely upon the initial demand letter in satisfaction of the statutory requirement.

The Court's analysis of this issue should begin with the Supreme Judicial Court's admonishment regarding chapter 93A that "technicalities are not to be read into the statute in such a way as to impede the accomplishment of substantial justice."  *Baldassari v. Public Fin. Trust*, 369 Mass. 33, 41 (1975) ("*Baldassari*").   "This includes the reading of the demand letter requirement." *Richards v. Arteva Specialties S.A.R.I.*, 66 Mass. App. Ct. 726, 730 (2006) ("*Richards*"), *citing Baldassari*, 369 Mass. at 41-42.  BAC's complaint regarding the Demand Letter is archetypal of a "technicality" put forth to defeat Plaintiffs' legitimate claims.  The burden should thus be placed on BAC to show how the Plaintiffs' course of action undermines the interests promoted by the statute's demand letter requirement.

BAC cannot meet this burden. "The purpose of chapter 93A's pre-suit demand letter requirement is 'to promote negotiation and settlement of claims and to allow the potential defendant the chance to make a reasonable offer of settlement . . . .'" BAC Mem. at 20, *citing Bassi v. Julian Crane Equip. Corp.*, No. 02-0306, 2005 WL 3105676, *6 (Mass. Super. Oct. 26, 2005).  BAC's position, contained in its response letter of March 26, 2010, is that it was unable

to negotiate or tender settlement in connection with Ms. Johnson's class claims because Plaintiffs' counsel represented only Ms. Johnson at the time of the Demand Letter. This position strains credibility. Counsel routinely engage in classwide settlement discussions prior to the certification of a class. Indeed, in a class settlement between different parties approved by Judge Woodlock in 2004, BAC's counsel herein reached a settlement agreement with Plaintiffs' same counsel herein prior to class certification. *See Curry, et al. v. Fairbanks Capital Corporation*, Civ. No. 1:03-cv-10895-DPW (D. Mass., complaint filed May 16, 2003). It therefore rings particularly hollow for BAC's counsel to claim categorically that it could not engage in settlement discussions on behalf of the class Ms. Johnson identified in her G.L. c. 93A demand letter.

Further, BAC's position that an individual class representative should not be permitted to submit a demand on behalf of similarly situated individuals, if accepted, would eviscerate Chapter 93A's class action component. Chapter 93A is not merely subject to Rule 23 – the Massachusetts legislature saw fit to provide expressly for class actions in G.L. c. 93A §9(2). The Supreme Judicial Court subsequently has recognized the value of the class action device, even when it must be reconciled with the demand letter requirement. "If a proper demand is made by one plaintiff, identifying him as the claimant and reasonably describing the act or practice relied on and the injury suffered by him, we think he and others similarly situated may join in a class action to redress that injury and similar injuries caused by the same act or practice. Multiple demands for relief need not be filed on behalf of all the members of the class." *Baldassari*, 369 Mass. at 42.[9]

---

[9] *Baldassari* left open the question whether this same reasoning applied in a situation where the class representative accepts the original offer of settlement as an individual. Nevertheless, where the Demand Letter's description of the injury and damages to the class is not challenged as

Moreover, it is important to note that BAC has *not* asserted that the Demand Letter insufficiently described the unfair practice alleged or the damages claimed.  By relegating its criticism of the Demand Letter to its failure to individually identify other class members, BAC stands on particularly weak ground.  In *Richards*, the Massachusetts Appeals Court, engaged in a close textual analysis to reject precisely the position that BAC puts forth here.  Concluding that the statute's use of the singular forms "claimant" and "petitioner" was significant and intentional, *Richards* holds that a demand letter sent on behalf of a class need only identify the class representative himself, and adequately describe only her injury. *See Richards*, 66 Mass. App. Ct. at 732  (noting that the legislature chose *not* to require the demand letter to identify "the claimant and any similarly situated persons on behalf of whom the claimant brings the action.")   Such a position makes eminent sense – the whole purpose of Rule 23 is to aggregate a multitude of claimants not before the court through the use of adequate class representatives who share common claims, are typical, and otherwise meet the requirements of the rule.  So long as the Demand Letter served to put BAC on notice as to the identity of that class, in order that it might assess an appropriate offer of settlement, the Plaintiffs have met their duties under the statute.

## V.      CONCLUSION

---

inadequate, Plaintiffs assert that the same rationale identified by the *Baldassari* Court applies.  Plaintiffs seek, *inter alia,* classwide injunctive relief – yet to require a succession of class representatives to present Demand Letters each time their predecessor is picked off by the Defendant would render chapter 93A's class action component null and void.  "The modern class action is 'designed to avoid, rather than encourage, unnecessary filing of repetitious papers and motions.'" *Baldassari*, 369 Mass. at 42, *quoting American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 550 (1974).  In a similar vein, the Supreme Court has stated:

> Requiring multiple plaintiffs to bring separate actions, which effectively could be "picked off" by a defendant's tender of judgment before an affirmative ruling on class certification could be obtained, obviously would frustrate the objectives of class actions; moreover it would invite waste of judicial resources by stimulating successive suits brought by others claiming aggrievement.

*Deposit Guaranty Nat. Bank v. Roper*, 445 U.S. 326, 339 (1980).

For the reasons stated above, the Court should deny BAC's motion to dismiss the First

Amended Complaint.

<div style="margin-left:50%;">

Respectfully Submitted,
On behalf of the Plaintiffs,

*/s/ Gary Klein*
Gary Klein (BBO 560769)
Shennan Kavanagh (BBO 655174)
Kevin Costello (BBO 669100)
RODDY KLEIN & RYAN
727 Atlantic Avenue
Boston, MA  02111-2810
Tel:  (617) 357-5500
Fax:  (617) 357-5030

Stuart Rossman (BBO 430640)
Charles Delbaum (BBO 543225)
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th floor
Boston, MA 02110
(617) 542-9595 *(telephone)*
(617) 542-8010 *(fax)*

Michael Raabe (BBO 546107)
NEIGHBORHOOD LEGAL SERVICES
170 Common Street, Suite 300
Lawrence, MA 01840
Tel:  (978) 686-6900
Fax:  (978) 685-2933

</div>

DATE:  July 8, 2010

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF) and paper copies will be sent to those indicated as non-registered participants on July 8, 2010.

/s/ Stuart Rossman
Stuart Rossman (BBO 430640)
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th floor
Boston, MA 02110
(617) 542-9595 (telephone)
(617) 542-8010 (fax)