**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **PATRICIA JOHNSON, FAUSTO CABRERA, VELLYN ANTONELLI, CARMEN FOX, MARK ANGELOPOULOS, DIANE ANDERSON JAMES COOLEY and MARGARET COOLEY, on behalf of themselves and all others similarly situated,**<br><br>　　**Plaintiffs,**<br><br>**vs.**<br><br>**BAC HOME LOANS SERVICING, L.P., a subsidiary of BANK OF AMERICA, N.A.**<br><br>　　**Defendant.** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **C.A. NO. 10-10316-RWZ** |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION TO PREVENT DEFENDANT, BAC HOME LOANS SERVICING, L.P., FROM FORECLOSING ON THEIR MORTGAGES**

## I. INTRODUCTION

Carmen Fox ("Ms. Fox") seeks preliminary injunctive relief for herself, on behalf of the Plaintiffs and on behalf of a provisional class of Massachusetts homeowners[1] (collectively, "Plaintiffs") to prevent Defendant, BAC Home Loans Servicing, L.P., ("BAC" or "Defendant") from foreclosing on their mortgages until a decision on the merits has been made in this case as to whether BAC is contractually or otherwise obligated to provide them with permanent loan modifications.  Because the threat of foreclosure is imminent for many class members, Plaintiffs urge this Court to hear this motion at the earliest possible time, despite the pendency of a motion to transfer this case to a Multi-District Litigation.

Ms. Fox additionally seeks preliminary injunctive relief requiring BAC to immediately notify members of the provisional class of the pendency of this action and the identity of provisional class counsel.  The injunctions, if entered, will preserve the *status quo* for borrowers like Ms. Fox, who are at risk of losing their families' source of shelter and probably their most valuable financial asset.

Despite promising Ms. Fox over ten months ago that it would provide her with a Home Affordable Modification[2] if she complied with her TPP Agreement, which she did, BAC has scheduled at least six foreclosure sales of Ms. Fox's home, the most recent of which was scheduled for August 3, 2010 and has now been postponed – but not cancelled – until an

---

[1] Plaintiffs simultaneously are filing a Motion for Provisional Class Certification pursuant to Fed. R. Civ. P 23(b)(2), seeking provisional certification of a class of borrowers defined as all Massachusetts borrowers who entered into a written Trial Period Plan ("TPP") Agreement with BAC and made the payments identified in Section 2 of the TPP Agreement, other than borrowers to whom BAC sent either:
 (a) a Home Affordable Modification Agreement prior to the date of class certification, or
 (b) a written denial of eligibility on or before the Modification Effective Date identified in Section 2 of the borrower's TPP Agreement.
[2] A "Home Affordable Modification" is a permanent modification the terms of which are calculated according to the rules of the Home Affordable Modification Program ("HAMP"). A description of the HAMP Program and its NPV requirements is set forth in Plaintiffs' First Amended Class Action Complaint ("FAC"), ¶¶17-46 [Docket No. 5], and the Expert Report of Christopher Wyatt ("Wyatt Report"), which is Exhibit 1 to the Declaration of Charles Delbaum ("Delbaum Decl."), filed simultaneously with this motion.

1

uncertain future date.  Delbaum Decl. at ¶ 7.  While BAC has so far postponed each sale shortly before the scheduled sale date, Ms. Fox has no assurance that BAC will continue to do so.  In fact, according to Defendant's Counsel, further postponements are unlikely.

Ms. Fox's circumstances are not unusual. Joblessness, the mounting foreclosure rate in Massachusetts and the failure of large mortgage servicers like BAC to convert Trial Periods into permanent Home Affordable Modifications as promised has been and continues to be well publicized.[3] For Ms. Fox, her financial hardship began when she was laid off from her job as a paralegal – a job she had held for 18 years.  She continued to pay her mortgage and requested assistance from BAC.  BAC told her she needed to be in default before it could offer assistance. On BAC's instructions, Ms. Fox exhausted her savings and then fell 60 days behind on her payments.  At that point, BAC allowed her to apply for HAMP.  After five months of requesting and receiving additional documents from Ms. Fox, BAC told Ms. Fox that it had everything it needed in October of 2009.

BAC determined that Ms. Fox was eligible for a HAMP modification based on the information and documentation she provided.  This eligibility determination included a positive outcome under the Net Present Value ("NPV") analysis.  As a result of its finding of eligibility, BAC offered Ms. Fox a TPP Agreement. BAC expressly promised to provide Ms. Fox with a Home Affordable Modification in exchange for her compliance with the requirements of the TPP Agreement.[4] BAC further promised that the modification would be effective "the first day of the month following the month in which the last Trial Period Payment is due." FAC, Ex. 10 at 2.

---

[3] Wyatt Report at 3-4; FAC ¶¶ 17-22.
[4] The TPP Agreements signed by Ms. Fox and each borrower in the provisional class provide that if the borrower complies with the requirements of the TPP Agreement, "the Lender will provide me with a Home Affordable Modification Agreement." *See, e.g*, FAC, Ex. 10, p. 1.

