# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| ) | |
| DOREEN EDWARDS, et al., ) | |
| ) | |
| Plaintiffs. ) | |
| ) | |
| ) | Case No: 09-CV-02100 |
| v. ) | Judge Henry H. Kennedy, Jr. |
| ) | |
| ) | |
| AURORA LOAN SERVICES, LLC, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| _____) | |

## DECLARATION OF LAURIE A. MAGGIANO

I, Laurie A. Maggiano, hereby affirm the following as my testimony in the above-captioned case:

1.      I have been employed as Director of Policy for the Homeowner Preservation Office ("HPO") of the United States Department of the Treasury ("Treasury") from May 10, 2009 to the present.  In this position, I am responsible for development of policy for the Making Home Affordable ("MHA") Program, which includes the Home Affordable Modification Program ("HAMP").  Prior to formal employment by the Department, I was detailed to Treasury by my former employer, the United States Department of Housing and Urban Development ("HUD") to assist with development of a nationwide foreclosure prevention program that subsequently became MHA.  Previously, I worked for HUD in the Office of Single Family Asset Management for 10 years.  In that capacity I was one of the primary policy architects of the FHA Loss Mitigation Program.  Preceding government service I had a 20-year career in the mortgage and real estate industry that included work at Freddie Mac as Director of

Real Estate, four years of consulting and training for Neighborworks America, and senior level residential and commercial asset management positions with two savings banks.  Accordingly, I have personal knowledge of the facts herein.

### The Role of the Homeownership Preservation Office

2.      The Treasury Department's Homeownership Preservation Office is part of the Office of Financial Stability ("OFS").  OFS is an office within the Office of Domestic Finance at the Department of Treasury.  OFS was created by Treasury pursuant to the Emergency Economic Stabilization Act of 2008 ("EESA"), which is the implementing statute for the Troubled Asset Relief Program ("TARP"), and is responsible for implementing programs paid for by TARP expenditures.  HPO is responsible for implementation of HAMP, which is a $75 billion program (of which $50 billion is provided from TARP funds).  In this effort, HPO works closely with housing specialists and senior policy makers from the Treasury as well as other Federal Agencies including HUD, the Federal Housing Finance Agency, the Federal Deposit Insurance Corporation, the Federal Reserve Board of Governors, the Office of Comptroller of the Currency, and the Office of Thrift Supervision, as well as mortgage industry organizations, housing counselors and consumer advocacy groups to create programs that will help borrowers at risk of foreclosure maintain homeownership.

### General Framework of the Home Affordable Modification Plan

3.      On February 18, 2009, President Obama and Secretary Geithner announced the Making Home Affordable Program, a comprehensive plan to stabilize the U.S. housing market, support low interest rates, and offer assistance to millions of homeowners by reducing mortgage payments and preventing avoidable foreclosures.  MHA includes three key parts:  (1) broad support for the Government-Sponsored Entities ("GSEs") to support mortgage refinancing and

affordability across the market, including continued support for market liquidity; (2) increased refinancing flexibilities for the GSEs, including the Home Affordable Refinance Program, providing the opportunity for refinancing of loans up to 125 percent loan-to-value ratio; and (3) HAMP, a $75 billion program to lower monthly mortgage payments for up to 3 to 4 million borrowers over 3 years and prevent avoidable foreclosures.

4.      On March 4, 2009, just two weeks after the February 18 announcement of MHA, Treasury issued guidelines for HAMP and authorized servicers to begin modifications immediately. HAMP has very specific eligibility criteria. To be eligible for HAMP, a borrower must meet, among other things, the following requirements:

(a)      the related property must have an unpaid principal balance less than the GSE conforming loan limit of $729,750;

(b)      the related property must be an owner-occupied principal residence (not investor-owned);

(c)      the related loan must have been originated on or before January 1, 2009;

(d)      the related borrower's mortgage-related debt-to-income ratio must be greater than 31 percent; and

(e)      the related borrower must have a financial hardship that puts them in imminent default, or they must already be in default.

Once a borrower meets the criteria (a) through (e) above, the loan must test positive under Treasury's net present value test in order for the loan to qualify for a modification. If the loan receives a negative net present value, it does not automatically qualify for a HAMP modification; however, a servicer may, at its sole discretion and with the approval of the related

owner/investor, complete a HAMP modification on a loan with a negative net present value and that modification will be eligible for incentives under HAMP.