BAC further promised that it would suspend any foreclosure sales while Ms. Fox continued to meet the obligations of the TPP Agreement. *Id.*

While Ms. Fox has performed all of the TPP Agreement's requirements, including making all of the payments, BAC failed to honor its agreement to permanently modify Ms. Fox's mortgage loan. Instead, BAC repeatedly scheduled foreclosure sales, each of which were postponed only after considerable effort on the part of Ms. Fox and her legal counsel. According to communication with Defendant's Counsel, BAC still intends to hold a foreclosure sale on Ms. Fox's home, although no date has been set since the postponement of the August 3 sale. Delbaum Decl. at ¶ 7. Curing the default to avoid foreclosure is becoming increasingly difficult, if not impossible, because the amount of Ms. Fox's default is greater than before she entered into the TPP Agreement – not only because of the difference between her modified and regular payments and accrued interest, but from the addition of multiple foreclosure fees and costs, late fees, penalties and other charges.

Hundreds of Massachusetts homeowners with loans serviced by BAC are in the same boat. Wyatt Report at 17. They complied with their TPP Agreements, yet are either in foreclosure, like Ms. Fox, or in an indefinite and stressful state of uncertainty. This is a particularly threatening state of affairs in Massachusetts, a non-judicial foreclosure state, because any Plaintiff or class member can be in Ms. Fox's situation with very little notice under Massachusetts law. By its very nature, the Massachusetts non-judicial foreclosure process occurs between private parties outside the sphere of the judicial system, without litigation. Therefore, borrowers do not and will not have an opportunity to raise the issues here as a defense to foreclosure in a court proceeding.

## II. FACTUAL BACKGROUND

1.    <u>Ms. Fox's Experience With BAC</u>

3

From June 2009 to October 2009, Ms. Fox repeatedly applied for a HAMP loan modification and sent supporting documentation requested by BAC. Affidavit of Carmen Fox, ¶7 ("Fox Aff."), attached as Exhibit 2 to Delbaum Decl.; FAC, ¶117. Finally, BAC told Ms. Fox that they had all the required documentation. Fox Aff., ¶9. In October 2009, BAC offered Ms. Fox a verified income TPP Agreement under HAMP. Fox Aff., ¶10; FAC, Ex. 10 [Docket No. 5-10] (Ms. Fox's TPP Agreement). The TPP Agreement called for monthly mortgage payments (Principal, Interest, Taxes and Insurance) of $1,097.40 per month for three months: December 2009 and January and February 2010. Fox Aff., FAC, 11; Ex. 10 at 2. Ms. Fox accepted the TPP Agreement by returning the executed TPP Agreement to BAC. Fox Aff., ¶12; FAC, ¶119.

The first sentence of the TPP Agreement provides: "If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Servicer will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage." FAC, Ex. 10 at 1. Section 2 states that the effective date of the modification will be "the first day of the month following the month in which the last Trial Period Payment is due." FAC, Ex. 10 at 2. Section 3 of the TPP Agreement references the means by which the principal balance and monthly payment amounts of the permanent modification will be calculated. FAC, Ex. 10 at 3.

Ms. Fox timely made each of the payments described in the TPP Agreement due in December 2009 and January and February 2010 in full. Fox Aff., ¶13; FAC, ¶121. She also made payments of the TPP amount in March, April and May 2010. Fox Aff., ¶14. She attempted to make payments of the TPP amount in June, July and August 2010, but each time, BAC refused to accept payment. *Id.* Since the TPP Agreement began, Ms. Fox has timely responded to all of

4

BAC's information and document requests by supplying the documents and information requested. Fox Aff., ¶15; FAC ¶ 124.

During the first month of Ms. Fox's trial period, by letters dated December 10, 2009 and December 22, 2009, BAC caused to have served on Ms. Fox an *Order of Notice*, a *Notice of Mortgage Foreclosure Sale*, a *Notice of Mortgagee's Sale of Real Estate* to be held on January 21, 2010, and a *Notice of Intention to Foreclosure Mortgage and of Deficiency After Foreclosure of Mortgage*. Fox Aff., ¶21; FAC ¶ 122. After frantic efforts by Ms. Fox, BAC postponed the January 21 sale date to February 22. Fox Aff., ¶23; FAC ¶ 122. Ms. Fox continued to comply with the terms of her TPP Agreement, and continued to try to have the sale cancelled. Fox Aff., ¶¶ 13, 15, 16, 24. Despite Ms. Fox's compliance with the TPP Agreement, BAC has continued to reschedule the foreclosure sale, setting dates in March, April, June and August 2010. Fox Aff., ¶¶ 25-26; FAC, ¶¶ 122-123. On multiple occasions, realtors have arrived at Ms. Fox's home to show it to potential buyers. Fox. Aff. ¶ 27. Ms. Fox suffers from nightmares and worries every time she leaves the house that she will return to find strangers inside, preparing to purchase it. *Id.* at 29.