5.      The March 4 guidelines outlined a standard for the industry to follow in modifying mortgages to make them affordable and sustainable.  Following release of the guidelines, Treasury began a number of actions to implement the program and facilitate the ability of servicers to participate and ramp up the pace of modifications as quickly as possible. These implementation steps included:  (1) entering into formal contracts on February 18, 2009, with Fannie Mae, as financial agent, and Freddie Mac, as compliance agent, to administer the program; (2) publishing servicer participation agreements, to formalize and legally document obligations of servicers under the HAMP program; (3) developing a net present value ("NPV") model that participating servicers are required to use to evaluate eligible borrowers, in order to determine if the cash flows from modification of a mortgage are greater than the cash flows if the loan is not modified (when cash flows from modification are greater, a servicer is required to modify absent contractual provisions prohibiting the modification); (4) drafting standard borrower documents including notices, disclosures, affidavits, and modification agreements; (5) developing a new data system to receive operational data from participating servicers to manage the program and calculate program incentives; (6) designing internal and external reports to track and communicate program activity; (7) designing a website for borrowers and other outreach programs to provide information and self-assessment tools to homeowners; and (8) developing training programs for a wide assortment of users with a variety of needs.

6.      The program automatically includes as participants the approximately 2,300 servicers that service loans owned or guaranteed by Fannie Mae and Freddie Mac (each, a "GSE," and together, the "GSEs").  Servicers for GSE mortgage loans which had previously

entered into an agreement with Fannie Mae or Freddie Mac to service loans on their behalf are required to participate in HAMP, and such servicers do not need to execute any new contracts to do so, as they are automatically participants in HAMP due to their pre-existing contract(s) (each a "GSE Contract") with the related GSE. *See, e.g.,* the Fannie Mae form of Mortgage Selling and Servicing Contract, at Exhibit A. Any such servicer wishing to make modifications for GSE mortgage loans would thereafter only need to follow the applicable HAMP program guidance promulgated by that GSE.[1]

7.      To modify non-GSE loans and receive incentive payments from Treasury, servicers of non-GSE loans (even those servicers already participating in HAMP for GSE loans) that desire to participate in the HAMP program must enter into an agreement with Fannie Mae as financial agent of Treasury. Under EESA, Treasury is directed to develop a foreclosure mitigation program. In addition, it is authorized to purchase "financial instruments" from "financial institutions" (each as defined in EESA). In order to comply with such EESA requirements, Fannie Mae's contracts, on behalf of Treasury, with servicers of non-GSE loans include: (i) a Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment") and (ii) a Financial Instrument (together with the Commitment, the "SPA"), each between the related servicer and Fannie Mae, acting as Treasury's financial agent. Treasury and Fannie Mae jointly developed a non-negotiable form of SPA, which servicers for non-GSE loans who wish to participate in HAMP must execute. *See, e.g.*, the SPA for Aurora Loan Services, LLC ("Aurora") at Exhibit B. The SPA document was first made publicly available on April 6, 2009, and the first servicers executed SPAs on April 13, 2009.

---

[1]      Incentive payments for modifications of GSE loans are not paid out of TARP. They are paid out of the corporate capital of the respective GSE.

8.      HAMP is built around three core concepts.  <u>First</u>, the HAMP program established

detailed guidelines for the industry to use in making loan modifications with the goal of

encouraging (but not requiring) the mortgage industry to adopt a sustainably affordable

standard, both within and outside of the HAMP program.  *See* Supplemental Directive 09-01

(April 6, 2009), attached hereto as Exhibit C.  These guidelines – known as "Supplemental

Directive 09-01" – outline the eligibility rules and servicing requirements specific to HAMP,

and in the case of GSE loans and non-GSE loans, are incorporated by reference into each of the

GSE Contracts or SPAs, respectively.[2]

9.      For example, pursuant to Supplemental Directive 09-01, mortgage servicers are

prevented from "cherry-picking" which loans to modify in a manner that might deny assistance

to borrowers at greatest risk of foreclosure.  Participating servicers are required to service all

loans in their portfolio according to HAMP guidelines, unless explicitly prohibited by the

related investor in or owner of the loan,[3] and the servicer must make reasonable efforts to obtain

waivers of any limits on participation.  *See* Supplemental Directive 09-01, at 4.  Participating

servicers are also required to evaluate every eligible loan using Treasury's NPV test.  The NPV

test compares the net present value of cash flows with modification and without modification.

If the NPV test has a positive result – which means that the owner/investor would receive a

---

[2]      Under servicing agreements in effect for both GSE and non-GSE loans prior to HAMP, a lack of industry-standard, agreed-upon guidelines limited the number of loan modifications that could be completed, even in instances where modifications would have been beneficial to all involved.  Through HAMP, Treasury hopes to increase the number of modifications industry-wide by providing standardized modification guidelines to servicers and lenders.