The first two foreclosure sales were scheduled by BAC *during* the three month period covered in Ms. Fox's TPP Agreement. The second two sales were scheduled before BAC sent Ms. Fox any notice that it considered her ineligible for HAMP. Fox Aff., ¶28. BAC's stated reason for denying Ms. Fox a HAMP modification was that she failed the NPV test. However, this determination is in error, since at the time BAC determined that it had all of the needed documents and offered Ms. Fox a TPP Agreement in October, 2009, it necessarily determined that her loan modification passed the NPV test. Wyatt Report at 7. Ms. Fox's income has not changed since then, and her representations made to BAC at that time continue to be true. Fox

Aff. ¶ 16.

As a result of BAC's failure to honor its TPP Agreement, Ms. Fox is at imminent risk of losing her home, despite BAC's determination that she was eligible for a Home Affordable Modification, and her compliance with her TPP Agreement.

**2.      Ms. Fox's Experience With BAC Is Common**

As described more fully in Plaintiffs' memorandum in support of their Motion for Provisional Class Certification and the expert report of Christopher Wyatt, hundreds of Massachusetts' borrowers are in immediate need of the injunctive relief Ms. Fox seeks. Wyatt Report at 17. Like Ms. Fox, these borrowers have mortgage loans serviced by BAC. They applied for HAMP loan modifications and were determined eligible, a process that included screening for eligibility, application of the waterfall and a positive NPV test, before being offered TPP Agreements. Wyatt Report at 7-8. Despite borrowers' compliance with their TPP Agreements, BAC failed to honor its promise to provide them Home Affordable Modifications on the Modification Effective Dates specified in each borrower's TPP Agreement. Many of these homeowners, like Ms. Fox, are at imminent risk of foreclosure, despite the fact that Servicers are not supposed to proceed to a foreclosure sale during the Trial Period or before determining a borrowers eligibility for HAMP. Wyatt Report at 9, 17-18.

As further evidence of the common circumstances of many Massachusetts borrowers, Counsel have filed affidavits from four additional borrowers who are not named plaintiffs is this action, but who are in circumstances similar to Ms. Fox's, described below. *See* Affidavits of Fredric Marino, Brian Tirrell, Denis Ingham and Eleanor Murphy, and Kimberly and Noel Ayers attached as Exhibits 2-6 to Delbaum Decl..[5] All these borrowers were found eligible for HAMP

---

[5] Each of these individuals is willing to participate in the case as a named representative if the Court considers it necessary for the purpose of the Motion for Preliminary Injunction or the Motion for Provisional Class Certification.

and entered into TPP Agreements with BAC.  Marino Aff. ¶ 8 (TPP Agreement accepted in July, 2009); Ingham/Murphy Aff. ¶ 9 (TPP Agreement accepted in September, 2009); Tirrell Aff. ¶ 8 (TPP Agreement accepted in August, 2009); Ayers Decl. ¶ 6 (TPP Agreement accepted in November, 2009).  Despite complying with the terms of their TPP Agreements, none of them have received Home Affordable Modifications, either on the Modification Effective Dates specified in their TPP Agreements or thereafter.  Marino Aff. ¶ 28; Ingham/Murphy Aff. ¶ 29; Tirrell Aff. ¶ 22; Ayers Decl. ¶ 11.  They all now face threats of foreclosure, as detailed below.

At the time Mr. Marino entered into his TPP Agreement, BAC determined that he was eligible for HAMP, which included determining that his monthly housing expenses were more than 31% of his gross monthly income.  Wyatt Report at 5, 7.  Mr. Marino has responded to every document request made by BAC and has provided BAC with evidence that his pre-modification monthly housing expenses continue to be more than 31% of his gross monthly income.  *Id*. at ¶¶ 9, 13-15, 25.  However, more than eleven months after Mr. Marino started his trial period, BAC denied him a Home Affordable Modification on the basis that his monthly payment ratio was less than 31%.  *Id*. at 16.  BAC caused a foreclosure sale on Mr. Marino's home to be scheduled for September 3, 2010.  *Id*. at ¶ 22.  From August 5 to September 2, 2010, Mr. Marino and his attorney attempted to have the sale canceled or postponed without success.  *Id*. at ¶¶ 24-26.  Finally, on September 2, 2010, Counsel received a communication from Defendant's Counsel that the sale has been postponed until September 30, 2010. Delbaum Decl. at ¶ 9.

Despite debiting all monthly payments directly from the borrowers' bank account, BAC has repeatedly told Mr. Ingham and Ms. Murphy that they have missed a payment due under the TPP Agreement and are therefore ineligible for HAMP.  Ingham/Murphy Aff. ¶¶ 16, 17, 19.  Mr.