[3]      Many mortgage loans are held in securitizations, which are pools of loans that have been bundled and placed in a trust that issues securities in respect of the pool of loans.  Such securities are usually held by a disparate pool of investors, and the securities are typically "tranched" into senior and subordinate securities.  The related securitization agreement – generally known as a "pooling and servicing agreement" or a "PSA" – typically imposes restrictions (often severe restrictions) on modifications.  These restrictions on modifications are usually in place to protect subordinate securityholders, whose interests are more at risk from mortgage loan modifications than senior securityholders.  For HAMP purposes, the "investors" in the securitization are the holders of securities of the related securitization.

greater financial benefit if the modification is made, than if the modification is not made – then the guidelines specify that the servicer must modify the related loan.

10.     In addition, any borrower who directly asks a participating servicer for consideration for a HAMP modification must be evaluated by the related servicer. "A servicer may receive calls from current or delinquent borrowers directly inquiring about the availability of the HAMP. In that case, the servicer should work with the borrower […] to determine if the HAMP is appropriate." *See* Supplemental Directive 09-01, at 13.

11.     Moreover, Supplemental Directive 09-01 requires the temporary suspension of foreclosure proceedings to allow borrowers sufficient time to file an application for a HAMP modification: "Servicers must use reasonable efforts to contact borrowers facing foreclosure to determine their eligibility for HAMP. Participating servicers must not conduct foreclosure sales on loans previously referred to foreclosure or refer new loans to foreclosure during the 30-day period that the borrower has to submit documents evidencing an intent to accept a Trial Period Plan offer." *See Id.* at 14 ("Temporary Suspension of Foreclosure Proceedings"). To implement this requirement, participating servicers have created letters describing the HAMP modification opportunity that they mail to every borrower in their servicing portfolio whose conventional loan is 60 or more days past due, originated as an owner-occupied property, and meets the loan limit and origination date requirements of the program. *See* Sample Servicer Letter (attached hereto as Exhibit D). As of January 14, 2010, servicers report having sent more than 3,494,520 HAMP solicitation letters to borrowers.

12.     Supplemental Directive 09-01 also requires servicers to covenant that they will act "in accordance with the practices, high professional standards of care, and degree of attention used in a well-managed operation." *See* SPA (Exhibit A, Form of Financial

Instrument, 5(d)).  A well-managed mortgage servicing operation incorporates written

communication with borrowers at appropriate points, including communication of denial of a

loan modification, and it is Treasury's expectation that HAMP denial letters will be provided to

borrowers who are determined by servicers to be ineligible for the program.  *See also*

Supplemental Directive 09-01, at 18 (requiring servicers to notify borrowers that they are not

eligible for HAMP if the borrower is not eligible based on verified income, and providing that

servicers should explore other foreclosure prevention options with borrowers who do not

qualify for HAMP prior to proceeding with foreclosure action).  Servicers are also expected to

"provide the borrower with information designed to help them understand the modification

terms that are being offered and the modification process."  *See* Supplemental Directive 09-01,

at 13.  Servicers are further expected to allocate sufficient staff to effect HAMP modifications,

as well as be able to provide timely responses and resolution to borrower inquiries and

complaints.  *See Id.*, at 13.

   13. When a servicer makes a HAMP modification, the HAMP guidelines require that

the servicer provide the borrower with a three month trial period modification, before the

modification can become permanent.  The primary purposes of the trial period are to (1) give

the borrower immediately the benefit of a reduced monthly mortgage payment, while giving

that borrower three full months in which to finalize their paperwork for a final modification and

gather supporting documentation (such as proof of income) and (2) demonstrate to the servicer

and the related owner/investor that the borrower can successfully manage the reduced monthly

payment, by making each of the trial period plan monthly mortgage payments.

   14. Supplemental Directive 09-01 identifies data reporting elements that servicers

were required to submit to Treasury beginning in July and additional data elements that were

required to be reported later as systems capacity was developed to receive them. *See* SPA, Exhibit D. The Exhibit D reporting data requires servicers to include the "[r]eason loans evaluated for a modification were not modified or that trial modification was not completed." In satisfaction of this reporting requirement, Fannie Mae as program administrator began in August 2009 to update its reporting system to include Decline Reason Codes, and a new supplemental directive, Supplemental Directive 09-06 (attached hereto as Exhibit E), notifying servicers of these codes and establishing events that trigger reporting of denial codes was published on September 11, 2009.

15. Since Supplemental Directive 09-01 was released, Treasury has continued to expand HAMP and make refinements to the process and procedures (publishing Supplemental Directives 09-02 and 09-03) in order to increase the amount of potential relief to borrowers. In particular, on July 31, 2009, Treasury published Supplemental Directive 09-04, which implemented the Home Price Decline Protection Program (the "HPDP Program") that provides additional owner/investor incentives to modify mortgage loans in markets where property values continue to decline. On October 8, 2009, Treasury issued Supplemental Directive 09-07 ("SD 09-07") (attached hereto as Exhibit F) which significantly streamlined the documentation requirements for borrowers requesting consideration of a HAMP modification. The guidance also included a new Trial Period Plan Notice written in language that is clear and easy to understand. Finally, SD 09-07 included a new requirement that within thirty days of receiving a borrower's participation request and supporting documentation, servicers must notify the borrower of the status of the evaluation including whether (1) or not the borrower has been approved for a Trial Period Plan, (2) more information is required to complete the evaluation or (3) he or she has failed to qualify for trial modification. If the borrower has failed to qualify for

trial modification, the servicer must consider the borrower for another foreclosure prevention alternative.