Ingham and Ms. Murphy have *not* missed any payments, a fact which has been acknowledged by BAC personnel on several occasions. *Id*. at ¶¶ 18, 22. Mr. Tirell's situation is similar. Despite the fact that he made all his payments, BAC denied Mr. Tirrell's HAMP eligibility on the basis of a missed TPP payment. Tirrell Aff. at ¶ 16. BAC personnel acknowledged that this was a mistake. *Id*. However, neither household has received a Home Affordable Modification, more than eleven months after the start of their respective Trial Periods. Ingham/Murphy Aff. ¶ 29; Tirrell Aff. at ¶ 23. Both have received threats of foreclosure. Ingham/Murphy Aff. ¶ 28; Tirrell Aff. at ¶ 18. BAC has set a deadline of September 24, 2010 for Mr. Ingham and Ms. Murphy to bring their loan current or face foreclosure. *Id*.

The Ayers provided information verifying their financial circumstances to BAC before BAC offered them a TPP Agreement. Ayers Decl. ¶ 4. BAC asked for additional documentation three times during the Ayers' TPP. Each time, the Ayers have gone to their local Bank of America branch and faxed the requested documentation. *Id.* at ¶ 9. Nevertheless, more than ten months after they entered into the TPP Agreement, the Ayers were told by BAC personnel that they would not receive a Home Affordable Modification because they were missing documents. *Id*. at ¶ 13. BAC has initiated foreclosure proceedings against the Ayers, which will proceed unless the Ayers pay $11,000, which they cannot afford to do. *Id.* at ¶ 14.

### III. LEGAL STANDARD

The U.S. Supreme Court has explained that, "[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 507 (1959); *see also*, *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). The Court must consider all four factors - likelihood of success, irreparable harm, balance of the harms and public interest - in deciding the appropriateness of injunctive relief. *Air Line Pilots Ass'n, Intern. v. Guilford Transp. Industries,*

*Inc*., 399 F.3d 89, 95 (1st Cir. 2005). "In assessing motions for a preliminary injunction, the First Circuit has adopted a 'sliding scale' approach...," that requires balancing of the likelihood of success on the merits and degree of irreparable harm. *See*, *Savin Corp. v. Rayne*, 2001 WL 3815751, at *3 (D. Mass. Mar. 26, 2001)(*citing*, *EEOC v. Astra USA, Inc.*, 94 F.3d 738, 743 (1st Cir. 1996).

Preliminary injunctive relief can flow to a class. *See e.g., Kozinski v. Schmidt*, 409 F. Supp. 215 (E.D. Wis. 1976) (granting preliminary injunctive relief for a class of individuals threatened with loss of heat, utilities, and shelter); *Buckles v. Weinberger*, 387 F. Supp. 328 (E.D. Pa. 1974) (granting preliminary injunctive relief to a class threatened with termination of disability benefits); *Brown v. Guiliani*, 158 F.R.D. 251 (E.D.N.Y. 1994) (granting preliminary injunctive relief to a class to ensure timely receipt of public assistance benefits); *In re Ameriquest Mortgage Co. Mortgage Lending Practices Litigation*, 2006 WL 1525661 (N.D. Ill. May 30, 2006) (granting interim injunctive relief to a class of borrowers requiring Defendant to provide notice of possible Truth In Lending Act rescission rights).

## IV. ARGUMENT

### 1.   Plaintiffs Are Likely To Succeed On The Merits

In their complaint, Plaintiffs have set forth several meritorious claims based on BAC's conduct, including breach of contract, violation of M.G.L. c. 93A and its applicable regulations, promissory estoppel and breach of the implied covenant of good faith and fair dealing. FAC ¶¶ 175-185 (breach of contract), ¶¶186-191 (good faith and fair dealing), ¶¶192-198 (promissory estoppel), ¶¶199-205 (M.G.L. c. 93A).[6] The factual circumstances supporting these claims are common to the provisional class, as shown by the Affidavits and report being filed herewith.

### A.    Plaintiffs Will Likely Succeed On Their Breach Of Contract Claim

---

[6] Plaintiffs incorporate herein the arguments set forth in their Response to Defendant's Motion to Dismiss [Docket No. 13].

9

To show breach of contract under Massachusetts law, a plaintiff must demonstrate that the parties had a contract supported by valid consideration that the defendant breached, causing damage to the plaintiff. *City of Revere v. Boston/Logan Airport Associates, LLC.*, 443 F.Supp.2d 121, 126 (D. Mass. 2006).

> ### i.       The TPP Agreements Are Complete, Enforceable Contracts Supported By Consideration

The TPP Agreement contains all of the elements of an enforceable contract. Massachusetts courts consider a contract's language, the circumstances surrounding its formation, its purposes, any technical meaning words used may have had to the parties and any documents it expressly incorporates to determine whether it is valid and enforceable. *United States. v. Boston Scientific Corp.*, 167 F. Supp. 2d 424, 432 (D. Mass. 2001). A contract is enforceable even if certain terms are left to be fixed at a later date or determined based on later events "and the need for further documents does not preclude the formation of a binding agreement." *Targus Group Intern., Inc. v. Sherman*, 76 Mass. App. Ct. 421, 429 (2010).