16. On November 3, 2009, Treasury issued Supplemental Directive 09-08 ("SD 09-08") (attached hereto as Exhibit G), which explicitly requires that, effective January 1, 2010, servicers send notice to every borrower who has been evaluated for HAMP and was not offered a trial period plan or an official modification, or who is at risk of losing eligibility for HAMP because he or she failed to provide the required financial documentation. Exhibit G at 1. SD 09-08 also includes Exhibit A which provides "model clauses for borrower notices" detailing over twelve different reasons why borrowers might be denied. *Id.* at A-1-4. The model clauses illustrate the level of specificity that is deemed to be in compliance with language requirements of the program. *Id.* at A-1. In addition, if a borrower is denied because the NPV of the transaction is negative, the borrower notice must include an explanation of the NPV test and a list of the inputs used, which allows the borrower an opportunity to correct values that may impact the analysis of the borrower's eligibility. *Id.* at 2-3; A-2. The required notice also refers borrowers to the HOPE hotline which provides an avenue for borrowers to complain about improper denials and receive further explanation for their denial. *Id.* at 4.

17. This collective HAMP program guidance was never meant to replace or replicate a mortgage servicer's normal and usual servicing practices, which are detailed in the servicer's or investors' own proprietary handbooks that are generally hundreds of pages long. Indeed, Treasury did not intend for the HAMP program guidelines to replace the existing, general servicing procedures used by servicers such as co-defendant Aurora Loan Services, LLC, particularly because the Government in no respect controls this private servicer. The HAMP

program guidelines are only intended to layer on to a servicer's existing servicing procedures those requirements that are unique to HAMP modifications.

18. <u>Second</u>, the program emphasizes affordability; it is designed to reduce qualified borrowers' mortgage payments to an affordable level based on a borrowers' gross monthly income. Thus, under the program, in evaluating potentially qualified borrowers, participating servicers must attempt to reduce the borrower's first lien mortgage to a 31 percent debt-to-income ("DTI") ratio, meaning that the monthly mortgage payment should be no greater than 31 percent of the borrower's gross monthly income. To reach this payment, the servicer uses a specified sequence of steps, including a reduction in interest rate, extension of the term of the loan (if necessary), and even forbearance of principal (if necessary). A borrower's modified monthly payment of 31 percent DTI will remain in place for five years, provided the borrower remains current; and following the modification, the interest rate will step up each year to a specified cap.

19. <u>Third</u>, HAMP offers "pay for success" incentives to servicers, owner/investors and borrowers for successful modifications. This aligns the incentives of market participants and ensures efficient expenditure of taxpayer dollars. HAMP is a voluntary program for servicers and investors; it was not intended to require servicers to abrogate contractual obligations or to expect investors to make modification decisions that are not economically viable. Treasury encourages voluntary participation by paying financial incentives to borrowers, servicers and investors that are sufficient to make a HAMP modification a better financial outcome for the investor and servicer. Thus, after completion of a trial period – in which the borrower who received the modification must show that he or she can make three monthly payments – servicers receive an up-front payment of $1,000 for that "successful" modification. Servicers

receive an up-front payment of $1,000 for each successful modification after completion of a trial period, [4] and "pay for success" fees of up to $1,000 per year per modification, provided the borrower remains current. Homeowners may receive up to $1,000 per year towards principal reduction for five years if they remain current and pay on time.

20.     HAMP also matches reductions in monthly payments dollar-for-dollar with the owner/investor of the related mortgage loan from 38 percent to 31 percent DTI. This requires the owner/investor to first, take all of the loss in reducing the borrower payment down to a 38 percent DTI, holding owners/investors – who are frequently the initial lenders – accountable for unaffordable loans they may have extended or purchased. Only after such owner/investor takes any such initial loss down to a 38 percent DTI, does the owner/investor then share on a 50%/50% basis any remaining loss with Treasury, until the DTI has been reduced to 31 percent DTI. Also, to encourage the modification of loans that are current in their related monthly payments but are at risk of default (in other words, the borrower has not defaulted yet but the servicer reasonably believes that default is imminent), HAMP provides additional incentives to servicers and owner/investors to modify these current loans.