Here, the terms of the TPP Agreement between Ms. Fox and BAC are unequivocal. The TPP Agreement makes clear that the terms of the permanent modification are to be determined using the mathematical formulas provided for in the HAMP Program Documentation.

The very first sentence of the TPP Agreement provides:

> If I am in compliance with this Trial Period Plan…, then the Servicer will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3.

FAC, Ex. 10 at 1. One of the few courts to address HAMP issues so far has recognized the binding nature of this language. *See, Williams v. Geithner*, Civil No. 09-1959 ADM/JJG, 2009

WL 3757380, at *3 (D. Minn. Nov. 9, 2009)[7] (*citing*, the Treasury's Guidelines which state, "[i]f the loan qualifies for a modification after consideration of all [necessary] factors, the servicer is obligated to provide a trial period loan modification." (citation omitted). "If the borrower remains current throughout the trial period, the servicer must then provide a loan modification." (citation omitted)).

The "Home Affordable Modification Agreement" referred to in the TPP Agreement is not generic language; the term has technical meaning, supplied by the HAMP Program Documentation. The Court may look to HAMP and its Supplemental Directives as extrinsic sources providing meaning to the contractual terms agreed to by the parties. *See United States v. President and Fellows of Harvard College*, 323 F. Supp.2d 151, 172 (D. Mass. 2004). In this instance, the precise terms of the promised permanent modification – including the interest rate, repayment term and principal balance – are ascertainable by operation of the HAMP "waterfall" formula that is designed to reduce the monthly payment to 31% of the borrower's monthly gross income. *See* FAC, Ex. 2 at 8-10; Wyatt Report at 7-8. The time for performance is also specified, since the Modification Effective Date is defined as "the first day of the month following the month in which the last Trial Period Payment is due" (*see e.g.*, FAC, Ex. 10 at 2).

Decades of Massachusetts court decisions confirm the conclusion that the TPP Agreements are complete, addressing all of the parties' duties and obligations, and therefore are enforceable contracts. "The courts… are slow to turn a plaintiff out of court for the reason that the promise given and relied on was so vague that it can be given no effect." *Weiner v. Pictorial Paper Package Corp.*, 303 Mass. 123 (1939). *See also George W. Wilcox, Inc. v. Shell Eastern Petroleum Products*, 283 Mass. 383, 388 (1933) (finding that for a contract to be enforceable, the

---

[7] Although the *Williams* Court ultimately denied Plaintiffs' motion for preliminary injunction, it did so only after a finding on the likelihood of success prong, decided on claims entirely different from those present here.

terms need only be set out "with sufficient definiteness and clarity that a court, by interpretation with the aid of existing and contemplated circumstances, may enforce it.").

Although the argument is not raised in Defendant's Motion to Dismiss, it should be noted that the TPP Agreement is supported by consideration.  The requirement of consideration is satisfied if there is either a benefit to the promisor or a detriment to the promisee. *Fall River Housing Joint Tenants Council, Inc. v. Fall River Housing Authority*, 15 Mass. App. Ct. 992, 993 (1983) (citing Restatement (Second) of Contracts § 73, Cmt. b (1979)). The law is not concerned with the adequacy of the consideration, as long as it is "valuable." *V. & F.W. Filoon Co. v. Whittaker Corp.*, 12 Mass. App. Ct. 932, 933 (1981).

Plaintiffs made payments required by their TPP Agreements in an amount and manner different from that required by their pre-existing loan documents. Borrowers' payments under TPP Agreements are less than their full monthly mortgage payments, but none of their indebtedness is forgiven, and their liability is actually increased by the accrual of interest, fees and charges.  Wyatt Report at 7-8, 17-18.  Plaintiffs' payments in specific amounts requested by BAC and differing from their prior obligations (without any reduction in the amount of the debt) satisfies the requirement of consideration.  Such mutual promises to alter the timing and conditions of payment of a debt constitute consideration.  *See* Restatement (Second) of Contracts § 73 ("[P]erformance [of a legal duty] is consideration if it differs from what was required by the duty in a way which reflects more than a pretense of bargain."); Williston, *supra*, §7:27 ("If a debtor does something more or different in character from that which it was legally bound to do, it will constitute consideration for the promise.").

Plaintiffs also complied with the other terms of their TPP Agreements, by providing extensive financial information, making binding representations concerning their personal

circumstances and agreeing to undergo credit counseling, all of which actions were requested by BAC and none of which were pre-existing legal obligations.  These actions also are sufficient to establish consideration for BAC's promises to provide a Home Affordable Modification.  "[I]t is a sufficient *legal* detriment to the promisee if it promises or performs any act, regardless of how slight or inconvenient, which it is not obligated to promise or perform so long as it does so at the request of the promisor and in exchange for the promise." Samuel Williston, *A Treatise on the Law of Contracts* §7:4 (4th ed. 2008) (emphasis in original); *accord Wit v. Commercial Hotel Co.*, 253 Mass. 564, 572 (1925).