21.     With the launch of HAMP on March 4, 2009, organizations servicing loans owned or securitized by Fannie Mae or Freddie Mac began notifying borrowers about HAMP, evaluating borrowers who responded and provided the necessary information, and placing qualified borrowers in Trial Period Plans, the first step toward modification. Thereafter, on April 13, 2009, the first set of SPAs were signed by six servicers to modify non-GSE loans. By May 1, 2009, there were 13 servicers enrolled in HAMP, and both GSE and non-GSE trial

---

[4]     Servicers may use verbal financial information to prepare and offer a Trial Plan Period. The trial period is three months in obligation (or longer if necessary to comply with applicable contractual obligations). The borrower must be current under the terms of the Trial Period Plan at the end of the trial period and submit the required documentation to receive a permanent loan modification. *See* Suppl. Dir. 09-01 at 17.

modifications began in earnest.  As of the date of this declaration:  (a) over one-hundred

servicers have signed up for HAMP, including the five largest; (b) between non-GSE loans

covered by these servicers and loans owned or guaranteed by the GSEs, more than 85% of loans

in the country are now covered by HAMP; and (c) these participating servicers have extended

offers for more than 1,000,000 trial modifications, and more than 850,000 trial modifications

are already underway.

### Treasury is Committed to Improving and Expanding HAMP

22.     The launch of HAMP required a nearly around-the-clock, collaborative effort on

the part of Treasury, the GSEs, the FHA, the FDIC and other agencies.  As noted above, the

program was designed and implemented virtually from scratch in a matter of weeks in order to

meet the mounting crisis in the nation's housing market.  While Treasury and its counterparts

tried to develop a program that was as detailed and comprehensive as possible, they recognized

that delaying the HAMP launch in an effort to perfect every program component would result in

many more borrowers losing their homes to foreclosure.[5]  Thus, some program components –

such as detailed reporting of government monitoring data (race, sex, and ethnicity), and servicer

reporting related to borrowers who applied for but were denied a HAMP modification – were

developed as quickly as possible, but could not be developed quickly enough to allow

simultaneous release with the start of modifications under the program.

23.     The rapid deployment of HAMP also required participating mortgage servicers

to quickly make major system changes, hire and train new staff, implement new policies and

procedures, update quality control protocols, and mail thousands of solicitation letters to

borrowers at the same time they were receiving a very large volume of calls and letters from

---

[5]     For example, had Treasury delayed release of Supplemental Directive 09-01 and the SPA until the end of
July, most of the 370,000 homeowners who were offered Trial Period Plans by July 27, 2009 may not have
received timely help and many of these loans might have terminated in foreclosure.

borrowers seeking help under the program. While servicers are accustomed to resolving delinquencies through short term repayment plans and simple restructures, servicers generally do not have as part of their standard business model extensive customer service, document processing or underwriting functions necessary for large scale mortgage modifications. In order to receive incentives and participate in HAMP, the program guidelines asked servicers to fundamentally change the type of business they did and these changes continue to require a significant investment in human and financial resources.

24.     In addition, the mortgage business, and particularly mortgage modification and restructuring is a highly individualized, high-touch process. Servicers of loans in mortgage-backed securities often receive financial incentives for completing a foreclosure but not for resolving a default through a mortgage modification. The HAMP program is designed to realign incentives so that servicers and investors will be financially motivated to choose modification over foreclosure. HAMP provides servicers an up-front incentive to help cover the administrative costs of modifications, and offers "pay-for-success" incentives to the major stakeholders in the modification process.

25.     HAMP was not designed to stop every foreclosure. Many analysts predict between 6 and 10 million foreclosures over the next 3 to 4 years. HAMP was designed to be available as a modification tool for up to 3 to 4 million borrowers over a 3-year period who meet all of the eligibility criteria (*see* Supplemental Directive 09-01, at 2-3) and have sufficient monthly income to support the subsidized mortgage payment. There are a number of types of mortgages that will not, or at least might not, be modified under HAMP. First, there are mortgages that do not meet the basic eligibility criteria, such as mortgages to investors, mortgages on second homes or "jumbo" mortgages (which are mortgages over $729,750); these

will not be modified.  Second, there are mortgages that are NPV-negative, meaning that the

projected cash flow to the investor is greater without a HAMP modification than with it.  The

program cannot require that these mortgages be modified because it may violate the servicer's

fiduciary duty to the trust or owner/investor.  However, if an owner/investor agrees to allow

modification of a loan that is NPV-negative, that loan is eligible for HAMP incentives.  Third,

some securitization pooling and servicing agreements have prohibitions that either limit or

prevent servicers from offering modifications, such as a trust provision that limits the number or

percentage of mortgages in the trust that can be modified or language that requires

securityholder consent to any modification.  While HAMP may not be an option for the

borrowers described above, servicers have other loss mitigation options including other loan

modification programs that they routinely offer to borrowers that are not eligible for HAMP.  In

fact, under HAMP guidelines, servicers are required to offer alternative loss mitigation options

to borrowers that are not HAMP eligible, before referring the loan to foreclosure.  *See*

Supplemental Directive 09-01, at 13-14.