### ii.     *Plaintiffs Have Suffered Damages As A Result Of BAC's Breach*

The harm resulting from BAC's breach is easy to see - had BAC performed under the TPP Agreements, Plaintiffs' loan documents permanently would have been altered to reflect the terms of a Home Affordable Modification, effective the first day of the month following the three-month TPP period. FAC, Ex. 10; Wyatt Report at 8-9. Upon modification of their loan documents, Plaintiffs no longer would have been in default of their mortgage obligations (which they necessarily was during the trial period), all existing arrearages would have been capitalized, late fees would have been forgiven and Plaintiffs would have had affordable monthly payment amounts going forward. Each month that BAC failed to perform its obligation under the TPP Agreements, Plaintiffs accrued greater default and foreclosure related fees and charges, were forced further into delinquency on their mortgages, were in default for a longer periods of time, and became at a heightened risk of losing their homes to foreclosure. In addition, Plaintiffs' credit is harmed by the extended period of default. These consequences are the natural result of BAC's breaches.

In addition, had BAC performed, Plaintiffs would not have been subjected to the additional foreclosure-related activity during the period after their permanent modifications would have

become effective.  Wyatt Report at 17.  They would not have incurred the foreclosure-related fees and costs that they are now required to pay to cure their defaults.  Indeed, BAC's practice of repeatedly scheduling, postponing and rescheduling foreclosure sales results in even higher foreclosure-related costs to Plaintiffs than would a single scheduled sale.  *Id.*  They have lost opportunities to pursue other means of avoiding foreclosure. These lost opportunities are not speculative.  *Cf. Don v. Soo Hoo*, 75 Mass.App.Ct. 80 (2009) (affirming jury award of damages for damages for lost opportunity to obtain a bankruptcy discharge).

### B.    Plaintiffs Are Likely To Succeed On Their Promissory Estoppel Claim

Even if the Court finds that the TPP Agreement does not constitute a binding contract, Plaintiffs are likely to prevail on their promissory estoppel theory.  "Courts typically invoke the doctrine of promissory estoppel when the formal requirements of contract formation are absent and when enforcing the promise would serve the interests of justice." *Steinke v. Sungard Fin. Sys.,* 121 F.3d 763, 776 (1st Cir. 1997).

Absent enforcement of BAC's promises, Plaintiffs will have spent time, money and resources under TPP Agreements in vain - without ultimately receiving a Home Affordable Modification.  By making all of the payments and otherwise complying with their TPP Agreements, Plaintiffs relied on BAC's promises to permanently modify their loans to their detriment - they spent money that they could have reserved for other uses, such as payment to a bankruptcy attorney to avoid foreclosure or a down payment for a rental unit if they are unable to avoid foreclosure. BAC has also made the option of a short sale less attainable since Plaintiffs are now further in arrears than when they began their TPP Agreements.

### C.    Plaintiffs Are Also Likely to Succeed on Their 93A Claim

It is also highly likely that Plaintiffs will prevail on their claims that BAC's conduct in the loan modification process was unfair and deceptive under M.G.L. 93A and its applicable

regulations. As an initial matter, injunctive relief is expressly available under M.G.L. c. 93A, § 9: "[a]ny person…who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two or any rule or regulation issued thereunder…may bring an action in the superior court…for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper."

"Chapter 93A is a broad remedial statute, creating new substantive rights." *Ciardi v. Hoffmann-LaRoche, LTD,* No. 993244, 2000 WL 33162197 at *4 (Mass. Super. Ct. Sept. 29, 2000). As this Court has recognized:

> To be held unfair and deceptive under c. 93A, practices involving even worldly-wise business people do not have to attain the antiheroic proportions of immoral, unethical, oppressive or unscrupulous conduct, but need only be within any recognized or established common law or statutory concept of unfairness. (citation omitted) An act or practice may be 'unfair' within the statutory meaning [of Mass. Gen. Laws ch. 93A, §§ 2 and 11] without being deceptive or fraudulent. (citation omitted)

*FundQuest Inc. v. Travelers Cas. & Sur. Co.*, Civil Action No. 09-11471-RGS, 2010 WL 2223301, at *5 (D. Mass. Jun. 4, 2010) (Stearns, J.).

Among other acts, the Attorney General has decreed that conduct contrary to public policy in the field of consumer lending violates Chapter 93A. *See* 940 C.M.R. § 3.16. Likewise, conduct that violates the requirement of good faith and fair dealing applicable to contracts is unfair and deceptive under 93A, as are deceptive representations and the failure to disclose relevant information relating to loan modifications offered to borrowers. *Id.*; 940 C.M.R. § 3.05. Under 940 C.M.R. § 25.01, failure to adequately describe foreclosure-related services and how they will assist a borrower in avoiding foreclosure is an unfair and deceptive act.