26.     By far the largest group of loans that either may not be offered HAMP

modifications, or fail to receive a successful HAMP modification despite eligibility for one, are

loans where the servicer is unable to establish contact with an otherwise HAMP-eligible

borrower or the borrower fails to follow up with the servicer and complete the modification

process.  For example, based on an evaluation of 320,000 active Trial Period Plans originated

between the inception of the program and September 1, 2009, more than 200,000 trials had not

been converted to permanent modifications, because borrowers had not provided complete

income documentation to the servicer.  HAMP trials and modifications cannot be completed

when borrowers do not respond to servicer communication or do not fully complete

documentation requirements. Treasury is seeking to reach these borrowers and increase the number of HAMP modifications through expanded outreach and improved implementation.

27.     Although HAMP has already been more successful than any previous modification program at avoiding preventable foreclosures, Treasury recognizes that challenges remain in implementing and scaling up the program. Treasury is committed to overcome those challenges and to that end, Treasury is focused on addressing three key areas: capacity, transparency, and borrower outreach.

*Expanding Servicer Capacity*

28.     Treasury continues to work with servicers to expand the number of eligible borrowers who can receive assistance through HAMP. Treasury has asked that all servicers move rapidly to expand their servicing capacity and improve the execution of loan modifications. This requires that participating servicers add more staff than they previously may have planned, expand call center capacities, provide a process for borrowers to escalate servicer performance and decisions, bolster training of representatives, enhance on-line offerings, and send additional mailings to potentially eligible borrowers.[6] In addition, Treasury and Fannie Mae have established support and guidance for servicers through a HAMP website for servicers (*https://www.hmpadmin.com*), as well as telephone and e-mail contact addresses.

29.     On July 9, 2009, as a part of the Administration's efforts to expedite implementation of HAMP, Treasury Secretary Geithner and HUD Secretary Donovan wrote to the CEOs of all of the servicers currently participating in the program (attached hereto as Exhibit H). In that joint letter, Secretaries Geithner and Donovan noted that "there appears to be substantial variation among servicers in performance and borrower experience, as well as

---

[6] Letter from Treasury Secretary Geithner and HUD Secretary Donovan to CEOs of participating servicers (July 9, 2009).

inconsistent results in converting trial modification offers into actual trial modifications." *Id.*

They called on the servicers "to devote substantially more resources" to the program in order for

it to fully succeed, and requested that the CEOs designate a senior liaison, authorized to make

decisions on behalf of the CEO, to work directly with Treasury on all aspects of HAMP, and

attend a program implementation meeting with senior Treasury and HUD officials on July 28,

2009.

30.     At the meeting on July 28, servicers committed to reaching a cumulative target

of 500,000 trial modifications by November 1, 2009 (which they actually met several weeks

ahead of schedule).  In addition, the participating servicers agreed to work with Treasury to

implement actions designed to improve program effectiveness, including the streamlining of

application documents which ultimately resulted in the publication of SD 09-07.

*Transparency and Accountability*

31.     Treasury is also focused on continued transparency and servicer accountability to

maximize the effectiveness of HAMP.  To this end, Treasury has taken three additional steps in

conjunction with the July 28 servicer liaison meeting to enhance transparency in the program.

32.     First, on July 28, 2009, Treasury asked Freddie Mac, in its role as compliance

agent for the MHA program, to develop a second look process (the "Second Look Program")

pursuant to which Freddie Mac will review a sample of loans potentially eligible for HAMP that

were not offered HAMP modifications.  The Second Look Program commenced on August 3,

2009, and is designed to evaluate the servicers' maintenance of appropriate evidence supporting

decisions not to offer HAMP modifications to borrowers.  In addition, Freddie Mac has

undertaken on-site compliance reviews (to assesses the strength of participating servicers'

processes and controls), as well as loan file reviews (to analyze servicers' rationales both for

granting and denying loan modifications).[7]  In addition, the Second Look Program is examining servicer portfolios of defaulted loans to identify eligible borrowers that should have been solicited for a modification, but were not offered a HAMP modification.[8]

33.   The Second Look Program has thus far proven effective by allowing Freddie Mac to identify and address potential issues regarding the HAMP program.  It has also encouraged participating servicers to undertake their own "second look" of those modification applications it previously declined.  For those loans where the validity of the servicer's decision not to offer HAMP cannot be validated through a file review, Freddie Mac follows up with the servicer to obtain additional information, and in the course of those communications reinforces with the servicer the requirement to forestall foreclosure sales while HAMP eligibility has not yet been determined.  Where the results of Second Look reviews indicate that additional oversight may be warranted, Freddie Mac conducts targeted on-site reviews in order to ascertain the nature and scope of any potential conditions where servicer performance under HAMP is not as expected.  In cases where Freddie Mac discovers non-compliance with HAMP, it informs non-complying servicers that they must meet the conditions of the HAMP program as laid out in the SPA and Supplemental Directives.