BAC has engaged in all of this misconduct among other bad acts, by failing to offer Plaintiffs Home Affordable Modifications when they complied with their TPP Agreements. BAC

also violated 93A by stringing Plaintiffs along when they should have received a Home Affordable Modification the month after they made their last Trial Plan Payment, by repeatedly asking for income documentation they have already provided and by failing to respond to their inquiries. Most egregiously, BAC acted unfairly and deceptively when it repeatedly scheduled foreclosure sales on Ms. Fox's and others' homes when they otherwise would have been able to avoid foreclosure had they received the Home Affordable Modification to which they were entitled.

     **D.**     **Plaintiffs Are Likely to Succeed on Their Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing**

"Every contract implies good faith and fair dealing between the parties to it. The covenant of good faith and fair dealing requires that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract." *T.W. Nickerson, Inc. v. Fleet Nat. Bank*, 456 Mass. 562, 569-570 (2010) (internal quotations and citations omitted). The "essential inquiry" when determining whether a party to a contract has breached the covenant of good faith and fair dealing is to consider whether "the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain." *Speakman v. Allmerica Financial Life Ins.*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005). A claim for breach of the covenant of good faith and fair dealing does not require a showing of bad faith. *Liss v. Studeny*, 450 Mass. 473, 477 & n.3 (2008) (citing *Nile v. Nile*, 432 Mass. 390, 398-399 (2000)).

     BAC, by its actions, has made it extremely difficult for Plaintiffs and others to secure the benefits of their TPP Agreements. BAC undermines borrowers' ability to satisfy the requirement to make payments by making (admitted) mistakes in accounting. *See, e.g.,* Tirrell Aff. ¶ 13; Ingham/Murphy Decl. ¶¶ 18, 22. BAC similarly undermines borrowers' ability

provide income verification by mishandling documents, repeatedly requesting documents it had already received, and giving conflicting and confusing instructions to borrowers. *See, e.g,* Fox Aff. ¶ 7 (explaining that it took over 4 months to provide BAC with everything it claimed it needed to consider her for HAMP); Wyatt Report at 15 ("BAC in its written testimony [to Congress] indicated that it lacked an adequate document control system to ensure that homeowner documentation submitted was appropriately maintained in its records"). Much of BAC's failure stems from its wholly inadequate staffing and training. Wyatt Report at 15 ("[A] BAC credit loss mitigation executive acknowledged in June 2010 that BAC's plan to address the Treasury Department's conversion campaign was not adequate.").

BAC's behavior very clearly breaches the covenant of good faith and fair dealing. *See, e.g., Tufankjian v. Rockland Trust Co.* 57 Mass.App.Ct. 173, 178-179 (2003) (finding that bank which agreed to provide financing for auto-dealership violated the covenant of good faith and fair dealing by "conducting itself in a manner at odds" with borrower by, *inter alia*, failing to complete appraisal on time and using a more expensive appraiser.); *Restatement (Second) Contracts* §205 (examples of breach of the covenant of good faith and fair dealing include "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.").

## 2.   **Absent Injunctive Relief, Plaintiffs Have No Adequate Remedy At Law And Will Suffer Irreparable Harm**

Irreparable injury and no adequate remedy at law are demonstrable here. "As a general rule, interference with the enjoyment or possession of land is considered 'irreparable' since land is viewed as a unique commodity for which monetary compensation is an inadequate substitute." *Shammas v. Merchants Nat'l Bank*, 1990 U.S. Dist. LEXIS 19334, *14 (D. Mass. 1990); *See*

17

*also*, *United Church of Medical Center v. Medical Center Com.*, 689 F.2d 693, 701(7th Cir. 1982) ("It is settled beyond the need for citation…that a given piece of property is considered to be unique, and its loss is always an irreparable injury.").  If Plaintiffs lost their homes at a foreclosure auction to a third party bidder, there would be nothing that the Court could do later to fully compensate them for the injury they suffered by loss of their unique properties.

**3.**     **The Balance Of Harm Weighs In Plaintiffs' Favor**

The harm Plaintiffs would suffer should BAC foreclose on their homes during the pendency of this case far outweighs any harm to BAC that may be caused by allowing injunctive relief. Absent injunctive relief, Plaintiffs are faced with having to pay tens of thousands of dollars to cure their delinquencies and, if they cannot, they will lose their homes.

BAC, on the other hand, is adequately protected because Plaintiffs' mortgage loans are secured. Many borrowers are also continuing to make payments even though they have completed their TPP Agreements. Ms. Fox is able and willing to continue making payments to BAC, although BAC has refused to accept payments for the last three months. Fox Aff. ¶ 14.  In circumstances like these, the Court has discretion to determine that an injunction bond under Fed. R. Civ. P. 65 is unnecessary, because there is limited risk of monetary loss to the party enjoined. *Aoude v. Mobil Oil Corp.,* 862 F. 2d 890 (1st Cir. 1988).