34.   <u>Second</u>, on August 4, Treasury began publicly reporting servicer-specific results on a monthly basis.  The most recent public report was published on January 15, 2010 (attached hereto as Exhibit I). These reports provide a transparent and public accounting of individual

---

[7]   While Freddie Mac's initial reviews were not based on statistical samples, and thus no specific conclusions can be drawn, such reviews indicated that servicers were generally in compliance with program guidelines.  To further bolster its data, in September 2009, Freddie Mac began sampling statistical samples of the substantial majority of participating servicers.

[8]   To be clear, the Second Look Program is not intended to review all mortgage loans that were declined a HAMP modification.  It only reviews a sample of declined modifications; the program is intended to focus on the servicer's processes and controls, to determine HAMP program compliance and to improve the modification process.

servicer performance by detailing the number of trial modification offers extended, the number

of trial modifications underway and the number of official modifications offered.

35.    Third, Treasury is establishing specific operational metrics to measure the

performance of each servicer with respect to customer responsiveness.  These performance

metrics include such measures as average borrower wait time in response to inquiries and

response time following receipt of completed applications.  Treasury plans to include these

metrics in its monthly public report on HAMP.

*Borrower Outreach*

36.    Treasury continues to expand the scope of its borrower outreach and education

efforts, and has committed significant resources, in partnership with servicers, to reach as many

borrowers as possible.  Treasury has taken a number of steps to achieve this goal.

37.    For example, concurrent with the March 4, 2009 launch of HAMP, Treasury

launched a new consumer focused website, *www.MakingHomeAffordable.gov*, targeted to

borrowers at risk of mortgage default.  The web site explains the program in layman's terms,

provides self-assessment tools that allow borrowers to determine if they meet the basic

eligibility requirements for consideration of modification, sets forth the information eligible

borrowers need to provide to their loan servicers for a determination if they qualify, helps

borrowers contact their servicer, and prominently announces a toll free phone number where

borrowers can seek additional help and information from HUD-approved housing counselors.

Treasury coordinated with other Federal agencies, housing counselors, servicers, and other

industry partners to link to the MHA website so that borrowers get the same consistent message

about the program whether they log on to HUD, the National Fair Housing Alliance, or Hope

Now.  The website is in both English and Spanish, and has been (along with the MHA program

itself) the subject of much print, radio, and television coverage, including a segment on the

Oprah Winfrey Show.  Since its launch, the website has had over 34 million page views.

38.     Treasury has also worked with an interagency team to establish a call center for

borrowers to reach HUD-approved housing counselors, allowing borrowers to receive direct

information and assistance in applying for the HAMP program and to escalate concerns if

borrowers believe their application was denied improperly.  Since July 2007, Treasury and

HUD have publically endorsed a nationwide foreclosure hotline – known as the "Homeowner's

HOPE™ Hotline" (888-995-HOPE) – operated by the nonprofit Homeownership Preservation

Foundation ("HPF").  One of the major considerations in Treasury's endorsement of HPF was

its status as a respected and independent nonprofit, staffed exclusively by experienced and

trained HUD-approved housing counselors, who were well suited to serving as neutral, trusted

advisors to borrowers in distress.

39.     In an effort to improve the effectiveness of the call center, Treasury instructed

Fannie Mae to work with HPF to create a borrower intake protocol specific to MHA and

HAMP. [9]  On May 19, 2009, Fannie Mae finalized a contract with HPF aimed at achieving

these goals.  Thereafter, the parties worked with Treasury to develop a call script specific to

MHA and HAMP, which was pilot tested on June 2, 2009, and fully implemented on June 22,

2009.

40.     To provide direct assistance to borrowers who have concerns or complaints

regarding how a particular servicer handled their individual case or who believe that they were

inappropriately denied a HAMP modification, Treasury instructed Fannie Mae and HPF to

---

[9]     The HPF contract requires detailed weekly reporting of the number, nature and disposition of calls
received.  The reporting tracks the number for customer concern calls, the type of concerns received and the
servicers, if applicable, that are the subject of the concerns.  This report is shared with Freddie Mac who uses the
information to assist in its overall assessment of servicer risk.  It is also used by Treasury and Fannie Mae to
identify potential policy changes or clarifications.

establish a team of specially trained counselors that can be accessed by calling the

Homeowner's HOPE hotline and asking for "MHA Help".  Once received, these calls are routed

to a trained, certified housing counselor who listen to the borrowers concerns and help the

borrower determine if the servicer was correctly following the program rules in evaluating their

application.  Thereafter, if the borrower's concern or complaint is not resolved, the counselor

will contact the borrower's servicer to further discuss the issue using proprietary points of

contact established between most major servicers and HPF.  If the borrowers' question or

concern remains unresolved after discussion with the servicer, the counselor can further escalate

the case to a designated team at Fannie Mae.  Fannie Mae representatives also have servicer

ombudsman at a more senior level who they work with to resolve both individual complaints

and "policy" or "systemic" problems.[10]

      41.     Treasury widely published the existence of the Homeowner's HOPE hotline at

nationwide public events, training seminars, and on the homepage of

*www.MakingHomeAffordable.gov*.