Indeed, BAC believed it would benefit from the Home Affordable Modifications, or it would not have offered TPP Agreements to Plaintiffs in the first instance.  After performing the NPV test, BAC determined that the present value of the payment stream from their loans would be higher if the loans were modified according to the HAMP waterfall, than if they were not. "The NPV is essentially an accounting calculation to determine whether it is more profitable to modify the loan or allow the loan to go into foreclosure." *Williams v. Geithner,* 2009 U.S. Dist. LEXIS 104096 at *8-9 n.3 (D. Minn. Nov. 9, 2009).  Plaintiffs performed and their financial

18

circumstances did not materially change. Thus, BAC should be better off receiving the payment stream than proceeding to foreclosure.

The other relief sought herein, requiring BAC to immediately notify class members of the pendency of this action, would impose a minor ministerial task on BAC that is far less burdensome than it would be for borrowers to remain unaware that this proceeding may permit them to receive Home Affordable Modifications and avoid foreclosure.

**4.**    **The Requested Injunction Will Serve The Public Interest**

The injunctive relief Ms. Fox seeks correlates with the strong public interest in avoiding foreclosures. Countless studies, news articles and research discuss the dire consequences of foreclosures - especially on the massive scale on which they are happening today. Wyatt Report at 3-4. Research demonstrates that foreclosure actually makes people sick, in addition to losing their homes and shelter; it exacerbates depression and other illnesses and also creates financial stresses that cause people to forego paying for needed healthcare and medication.  Mary Pilon, *Home Foreclosures and Depression*, Wall Street Journal "The Wallet" Blog, Aug. 25, 2010 (available at http://blogs.wsj.com/wallet/2009/08/25/home-foreclosures-and-depression/).   In addition to the effect on individuals and families, foreclosures destroy communities, contribute to an increase in crime rates, homelessness and decrease cities' and towns' tax revenue. These problems are exacerbated by the current economic downturn generated by decreasing housing values.

Further, injunctive relief would serve the public purposes embodied in the Obama Administration's recent pronouncements and initiatives regarding the importance of turning trial plans into permanent loan modifications. In November 2009, the Chief of Treasury's Homeownership Preservation Office and other officials announced a "Mortgage Modification

Conversion Drive."[8]    According to David Stevens, the HUD Assistant Secretary for Housing and FHA Commissioner, the "top priority," is "[e]ncouraging borrowers to move through the process of converting trial modifications to permanent modifications."[9]  Despite these efforts, servicer performance continues to be lackluster.  The Government Accountability Office, in its most recent review of HAMP, recommended that Treasury "issue consequences for servicer noncompliance with HAMP requirements as soon as possible."[10]

These initiatives and public statements recognize the failure of servicers to comply with HAMP. The federal government is expending vast amounts of time and money to ensure unnecessary foreclosures like Ms. Fox's are avoided. The injunctive relief Ms. Fox seeks on her own behalf and on behalf of the provisional class is directly in line with this current and compelling public policy.

## V. CONCLUSION

For the foregoing reasons, Ms. Fox respectfully requests that this Court grant her request for injunctive relief for herself, the Plaintiffs and the putative provisional class. The injunction, if entered, will preserve the *status quo*. Ms. Fox requests that the Court set a hearing at the earliest possible date on this Motion.

Respectfully submitted,
Carmen Fox,
By her attorneys,

*/s/ Charles Delbaum*
Stuart Rossman (BBO 430640)
Charles Delbaum (BBO 543225)

---

[8] MakingHomeAffordable.gov, Press Release: Obama Administration Kicks Off Mortgage Modification Conversion Drive (November 30, 2009), *available at* http://makinghomeaffordable.gov/pr_11302009.html (last visited August 20, 2010).
[9] *Id*.
[10] U.S. Government Accountability Office, Troubled Asset Relief Program:
Further Actions Needed to Fully and Equitably Implement Foreclosure Mitigation Programs, GAO-10-634, p. 47, (June 2010).

NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th floor
Boston, MA 02110
Tel: (617) 542-8010
Fax: (617) 542-8028

Gary Klein (BBO 560769)
Shennan Kavanagh (BBO 655174)
Kevin Costello (BBO 669100)
RODDY KLEIN & RYAN
727 Atlantic Avenue
Boston, MA  02111-2810
Tel:  (617) 357-5500
Fax:  (617) 357-5030

Michael Raabe (BBO 546107)
NEIGHBORHOOD LEGAL SERVICES
170 Common Street, Suite 300
Lawrence, MA 01840
Tel:  (978) 686-6900
Fax:  (978) 685-2933

Dated: September 7, 2010

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF) and paper copies will be sent to those indicated as non-registered participants on September 7, 2010.

*/s/ Charles Delbaum*
Charles Delbaum