      42.     Moreover, Treasury is engaged in an aggressive marketing and outreach effort to

ensure that borrowers know about MHA and HAMP, and how to seek help.  Since program

inception, Treasury has partnered with HUD, Fannie Mae, and Freddie Mac (and a variety of

other sponsors depending on the market) to hold more than 20 foreclosure prevention

workshops and borrower outreach events attended by more than 22,000 borrowers in markets

hit hard by the foreclosure crisis,.  These foreclosure prevention events allow homeowners to sit

down with their servicers and include counselor training forums where representatives from

---

[10]      In addition, while Treasury and Fannie Mae were working with HPF to set up MHA Help, Fannie Mae
established a separate process for providing counselors and trusted advisors, as advocates for borrowers, a way to
resolve concerns.  Borrowers' advocates were given the option of emailing issues to support@hmpadmin.com or
calling 1-866-939-4469.  These contact points were communicated through training, public speeches and through
Frequently Asked Questions posted on the *www.MakingHomeAffordable.gov/ads* web site.

Treasury, Fannie Mae, HUD and other agencies provide information and training to local

housing counselors and non-profit groups, leveraging local resources to expand the reach of the

HAMP program.

43.     HAMP has made significant progress in reaching borrowers at risk of

foreclosure.  However, much more remains to be done and Treasury will continue to work with

other agencies, regulators, and the private sector to reach as many families as possible.  In

December 2009, as part of an intensive effort to increase the conversion rate of Trial Period

Plans to permanent modifications, Treasury imbedded "Swat Teams" comprised of Treasury

and Fannie Mae staff into the servicing facilities of the seven largest servicers.  This experience

provided an in depth look at servicing practices and operational issues that impact the efficiency

and effectiveness of HAMP.

44.     Also in December, Treasury convened a diverse working group of subject matter

experts including servicers, foreclosure and bankruptcy attorneys, consumer advocates and

banking regulators to work together over a three week period on issues related to foreclosure

suspension and bankruptcy in the HAMP program.  Using the Swat Team experience, the

Foreclosure/Bankruptcy Working Group recommendations and program performance data,

Treasury is evaluating a number of changes based on lessons learned during the first nine

months of HAMP and expects to implement a number of program improvements during the first

quarter of 2010.

45.     The goal of these additional, contemplated changes is to make it easier for

servicers to do an efficient and effective job of helping borrowers determine their eligibility for

the HAMP program, apply if eligible, and determine other loss mitigation options if they are not

eligible for HAMP.

*Program Limitations*

46.     Nevertheless, and despite all these efforts, HAMP was not designed to prevent

every foreclosure.  *See, e.g.,* Remarks by the President on the Home Mortgage Crisis (Feb. 18,

2009) at *http://www.whitehouse.gov/the_press_office/Remarks-by-the-President-on-the-*

*mortgage-crisis* ("I want to be very clear about what this plan will not do:  It will not rescue the

unscrupulous or irresponsible by throwing good taxpayer money after bad loans … it will not

reward folks who bought homes they knew from the beginning they would never be able to

afford.  So I just want to make this clear:  This plan will not save every home.") (attached hereto

as Exhibit J); and written Testimony of Assistant Secretary Michael Barr (Sept. 9, 2009) at

*http://www.treas.gov/ press/releases/tg280.htm* ("We recognize that any modification program

seeking to avoid preventable foreclosures has limits, HAMP included.  Even before the current

crisis, when home prices were climbing, there were still many hundreds of thousands of

foreclosures. Therefore, even if HAMP is a total success, we should still expect millions of

foreclosures, as President Obama noted when he launched the program in February.  Some of

these foreclosures will result from borrowers who, as investors, do not qualify for the program.

Others will occur because borrowers do not respond to our outreach.  Still others will be the

product of borrowers who bought homes well beyond what they could afford and so would be

unable to make the monthly payment even on a modified loan.") (attached hereto as Exhibit K).


*[Remainder of this page intentionally left blank]*

I declare under penalty of perjury that the foregoing is true and correct. Executed in the city of Washington, D.C. on this 22 day of January, 2010.

Laurie A. Maggiano